**PERSEPTIVE BIOSYSTEMS, INC., Plaintiff,**

v.

**PHARMACIA BIOTECH, INC., et al., Defendants.**

No. CIV. A. 93–12237–PBS.

United States District Court, D. Massachusetts.

Jan. 28, 1998.

Robert H. Stier, Jr., Todd S. Holbrook, Bernstein, Shur, Sawyer & Nelson, Portland, ME, Paul S. Veidenheimer, Hutchins, Wheeler & Dittmar, Boston, MA, Richard L. Edwards, Campbell, Campbell & Edwards, Boston, MA, for PerSeptive Biosystem.

William H. Paine, William F. Lee, Lisa Pirozzolo, Hale & Dorr, Boston, MA, John M.R. Patterson, Pennie & Edmonds, New York, NY, Paul S. Veidenheimer, Hutchins, Wheeler & Dittmar, Boston, MA, Richard L. Edwards, Campbell, Campbell & Edwards, Boston, MA, Stanton T. Lawrence, Pennie & Edmonds, Washington, DC, for Sepracor Inc.

Robert H. Stier, Jr., Bernstein, Shur, Sawyer & Nelson, Portland, ME, for Pharmacia LBK Biotechnology AB.

William H. Paine, William F. Lee, Lisa Pirozzolo, Hale & Dorr, Boston, MA, for BioSepra, Inc., Sepracor Inc.

Robert H. Stier, Jr., Todd S. Holbrook, Bernstein, Shur, Sawyer & Nelson, Portland, ME, for Pharmacia Biotech.

## MEMORANDUM AND ORDER

SARIS, District Judge.

### INTRODUCTION

Plaintiffs PerSeptive Biosystems, Inc. and Purdue Research Foundation (collectively "PerSeptive") have filed motions (1) to vacate the March 31, 1997 order on correction of patents; (2) to enter a judgment pursuant to Fed.R.Civ.P. 54(b); and (3) to withdraw the motion to correct inventorship. This flurry of motions was precipitated by a new standard articulated in a recent decision, *Stark v. Advanced Magnetics, Inc.*, 119 F.3d 1551, 43 U.S.P.Q.2d 1321 (Fed.Cir. July 11, 1997) ("*Stark*"), which fundamentally alters the legal landscape of proceedings pursuant to 35 U.S.C. § 256. After hearing, this Court must re-examine its March 31, 1997 decision under the new standard.

### PROCEDURAL BACKGROUND

As background, on January 9, 1996 this Court allowed defendants' motion for partial summary judgment. Based on the undisputed facts in the record, the Court concluded as a matter of law that, pursuant to 35 U.S.C. § 116, Frank Warner and/or Linda Lloyd were joint inventors of three patents concerning "perfusive chromatography". *See* Memorandum and Order, Jan. 9, 1996 ("*PerSeptive I*") (Attachment A to this opinion.) The Court directed PerSeptive to move to correct inventorship of the patents pursuant to 35 U.S.C. § 256 or the patents would be held invalid. Although objecting to that ruling and requesting the right to seek an interlocutory appeal on the inventorship issue, plaintiff moved to correct the inventorship. The Court held ten days of hearings on that motion. On March 31, 1997, the Court ruled that PerSeptive had not met its burden of

proving by a preponderance of the evidence that the nonjoinder was made without deceptive intent on the part of the named inventors. *See* Memorandum and Order, Mar. 31, 1997, at 131 ("*PerSeptive II* ") (Attachment B to this opinion.)

Because the Federal Circuit had not decided the proper burden of proof for the element of deceptive intent in a correction motion pursuant to § 256, that issue was starkly contested by the parties. Defendants urged the Court to put on the plaintiffs, i.e. the named inventors, the burden of proving the absence of deceptive intent on the part of the named inventors by clear and convincing evidence. The named inventors argued that the defendants were required to prove their intent by clear and convincing evidence, or, as a fallback, that if the named inventors bore the burden, they were required to prove the absence of deceptive intent only by a preponderance of the evidence. I adopted the fallback position of the plaintiffs. *Id.* at 123–25.

### DISCUSSION

#### 1. *Stark*

*Stark* holds, contrary to what the parties and the Court had assumed, that the proper focus of a Section 256 hearing is not on the intent of the named inventors. Instead, correction of inventorship under Section 256 "only requires an inquiry into the intent of the *nonjoined* inventor." *Stark*, 119 F.3d at 1552 emphasis added. Section 256 "allows complete substitution of inventors as long as the true inventors are without deceptive intent." *Id.* at 1556.

■ To the extent the defendants allege deceptive conduct on the part of the named inventors, the Court is called upon to examine that claim under the "inequitable conduct" doctrine. *Id.* at 1555–1556. Under this doctrine, defendants bear the burden of proving deceptive intent by the named inventors by clear and convincing evidence. *See Glaverbel Societe Anonyme v. Northlake Mktg. & Supply, Inc.*, 45 F.3d 1550, 1556–57 (Fed.Cir.1995) ("The factual premises of materiality and intent must be proved by clear

and convincing evidence."). As *Stark* points out, a patent may be held unenforceable under the inequitable conduct doctrine where any co-inventors have been omitted with evidence of deceptive intent on the part of the named inventors. *See* 119 F.3d at 1555–56 (citing *Burroughs Wellcome Co. v. Barr Lab., Inc.*, 40 F.3d 1223, 1226 (Fed.Cir.1994)); *see also* 35 U.S.C. § 115 (requiring that an applicant for a parent "shall make oath that he believes himself to be the original and first inventor").

■ With respect to Warner and Lloyd, the nonjoined and unnamed true co-inventors, exhaustive discovery has unearthed no hint of deceptive intent. The named inventors proffer none. Still, the straightforward, straightjacket task mandated in *Stark*—the inquiry into the intent of the nonjoined inventor(s)—is complicated by the fact that both Warner and Lloyd are probably estopped from asserting an inventorship interest, as they have received notice of these proceedings, but declined to intervene.[1] *See PerSeptive II* at 88. Accordingly, I decline to order the patents to be corrected and instead simply hold, as suggested by PerSeptive, that they are correctable—subject to the claim of estoppel—because there is no evidence of deceptive intent on the part of the nonjoined inventors.

#### 2. *Inequitable Conduct*

In light of *Stark*, the Court must reexamine the legal effect of its factual findings in *PerSeptive II* that defendants have proven by clear and convincing evidence that the named inventors made a series of misrepresentations to the United States Patent and Trademark Office ("PTO"). First, in the 117–page opinion, I concluded that the named inventors intentionally misrepresented their role in developing the perfusive particle and intentionally underplayed the role of Polymer Laboratories. Second, I concluded that defendants had demonstrated that the named inventors made four affirmative misrepresentations to the Parent Examiner regarding the timing of the invention. I

1. Polymer Labs, where these scientists worked, had settled an earlier action against PerSeptive.

fully re-adopt all factual findings in *PerSeptive II*. *See id.* at 88–122 & 125–131.

■ Even before *Stark* was decided, defendants had filed a motion for determination of inequitable conduct based on these factual findings. (Docket No. 876.) Rather than resolve this action in a piecemeal fashion, I conclude that it is both more efficient and in the interest of justice to determine whether defendants have proven by clear and convincing evidence that the named inventors engaged in inequitable conduct during prosecution of the patent by omitting co-inventors with deceptive intent, rather than to permit plaintiffs to withdraw the motion to correct inventorship. This determination would permit all issues concerning inventorship can be considered in a single appellate proceeding. While all parties envisioned the proceeding to be governed by Section 256, I see no unfair surprise in determining whether plaintiffs engaged in inequitable conduct solely with respect to the omission of inventors because this issue of deceptive intent is substantially the same issue addressed in the Section 256 proceeding under a shifted burden. Early in the Section 256 proceeding, this Court suggested that it decide the issue of inequitable conduct as well as inventorship with respect to each of the alleged misrepresentations. Plaintiffs had objected because of the late notice, and the Court declined to decide the inequitable conduct issue given its ruling on inventorship under Section 256. Now, under *Stark,* I have reconsidered that decision, in part.

■ There is no right to a jury trial on the affirmative defense of inequitable conduct, which provides relief by way of a court's equitable powers. *See Cabinet Vision v. Cabnetware,* 129 F.3d 595, 599 n. 4 (Fed.Cir.1997). A trial court may decide the issue of inequitable conduct involving "conduct-of-the-applicant in-the-PTO" in a nonjury trial before determining "infringement/validity issues." *Gardco Mfg. Inc. v. Herst Lighting Co.,* 820 F.2d 1209, 1213 (Fed.Cir.1987) (holding that a prior trial of the inequitable conduct claim is precluded only where the party seeking the jury trial shows that the factual issues relating to a legal claim for patent infringement were common with those relating to the equitable claim).

■ A conclusion of inequitable conduct requires an equitable weighing by the Court of the factual issues of intent to deceive and materiality of the alleged omissions or misrepresentations in the totality of the circumstances. *See Nobelpharma AB v. Implant Innovations, Inc.,* 129 F.3d 1463, 1474 (Fed. Cir.1997). The Federal Circuit has clearly delineated the applicable standard:

> Inequitable conduct resides in the failure to disclose material information with an intent to deceive or mislead the PTO. Once thresholds of materiality and intent have been established, the court conducts a balancing test and determines whether the scales tilt to a conclusion that 'inequitable' conduct has occurred. The more material the omission or the misrepresentation, the lower the level of intent required to establish inequitable conduct, and vice versa. . . . Direct evidence of intent or proof of deliberate scheming is rarely available in instances of inequitable conduct, but intent may be inferred from the surrounding circumstances.

*Critikon, Inc. v. Becton Dickinson Vascular Access, Inc.,* 120 F.3d 1253, 1256 (Fed.Cir. 1997) (internal citations omitted), *petition for cert. filed,* —— U.S. ——, 118 S.Ct. 1510, 140 L.Ed.2d 665 (1998). "It is axiomatic that '[c]lose cases should be resolved by disclosure [to the PTO], not unilaterally by the applicant.'" *Id.* at 1257 (quoting *LaBounty Mfg. Inc. v. United States Int'l Trade Comm'n,* 958 F.2d 1066, 1076 (Fed.Cir.1992)).

■ Intentional misrepresentations in affidavits are material as a matter of law. *See Refac Int'l, Ltd. v. Lotus Dev. Corp.,* 81 F.3d 1576, 1583 (Fed.Cir.1996) (holding that presentation of a half-truth in an affidavit submitted to the PTO was inherently material); *see also Paragon Podiatry Lab., Inc. v. KLM Lab., Inc.,* 984 F.2d 1182, 1191 (Fed. Cir.1993). Omission of a true inventor with deceptive intent is a material omission because it would involve "filing a false oath." *Stark,* 119 F.3d at 1555; *see also Sadler–Cisar, Inc. v. Commercial Sales Network, Inc.,* 786 F.Supp. 1287, 1296 (N.D.Ohio 1991)

(finding inequitable conduct in the making of a false oath regarding inventorship). Even deceptive intent by one co-inventor is sufficient to invalidate a patent. *See Stark,* 119 F.3d at 1556 ("One bad apple spoils the entire barrel."); *see also* 37 C.F.R. § 1.324 (1996).[2]

■ In re-examining the record evidence, as described in *PerSeptive II,* under this equitable balancing test, I conclude that the named inventors, particularly Professor Fred Regnier, engaged in inequitable conduct by omitting the names of Warner and/or Lloyd as co-inventors on the patent with deceptive intent, and that this omission is material as a matter of law. Accordingly, the patents are unenforceable. This is not a situation of a few instances where, in hindsight, an applicant acted with less than full candor. *See, e.g., Rohm and Haas Co. v. Brotech Corp.,* 127 F.3d 1089, 1093 (Fed.Cir.1997). For example, if this case had involved simply the deletion of the date on the Rounds chromatogram pursuant to a generally permitted practice of the PTO, a finding of inequitable conduct might be inappropriate under the totality of the circumstances, even if in hindsight this deletion reflected less than full candor. The same flexible analysis would be applied if Professor Regnier had simply failed to exercise due diligence in determining whether he used a chromatogram during the 1988 HPLC meeting to make his presentation. It is the persistent course of material misrepresentations, omissions and half-truths to the PTO that persuade me by clear and convincing evidence of deceptive intent on inventorship.

As I discussed in *PerSeptive II,* a good faith disagreement over the law of joint inventorship does not provide the basis for this ruling. Even assuming a close legal question, the Federal Circuit has made it clear that any doubts about the materiality of a that should be resolved by disclosure to the PTO, not "unilaterally by the applicant." *See Critikon,* 120 F.3d at 1257. The named in-

ventors had a duty of candor of disclosing the role of Warner and Lloyd at Polymer Labs and the work conducted jointly, and of presenting to the PTO their legal theory on joint inventorship so that the examiner could make an independent determination. A *post hoc* presentation in an *ex parte* submission to the PTO after litigation has heated up does not suffice. After balancing the materiality of the misrepresentations and omissions on a central issue—inventorship—and the evidence of deceptive intent, I conclude that defendant has met its burden of providing clear and convincing evidence of inequitable conduct based on the current record.

### 3. *Jury Claim*

PerSeptive claims that a determination of inequitable conduct by the Court deprives it of the right to a jury trial. PerSeptive claims that the Court cannot proceed to consider inequitable conduct without first having a jury determine the correct inventive entities for each of the patents. The expanded record after ten days of hearings fully buttresses my conclusion of joint inventorship as set forth in *PerSeptive I* under the standard for summary judgment set forth in *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). *See PerSeptive II,* at 88 n. 2. There is no disputed issue of material fact with respect to nonjoinder of Warner and Lloyd. While plaintiff is entitled to a jury trial on the correct inventive entity because of a fact dispute concerning the question of whether Mary Ann Rounds was just a "pain of hands", that remaining fact question does not undermine the bottom line that there was inequitable conduct in omitting names of other true inventors, the scientists at Polymer Labs, based on the Court's review of the undisputed facts. The fact dispute whirling around Rounds is not substantially common to the issue of inequitable conduct involving Polymer Labs.[3] *See Gardco Mfg.,* 820 F.2d at 1213.

---

2. In *PerSeptive II,* I noted that there was some question in my mine whether Afeyan and Dean were misjoined as inventors. However, that was never presented by defendants, and I did not resolve the question. Accordingly, the only issue fairly presented is nonjoinder, not misjoinder.

3. I suppose there could be a fact dispute (which plaintiff has never pressed) as to whether Lloyd was just a "pair of hands" for Warner. This is why I refer to "Warner and/or Lloyd". There is no genuine fact dispute that both were intimately

PerSeptive also claims that it may have additional evidence to defend against a claim of inequitable conduct and that its due process rights would be violated by making a decision on the current record. It is hard to imagine what additional evidence would be material in light of the extensive testimony and hundreds of documents I have reviewed. At the Section 256 hearing, as I remember, PerSeptive suggested that it had expert testimony to demonstrate that any misrepresentations were not material. This expert testimony might have been helpful if the Court were relying on the misrepresentations as the basis of inequitable conduct claim. However, the basis of my conclusion that there was inequitable conduct is my finding of a deliberate omission of a true inventor. This omission is material as a matter of law. I conclude that expert testimony would not be helpful on the issue of materiality on the joint inventorship issue.

In all its post hearing filings, PerSeptive has only a limited, unsworn proffer of additional fact evidence to rebut a claim of inequitable conduct, relating to inventorship. Its post-trial complaints that the ability to present evidence on inventorship was unfairly denied or limited are conclusory. For example, PerSeptive states that it would have introduced "numerous additional witnesses" concerning, among other things, suggestions made by Professor Regnier regarding the use of larger pore size materials for use with biological macromolecules and the existence of alternative sources of support capable for use in developing perfusive chromatography media. (Docket 878 at 10). This sketchy proffer is insufficient to demonstrate any prejudice on the inventorship issue. PerSeptive does not adequately explain why it did not mention or seek to introduce additional witnesses on these fact issues at the Section 256 hearing where the issues were explored, or demonstrate how the evidence would affect an equitable weighing. It is too little, too late. The other proffered evidence appears to relate to claims of inequitable conduct which I did not even address in my opinion.

involved in the development of the perfusive par-

Any claim that PerSeptive was prejudiced because it chose to put its patent counsel on the stand on the issue of deceptive intent is unpersuasive as it would have faced the same tactical decision in an inequitable conduct proceeding probing nonjoinder.

### *ORDER*

I order as follows:

(1) I **DENY** the motion to withdraw the motion to correct inventorship;

(2) I vacate my March 31, 1997 decision to the extent stated in this Memorandum and Order;

(3) I order the entry of judgment pursuant to Fed.R.Civ.P. 54(b) in favor of defendant Pharmacia BioTech, Inc. on its affirmative defense of inequitable conduct. I conclude there is "no just reason for delay" in entering judgment on less than all the claims. The other defendants, Sepracor, Inc. and BioSepra, Inc., have settled. The remaining parties shall consult and propose a form of order within ten (10) days of receipt of this order or submit competing draft orders;

(4) There are other claims and counterclaims alleging, inter alia, unfair competition, which the parties seem to agree are substantially different from the joint inventorship issues. I stay further proceedings on all remaining claims and counterclaims pending disposition of such appeal; and

(5) The motion for attorneys fees need not be brought until after appeal and entry of final judgment.

### ATTACHMENT A

United States District Court
District of Massachusetts

PerSeptive Biosystems, Inc. and Purdue Research Foundation, Plaintiffs,

v.

Pharmacia Biotech, Inc., et al., Defendants.

Civil Action No. 93–12237–PBS

**MEMORANDUM AND ORDER**

January 9, 1996

SARIS, District Judge.

ticle.

## INTRODUCTION

Plaintiffs Perspective Biosystems Inc. and Purdue Research Foundation (collectively "Perspective") bring this action charging defendants with infringing three patents which involve the use of liquid chromanography to separate and purify mixtures of proteins or other biological molecules. They move for partial summary judgment on the defense advanced by defendants Pharmacia Biotech Inc. ("Pharmacia") and Sepracor Inc. ("Sepracor") that the patents are invalid because they fail to designate one or more of the true inventors.

Pharmacia has filed a cross-motion for summary judgment, and Sepracor has asserted pursuant to Fed.R.Civ.P. 56(d) that the named inventors are not the correct inventive entity of the invention claimed in the patents-in-suit. They assert that Mary Ann Rounds of Purdue University and certain scientists at Polymer Laboratories ("Polymer Labs") are the true inventors of the subject matter claimed in the patents. Perspective counters that there can be no genuine issue of material fact that neither Rounds nor any scientist from Polymer Labs participated in the "conception of the invention" described in the patents. Neither defendant asserts that it was involved in the inventive process; those alleged by defendants to be co-inventors are not parties to this suit.

These cross-motions raise intriguing questions. Who should be named as inventors on the patent application pursuant to 35 U.S.C. § 102(f)? Are the "inventors" the scientists who developed and tested a particle which improved the ability of chromatographers to separate proteins at high speeds—but without understanding why? Or are the "inventors" the scientists who later discovered the microscopic properties of that particle—internal channels called "throughpores"—and explained the significance of those properties? Or if all these scientists worked collaboratively, are they all "joint inventors" pursuant to 35 U.S.C. § 116?

After review of the extensive record, and hearing, the Court concludes that pursuant to 35 U.S.C. § 116 there is undisputed, clear and convincing evidence that the Polymer Lab scientists, Dr. Frank Warner and Linda Lloyd, are joint inventors who worked in collaboration with the inventors named on the patents. Accordingly, Perspective's motion is **DENIED,** and defendants cross-motions are **ALLOWED.**[1]

## BACKGROUND

### 1. *Liquid Chromatography*

A primer on liquid chromatography is essential to an understanding of the inventorship dispute. Liquid chromatography is a procedure in which a liquid containing a mixture of compounds is passed through a material that separates the mixture into its components. The patents at issue in this case concern the use of liquid chromatography to separate mixtures of proteins or other biological molecules into components, in order to identify the components of a substance or to obtain a component in purified form. Liquid chromatography typically is performed using thin tubes ("columns") that are tightly packed with a matrix of microscopic particles ("media" or "packing materials" or "beads"). To the naked eye, the particles look like fine sand or talcum powder. The matrix of packed particles does not fill up the entire space inside the column; rather, a network of channels exists.

The base particles may be solid or porous. Porous particles may have pores that are crater-like and do not transect the particles and/or pores that transect the particles called "throughpores." It is the development of and discovery of these throughpores that is at issue in this suit. The size of the particles and of the pores is also significant. Particle diameter is typically measured in microns. A micron is equal to .000001 meter. The diameter of the pores inside the particles is measured in angstroms. One angstrom is equal to .0000000001 meter.

1. Because of this conclusion, the Court does not address the challenges based on obviousness or anticipation.

The chromatographer introduces into the column a liquid containing a solution of one or more proteins. When liquid containing a mixture to be separated is introduced at the top of the column, the liquid flows down, around and/or through the particles and out the bottom of the column. The fluid flow rate through a column is referred to as the linear velocity and is typically measured in centimeters per hour ("cm/hr"). A modern form of column liquid chromatography, high performance liquid chromatography ("HPLC"), uses a pump to push liquid through the column at increased linear velocities, thereby decreasing the time in which the separation is performed.

The base particles may be modified (or "derivatized") by applying a chemical to the particles that has the ability to selectively interact or bind with the components in the liquid mixture. In adsorptive chromatography, the type of chromatography that is the subject matter of the patents, the proteins generally adsorb (meaning "bind") to the interactive surface regions of the particles. If the particles are porous, the proteins can bind to the interactive surface regions in the interior of the particles as well. The separation of the components is achieved because the various components flow through the column and media at different rates, depending on the conditions in the column and the degree to which each component adsorbs to the particles at the so-called "interactive" or binding sites.

During the HPLC separation process, the compounds to be separated are carried to the interactive sites by two specific types of fluid movement—convection and diffusion—which can take place at the same time. The rate of convection through the pores is the rate at which pressure drives the liquid containing the compounds to be separated through the pores. The rate of diffusion within the pores is the rate at which the compounds migrate from areas where they are highly concentrated to areas of low concentration.

2. Reverse phase chromatography is an adsorption technique using a hydrophobic packing like polystyrene which is attracted to a hydrophobic

Following adsorption, the chromatographer can change a characteristic of the liquid in the column in a controlled manner, so that the proteins selectively "desorb" (or detach) from the interactive surface regions. Carried by the liquid flow, the proteins exit the column (or "elute") where they can be detected, measured, or collected.

The patents-in-suit involve "perfusive chromatography," a method which depends on particles which feature throughpores, permitting liquids to flow through a particle. The throughpores used are relatively large compared to the particle size, so that at achievable liquid flow rates, a significant portion of the liquid passing through the column flows through the particles. As defined by the patent claims, "perfusive chromatography" occurs when the rate of convective flow through the particles exceeds the rate of diffusion. This intraparticle flow allows the chromatographer to separate proteins at high speed without losing resolution or capacity.

2. *The Collaborative Relationship Between Polymer Labs and Purdue Laboratory—1986*

Since 1977, Polymer Laboratories Ltd. ("Polymer Labs"), a British company, has manufactured and sold products in the area of chromatography and polymer analysis. Polymer Labs has a wholly owned affiliate in Amherst, Massachusetts which distributes chromatography media and pre-packed columns in the United States. One of its early product lines was a series of uncoated chromatography particles sold as early as 1977 under the trade name PL–GEL. This product line offered particles averaging three to 100 microns in diameter and having pore sizes ranging from ten to fifty angstroms up to 4000 angstroms. In the early 1980's, Polymer Labs developed another kind of base particle ("PLRP–S"), with 4000–angstrom pores for use in reverse phase chromatography,[2] which was sold before 1988.

In late 1985, an informal collaboration developed between Dr. Fred E. Regnier, a

sample. This creates separation based on hydrophobicity.

named inventor, and Polymer Labs. Regnier was the scientist in charge of research at Purdue Laboratory, and Mary Ann Rounds was his research assistant. Rounds made the initial contact with Polymer Labs to inquire as to the availability of packing material. On December 17, 1985, Dr. Frank Warner, the vice president of Polymer Labs, wrote to Rounds at Purdue University in Lafayette, Indiana, stating: "Polymer Laboratories would be pleased to *collaborate* with yourself and Professor F. Regnier by supplying, free of charge, loose polymeric HPLC packings for derivatizing at Lafayette." (Emphasis added). He then wrote: "Currently we have available a whole range of polystyrene/DVB macroporous packings at 8 or 10 micron particle sizes in 100, 300, 1000 and 4000–angstrom pore sizes. These may in the future be available in modified form and could possibly be useful to you as an intermediate in your work." Warner indicated that he was researching "modification areas on these materials" and might be able to provide Rounds with some. In return, he wanted to be informed of any "interesting or commercially useful results on the materials that we supply."

On January 3, 1986, Rounds and Regnier promptly responded, stating that their "objective is to make ion-exchange chromatographic media for biomolecules" and promising that if the research is successful, they would make their findings available well in advance of publication and acknowledge that Polymer Labs provided the materials. The letter concluded:

> In accordance with your wishes, we will simply exchange findings of interest to you for the packings received. Should you decide that you prefer monetary compensation for the media *or a more formal collaboration,* please do not hesitate to contact us.

(Emphasis added). The understanding was that Dr. Regnier's lab at Purdue and Polymer Labs would exchange information on the Polymer Labs packing material which Dr. Regnier's lab received free of charge.

3. This coating technology involves the application of an adsorbed polyethyleneimine ("PEI")

Rounds hoped to evaluate the materials for use in the chromatography of large materials. The purpose of the testing at Purdue Lab was to evaluate the performance of an interactive surface chemistry known as SAX[3] when applied to the particles manufactured by Polymer Labs. The SAX technology had been patented by Regnier, and had been licensed to Polymer Labs by the Purdue Research Foundation. Rounds evaluated the 300–angstrom and 1000–angstrom media from Polymer Labs in the first half of 1986, and discussed the results with Regnier. They concluded that the results were favorable. With Regnier's knowledge, Rounds sent the evaluation of the material to Polymer Labs. The collaboration with Polymer Labs continued to be informal.

After receiving the favorable results of the research from Regnier's laboratory, Polymer Labs decided to commercialize the SAX coated version of its 1000–angstrom particle. In Warner's words: "The PL–SAX product was developed through a *collaboration* with Professor Regnier of Purdue University, and that collaboration started, I think, in 1985." (Emphasis added). On July 7, 1986, Rounds had written Warner:

> I am pleased to hear that Polymer Labs is interested in marketing the strong anion-exchange packing material which I made from your 1000A polystyrene DVB.
>
> Although other larger companies are also quite interested in this technology, it has always been my hope that Polymer Labs would benefit most directly since none of this work would have been done without your generous gift of polystyrene last December.

On December 1, 1986, Polymer Labs obtained a license to use the Purdue coating technology. In December, 1986, Rounds and Regnier submitted a proposal to Polymer Labs "for the development of polystyrene divinylbenzene-based packing materials for HPLC of proteins."

Polymer Labs entered into a formal six month agreement with Purdue to provide funding to Regnier, as principal investigator and Rounds as research assistant, for the

coating to the base particle, and modification to create a strong anion exchange (SAX) particle.

development of packing materials for HPLC of proteins, in particular to optimize "the macroporous strong anion-exchange (SAX) packing material for commercialization." The PL–SAX 1000 was on the market in 1987.

### 3. Collaboration—1987

In 1987, Polymer Labs began applying the SAX coating technology on the 4000–angstrom particles. On March 18 and October 7, 1987, it manufactured such 4000–angstrom particles with diameters of 12 to 15 microns, and 10 to 12 microns respectively. Polymer's logic in evaluating larger pore sizes was primarily to allow larger proteins to enter the pores of the particles, proteins which might be excluded by the 1000–angstrom pores. Linda Lloyd, a Polymer Laboratory scientist, prepared PL–SAX 4000A and studied the influence of pore size on chromatographic performance of PL–SAX particles, including the 100, 300, 1000 and 4000 angstrom particle at a flow rate of 1 ml/min (which amounts to 360 cm/hr). In a paper presented at a conference in England on September 15–18, 1987, Lloyd, Warner and others showed the results of separations of biological materials on a matrix composed of PL–SAX 1000 particles at a flow rate of 1440 cm/hr. Polymer Labs again publicly presented the results in the Seventh International Symposium on HPLC of Proteins, Peptides and Polynucleotides in Washington D.C. on November 2–4, 1987. Regnier and Rounds attended. A poster prepared for the symposium was entitled "Influence of Pore Size/Ionic Capacity on the Separation of Small and Large Biomolecules when using Polymeric Anion Exchange Media." In the paper presented at the conference, Warner, Lloyd and another author concluded: "Therefore for the analysis of very large proteins, e.g., thyroglobulin and DNA the optimum material would be the PL–SAX 4000A but for the gradient elution of small solutes and the majority of proteins the smaller pore size PL–SAX 1000A would provide optimum resolution loading."

### 4. Collaboration—1988

As a result of the conference, the collaboration between Polymer Labs and Purdue Laboratory continued. At the conference, Regnier and Rounds met with John McConville, a representative of Polymer Labs who asked them to do some additional chromatographic evaluations of a column packed with the PL–SAX 4000A polystyrene particles which had been derivatized and evaluated by Lloyd. On November 12, 1987 Rounds wrote a research plan. Regnier's Purdue laboratory received experimental batches of PL–SAX 4000A from Polymer Labs for testing on December 28, 1987. Rounds ran the columns at high flow rates of 360 cm/hr (1 ml/min) and 720 cm/hr (2 ml/min), according to the standard lab protocols and her experience. The initial separation results were in Rounds' words "really good." Of particular significance was the "surprisingly high capacity of the 4000–angstrom pore diameter material compared to 1000–angstrom pore diameter material."

In late December, 1987, after seeing Rounds' chromatograms, Regnier was so excited about the results of the data that he suggested to Rounds that she call Lloyd and that they "should get together and plan a study and write a paper on these comparisons." On December 30, 1987, Rounds called Lloyd to plan jointly the study and to exchange data. That same day Rounds forwarded the chromatograms and wrote Lloyd:

> "Dr. Regnier is very excited over the 4000A packing material (he thinks it will be great for preparative use). He suggested that you and I *collaborate* to do a thorough study of this material, which should be publishable."

(emphasis added). Rounds then asked for 10 micron, 4000A packing particles for testing.

The data generated by Rounds in January and February 1988 showed that resolution was retained at relatively high flow rates. On January 12, 1988, Rounds generated a chromatogram on a column of 4000A PL–SAX at 1 ml and 4 ml per minute. On January 19, 1988, Lloyd sent Rounds 8 micron PL–SAX 4000A and 10 micron PL–SAX 4000A for her evaluation. On February 5, 1988 Rounds wrote an animated letter to Lloyd proclaiming the virtues of 4000–angstrom PL–SAX media which "does indeed perform analogously to non-porous, without

the problems of high back pressure and low loading capacity." Rounds had separated a four protein mixture at a flow rate of 3 ml/min achieving a good resolution in 45 seconds. She wrote:

> Dr. Regnier is most excited about the preparative potential of this packing material and told me that he had talked to Frank (Warner) about the possibility of arranging some kind of agreement between PL and "Synosis", the new company which Fred is involved in starting along with two other men from the Boston area. Whether this takes place or not, there certainly will be a market for the 4000A packing material, if Fred's interest and enthusiasm for it are a valid indication of the future.

The chromatograms generated by Rounds on 4000-angstrom Polymer Labs material, at Polymer's request, in January and February 1988, represented the then-unknown phenomenon of perfusion chromatography.

In early 1988, Warner learned from Lloyd that Regnier's hypothesis for explaining the high speed resolution was by "flow through" the particles. Rounds had shared Regnier's explanation with Lloyd. Warner was skeptical that this was the explanation.

In February 1988, Lloyd, Warner and other scientists presented another paper at the 39th Pittsburgh Conference and Exposition on Analytical Chemistry and applied Spectroscopy in New Orleans entitled "Polymeric Anion Exchange Columns for the HPLC Analysis of Large Biological Solutes (Proteins)." This paper discussed the use of PL–SAX 4000–angstrom particles of 10–micron diameter. For analysis of DNA, restriction fragments and oligonucleotides, the paper concluded "the large pore size maximizes the loading capacity through maximum available surface area." PL–SAX 4000A was introduced as a commercial product at this conference.

On March 4, 1988, Lloyd responded to Rounds that Rounds' PL–SAX 4000A evaluation looked "absolutely great," and added: "The more I use the [PL–SAX 4000A] material the more convinced I become that high

speed/high load separations could be achieved using standard HPLC systems." Lloyd forwarded information concerning separations she accomplished on PL–SAX 4000A at a flow rate of 2 ml/min (720 cm/hr), and asked for Rounds' completed evaluation on the packing materials.

On March 16, 1988, Rounds replied again to Lloyd, calling the oligonucleotide chromatogram "spectacular," continuing the data exchange, and proposing that they begin "putting together a paper."

In June 1988, PL–SAX 4000A was first sold in the United States.

### 5. *The New Corporation*

The named inventors—Regnier, Robert C. Dean and Noubar Afeyan—became associated in June, 1987 when they joined as founders to form plaintiff Perceptive's predecessor, Synosys Corporation. The new company was formed to develop protein purification systems. It was incorporated in November, 1987. By March, 1988, it was commencing a major product development program for the sale of a chromatograph adsorbent called Poros, which was manufactured using the Polymer Labs base particle. On March 17, 1988, Dean, on behalf of Synosys, wrote Frank Warner and John McConville to propose a contract between the two entities and to request an exclusive license to sell PL–SAX in the United States. The first paragraph of the term sheet proposed by Dean read:

> Polymer Laboratories (PL) wishes to market its macroporous, polymer-based chromatography media line in the life science market for preparative use in process development, pilot and production applications, via an exclusive arrangement with Synosys (SYS). SYS agrees to purchase polymer-based media exclusively from PL during the term of this Agreement. SYS intends to *collaborate* with PL in the future improvement of polymer media.

(Emphasis added). On the cover sheet, Dean wrote: "We are very enthusiastic about *collaborating* with you." (Emphasis added).

On March 24, 1988, Warner of Polymer Labs rejected the proposal for an exclusive

relationship, stating that "[r]estrictive practices and forced collaboration between our companies will not be beneficial in the long term." On November 3, 1988, Dean sent Warner the scanning electron micrographs (SEM's) which "we have been basing our ideas of Poros 4000 structure upon" and added: "The *collaboration* developing between us is most satisfying and has exciting potential." (Emphasis added). On November 28, 1988, Afeyan wrote Warner to procure more PL–SAX 1000A and 4000A and to seek more data on pore size. The letter stated they were taking the necessary steps "for patent protection for these new coats."

On June 21, 1989, Afeyan wrote Warner again seeking 4000–and 1000–angstrom–pore particles, and asking for certain improvements in surface area:

Polymer Laboratories is a recognized specialist in porous polymer manufacture, and has already made particles stronger and better than others, at least in our assessment. Encouraged by your past achievements, and based on our numerous discussions *about ways to jointly improve the particles,* I have a request for such an improvement.

(Emphasis added).

### 6. *The Named Inventors*

Dr. Regnier believed that Rounds' test results on the 4000A particles in January and February 1988 were unusual and did not understand them. Excited, Dr. Regnier talked with Afeyan and Dean, about the chromatogram early in 1988, and they speculated that there might be convection in the particles. In February 1988, they took SEM's of the particles. They also discussed the chromatograms as something the fledgling company might pursue. By March 29, 1988, Dr. Regnier wrote in a memorandum that the Polymer Labs 4000A particles "have pores that go completely through the particle." Dean annotated the memorandum: "through porosity permits perfusion."

In June, 1988, Dr. Regnier gave a presentation at the Twelfth International Symposium on Column Liquid Chromatography in Washington, D.C. entitled "Macroporous

Styrene–Divinyl Benzene–Based Media for Proteins." He used Rounds' chromatograms of the PL–SAX media but crossed out "PL–SAX" and called the media "Poros." At the conference, he called his work "perfusion" and explained the results as due to "flow through" the pores by convection. Warner, who was present at the conference, was angry that "Polymer Labs were not given the right recognition in this work," and concerned when Regnier said that the technologies were in the process of being patented. At his deposition, Warner explained his concern:

Because I wanted to make sure that there was nothing that was being patented without PL's input into that, because alot of this work had alot of *collaboration* between Mary Rounds and Polymer Laboratories, and I wanted to make sure that we were not left out in the cold. (emphasis added).

At that June 1988 meeting, Warner immediately confronted Afeyan, who stated that: "The flow through chromatography he did not consider was patentable at that time and they had no intentions in that direction." Afeyan remembers that in the late summer and early fall of 1988, the named inventors determined that the throughpore which was necessary for perfusive chromatography was a structure that permitted intraparticle convective mass transfer to dominate over diffusive mass transfer with resulting ability to operate media at high linear velocities, while maintaining excellent performance characteristics. The initial invention disclosure was prepared in October, 1988. Afeyan testified that the inventors did not realize that the 4000–angstrom particles had transecting pores until this time period.

### 7. *The Patent Application*

More than a year later the patent application was filed, on July 6, 1989. The patent office initially rejected the application based on the prior art of Polymer Labs, Rounds and Regnier.

In an "Amendment, Response and Interview Summary Record" filed on September 5, 1990, the named inventors disclosed that Dr. Regnier, while a professor at Purdue

University, had informally consulted with Polymer Labs for many years, and that prior to January 1, 1989, the applicants discovered that "some batches" of the wide pore materials supplied experimentally by PL "produced outstanding separations at extraordinarily high flow rates. These properties could be observed with some wide pore materials and not with others." The applicants pointed out to the examiner that there was "no evidence suggesting that the 8 micron or 10 micron '4000 A' material, some prototype batches of which were capable of perfusion chromatography, were even sold or in public use prior to the making of their invention." They also stated that in June, 1988, neither Dr. Regnier nor the other inventors were aware that any experimental PL particles had throughpores.

Attached to the Rule 131 declaration of the inventors as to the date of invention were the chromatograms dated January 12, 1988 and February 1988, generated by Rounds. These were submitted as evidence of "actual reduction to practice." Essentially, the inventors claimed that the date of invention was before January 1, 1989, but after Regnier's presentation in June, 1988.

By January, 1990, Polymer Labs knew that Perspective had filed a patent application, but never filed its own. It did send a letter to Perspective contesting the validity of the patent. On September 5, 1991, it filed a declaratory judgment action claiming invalidity of the patent on the grounds, inter alia, of prior art, but the litigation was withdrawn.

### 8. The patents-in-suit

There are three patents at stake. Perspective filed suit against defendants on October 14, 1993 alleging infringement of United States Patent Nos. 5,019,270 (" '270 patent") and 5,228,989 (" '989"), which claim respectively chromatography methods of separating biomolecules at high speed and high efficiency, and particles for practicing these methods. Specifically, claim 1 of the '270 patent provides for:

A chromatography method comprising the steps of: (A) forming a chromatography matrix by packing a multiplicity of particles defining throughpores and solute interactive surface regions therewithin; and (B) passing a fluid mixture of solutes comprising biological molecules through said matrix at a velocity sufficient to induce a convective fluid flow rate through said throughpores greater than the rate of solute diffusion through said throughpores and to produce a Peclet number in said throughpore greater than 1.0.

'270 patent, col. 25, lines 37–48.

The '270 patent states that the PL–SAX 4000A ten micron particle, run at a velocity greater than 300 cm/hr satisfies the method claimed in the '270 patent (Col. 12, lines 52–54). Chromatograms prepared by Rounds are included in figures 10 and 12 of the specification.

On January 25, 1995, Perspective filed another action alleging infringement of United States Patent No. 5,384,042 (" '042 patent"), which claims a matrix for conducting high efficiency and high speed adsorption chromatography of biological molecules. Collectively, the '270, the '989 and the '042 patents will be referred to as the perfusion patents. All three perfusion patents list as inventors Drs. Noubar B. Afeyan, Robert C. Dean and Fred E. Regnier.[4] Perspective claims that each of the claims of the '270 and '989 patent were conceived during the period August 1988 to November 1988.

### DISCUSSION

Pursuant to 35 U.S.C. § 102(f), a person "shall be entitled to a patent unless—(f) he did not himself invent the subject matter sought to be patented."

The inventors named in an issued patent are presumed to be correct. *Amax Fly Ash Corp. v. United States*, 206 Ct.Cl. 756, 514 F.2d 1041, 1047 (1975)(*per curiam*). "The burden of showing misjoinder or nonjoinder of inventors is a heavy one and must be proved by clear and convincing evidence." *Garrett Corp. v. United States*, 190 Ct.Cl.

---

4. Neither Sepracor nor Pharmacia have contested the joinder of Dean and Afeyan as joint inventors, although the record is unclear as to their contribution.

858, 422 F.2d 874, 880 (*per curiam*), *cert. denied,* 400 U.S. 951, 91 S.Ct. 242, 27 L.Ed.2d 257 (1970). To invalidate a patent under section 102(f), "a party must demonstrate that the named inventor in the patent acquired knowledge of the claimed invention from another, or at least so much of the claimed invention as would have made it obvious to one of ordinary skill in the art." *New England Braiding Co., Inc. v. A.W. Chesterton Co.,* 970 F.2d 878, 883 (Fed.Cir. 1992).

A patent is also unenforceable if it fails to name all persons properly considered as joint inventors pursuant to 35 U.S.C. § 116. A joint invention is the product of a collaboration between two or more persons working together to solve the problem addressed. *Burroughs Wellcome Co. v. Barr Laboratories, Inc.,* 40 F.3d 1223, 1227 (Fed.Cir.1994), *cert. denied,* 516 U.S. 1070, 116 S.Ct. 771, 133 L.Ed.2d 724 (1996) (Nos. 94–1527, 94–1531)[5]. People may be joint inventors even though they do not physically work on the invention together or at the same time, and even though each does not make the same type or amount of contribution. *Id.* "The statute does not set forth the minimum quality or quantity of contribution required for joint inventorship." *Id.*

At the heart of this controversy is the meaning of the term "inventorship." In *Burroughs Wellcome,* the Federal Circuit had the following useful discussion, which bears repeating at length:

Conception is the touchstone of inventorship, the completion of the mental part of invention. It is "the formation in the mind of the inventor, of a definite and permanent idea of the complete and operative invention, as it is hereafter to be applied in practice." Conception is complete only when the idea is so clearly defined in the inventor's mind that only ordinary skill would be necessary to reduce the invention to practice, without extensive research or experimentation. Because it is a mental act, courts require corroborating evidence of a contemporaneous disclosure that would enable one skilled in the art to make the invention.

Thus, the test for conception is whether the inventor had an idea that was definite and permanent enough that one skilled in the art could understand the invention; the inventor must prove his conception by corroborating evidence, preferably by showing a contemporaneous disclosure. An idea is definite and permanent when the inventor has a specific, settled idea, a particular solution to the problem at hand, not just a general goal or research plan he hopes to pursue. The conception analysis necessarily turns on the inventor's ability to describe his invention with particularity. Until he can do so, he cannot prove possession of the complete mental picture of the invention. These rules ensure that patent rights attach only when an idea is so far developed that the inventor can point to a definite, particular invention.

*Id.* (citations omitted). The court emphasized that a person is not "precluded from being a joint inventor simply because his contribution to a collaborative effort is experimental." *Id.* at 1229. "Instead, the qualitative contribution of each collaborator is the key—each inventor must contribute to the joint arrival at a definite and permanent idea of the invention as it will be used in practice." *Id.*

Here, the record overwhelmingly demonstrates that the scientists at Polymer Labs and at Regnier's laboratories, although in physically different locations, collaborated in developing and testing the media essential to perfusion chromatography.[6] Yet, Perspective

---

5. On June 12, 1995, the Supreme Court issued a memorandum inviting the Solicitor General to file a brief expressing the views of the United States in this case. 515 U.S. 1130, 115 S.Ct. 2554 (1995).

6. It is a hotly disputed issue of fact as to whether Rounds was working under Professor Regnier's direction as a "pair of hands" using his lab protocol in connection with this work or whether she evaluated the material without substantial contribution of Dr. Regnier based on her own experience and expertise as a scientist. Accordingly, the Court does not consider the role of Rounds in this analysis. *See generally Consolidated Aluminum Corp. v. Foseco Int'l Ltd.,* 10 U.S.P.Q.2d 1143, 1172 (N.D.Ill.1988) (holding that "a person who merely follows the instruction of another in performing experiments is not

insists that the three scientists listed on the patent, Regnier, Dean and Afeyan, were the true inventors of the patent because they were the only ones to conceive that the quality of the packing material which made it a successful media for high pressure liquid chromatography was the throughpore which had a sufficiently large diameter to allow the rate of convection to exceed the rate of diffusion. While Warner and Lloyd understood that the Polymer Lab 4000–angstrom beads had desirable properties in performing high speed liquid chromatography, they admit that they did not understand the properties of the beads which accomplished the high speed separations. Indeed, Warner candidly admitted that initially he doubted Regnier's explanation. Nevertheless, Warner and Lloyd knew what the 4000–angstrom particles did and could replicate them, even if not consistently.[7]

Relying heavily on *Burroughs Wellcome*, Perseptive argues that "neither [Warner nor Lloyd] had an understanding of even the most basic aspect of Perfusion Chromatography, namely that the invention requires chromatography particles with a pore structure which permits liquids to flow through the particle, let alone other, more specific details of the inventions." Rather "it was Drs. Afeyan, Dean and Regnier who first proposed the possible explanation of the performance of the 4000 angstrom particles."

Is discovery of the properties of a previously manufactured particle, without more, sufficient to constitute an invention subject to patent protection? *General Elec. Co. v. Jewel Incandescent Lamp Co.*, 326 U.S. 242, 66 S.Ct. 81, 90 L.Ed. 43 (1945), provides illumination. In *General Elec.*, the patentee had

claimed that the object of his invention was to produce an inside-frosted glass bulb which was stronger than the prior art, and that the inventive feature of the patented bulb was the fact that the interior surface was characterized by the presence of rounded as distinguished from sharp angular crevices. An earlier inventor, seeking to improve the diffusion of light, had described how to make rounded crevices on frosted glass. Although the Supreme Court acknowledged that the patentee seemed to be "the first to have recognized that the form of the pitting had an effect on the strength of the glass," *id.* at 248, 66 S.Ct. 81, it held that there was no patent protection where "the prior art discloses the method of making an article having the characteristics of the patented product, though all the advantageous properties of the product had not been fully appreciated." *Id.* It added: "It is not invention to perceive that the product which others had discovered had qualities they failed to detect." *Id.* at 249, 66 S.Ct. 81; *see also De Forest Radio Co. v. General Electric Co.*, 283 U.S. 664, 682, 51 S.Ct. 563, 75 L.Ed. 1339 (1931) ("It is method and device which may be patented and not the scientific explanation of their operation."); *accord Eli Lilly & Co. v. Premo Pharmaceutical Laboratories, Inc.*, 630 F.2d 120 (3d Cir.), *cert. denied*, 449 U.S. 1014, 101 S.Ct. 573, 66 L.Ed.2d 473 (1980).

Here the named inventors seem to be the first to have recognized that the existence and size of the throughpore in the Polymer Labs packing particle had an effect on the separation of liquids under high pressure. However, just as recognizing that the form of the pitting had an effect on the strength of the light bulb did not trigger patent protection in *General Elec.*, the discoverers of the

an inventor"), *aff'd* 716 F.Supp. 316 (N.D.Ill. 1989), *aff'd*, 910 F.2d 804 (Fed.Cir.1990).

7. At the hearing on the motion for summary judgment on October 5, 1985, Perseptive's counsel conceded that the particles used by Polymer Labs and Rounds had throughpores. (Tr. 15–15). According to documents produced on September 13, 1995 by Polymer Labs to Perseptive pursuant to an order of the magistrate judge, Perseptive alleges that the PL–SAX 1000A and PL–SAX 4000A did not uniformly have the mass transport characteristics necessary for perfusion.

There is insufficient evidence to determine whether the particles produced prior to 1988 uniformly had throughpores necessary for perfusive performance, because the records are incomplete for the initial batches. While the batches of 4000A particles apparently had non-uniform test results, the documents from 1987 demonstrate that there was sufficient uniformity in the internal structure of the experimental batches of 4000A particles for both Lloyd and Rounds to achieve excellent separation results from the 4000A batches.

latent qualities in the packing material developed and manufactured by another cannot claim sole inventorship within the meaning of the patent laws.

The undisputed evidence is sufficient to overcome any inference that might be drawn from the fact that Polymer has failed to press a claim of inventorship. *See Consolidated Aluminum Corp. v. Foseco Int'l Ltd.,* 10 U.S.P.Q.2d 1143, 1172 (N.D.Ill.1988), *aff'd,* 716 F.Supp. 316 (N.D.Ill.1989), *aff'd,* 910 F.2d 804 (Fed.Cir.1990) ("[F]ailure of others to claim inventorship at the time of the original inventors' publication is evidence permitting an inference that [the] other's position [as inventors] [is] not sustainable."). Polymer Labs was under no duty to file or join in the patent application. *Checkpoint Sys., Inc. v. U.S. Int'l Trade Comm'n,* 54 F.3d 756, 762 (Fed.Cir.1995). It did file a declaratory judgment action contesting the validity of the patent, but the action was dropped, and the record is unclear as to whether it was dropped as part of a settlement or for lack of interest, or for lack of financial ability to press the claim.

### 1. *Joint Inventorship*

Although there is undisputed, clear and convincing evidence that the named inventors are not the sole inventors of the perfusion chromatography process simply by discovering the properties of a packing material which facilitated the scientific advance, Section 116 recognizes that an invention may be made "by two or more persons *jointly.*" (emphasis added). Prior to the 1984 amendments, the concept of joint invention was "one of the muddiest concepts in the muddy metaphysics of patent law." *Mueller Brass Co. v. Reading Indus.,* 352 F.Supp. 1357, 1372, 176 U.S.P.Q. 361 (E.D.Pa.1972), *aff'd,* 487 F.2d 1395 (3d Cir.1973) (table), quoted in 1 Donald S. Chisum, *Patents* § 2.02[2] at 2–5 (1995). In the 1984 Amendment to Section 116,[8] Congress intended to clarify the law of joint inventorship by codifying the following helpful principles first stated in *Monsanto Co. v. Kamp,* 269 F.Supp. 818, 154 U.S.P.Q. 259 (D.D.C.1967):

A joint invention is the product of *collaboration* of the inventive endeavors of two or more persons *working toward the same end* and producing an invention by their *aggregate* efforts. To constitute a joint invention, it is necessary that each of the inventors work on the same subject matter and make some contribution to the inventive thought and to the final result. Each needs to perform but a part of the task if an invention emerges from all of the steps taken together. It is not necessary that the entire inventive concept should occur to each of the joint inventors, or that the two should physically work on the project together. One may take a step at one time, the other an approach at different times. One may do more of the experimental work while the other makes suggestions from time to time. The fact that each of the inventors plays a different role and that the contribution of one may not be as great as that of another does not detract from the fact that the invention is joint if each makes some original contribution, though partial, to the final solution of the problem.

*Kimberly–Clark v. Procter & Gamble Distr. Co., Inc.,* 973 F.2d 911, 916–17 (Fed.Cir.1992) (emphasis in original) (quoting *Monsanto,*

8. Section 116 now reads: "When an invention is made by two or more persons jointly, they shall apply for a patent jointly and each make the required oath ... Inventors may apply for a patent jointly even though (1) they did not physically work together or at the same time, (2) each did not make the same type or amount of contribution, or (3) each did not make a contribution to the subject matter of every claim of the patent.

"If a joint inventor refuses to join in an application for patent or cannot be found or reached after diligent effort, the application may be made by the other inventor on behalf of himself and the omitted inventor. The Commissioner, on proof of the pertinent facts and after such notice to the omitted inventor as he prescribes,. may grant a patent to the inventor making the application, subject to the same rights which the omitted inventor would have had if he had been joined. The omitted inventor may subsequently join in the application.

"Whenever a person is joined in an application for patent as joint inventor through error, or through error an inventor is not named in an application, and such error arose without any deceptive intention on his part, the Commissioner may permit the application to be amended accordingly, under such terms as he prescribes."

269 F.Supp. at 824). In *Kimberly–Clark*, 973 F.2d at 916, the Federal Circuit confirmed that an invention can be made "jointly" under Section 116 only if two or more persons actually collaborate in it. The purpose of the amendment was to encourage team research. *Id.* In determining co-inventorship, courts look to a number of factors, the most important being the relationship of the scientists who conceived the idea and who reduced it to practice. *See Celestron Pacific v. Criterion Mfg.*, 552 F.Supp. 612, 616 n. 1, 219 U.S.P.Q. 870 (D.Conn.1982).

Here, the relationship between the scientists at Polymer Labs and Purdue Laboratory was precisely the kind of collaboration and synergy the 1984 amendment was intended to promote. Warner and Lloyd discovered that a 4000–angstrom packing material had terrific separation results but did not understand why. They hired Regnier and his research staff to study the material, and funded the research, as well as performing research on their own. Excited letters went back and forth between the laboratories sharing information. The named inventors examined the particles under an electron microscope, discovered the throughpores, and appreciated that the reason for the success of the particle was that the convective mass transport through the particles dominated the mass transport within the throughpores. This conception enabled others to replicate the perfusive chromatograph method more consistently.

Without the manufacture and testing of the 4000–angstrom particle, and the recognition and publication of the positive test results, Regnier and his team would not have had the critical scientific starting point for their research—the recognition of the success of the 4000–angstrom particle in separating proteins at high speed.

While "the theory or explanation as to why a product or process works to achieve its aim is generally not viewed as part of the act of inventing," D. Chisum at § 202[5] at 2–20 to –21, here Perseptive did more than provide the scientific explanation for why the process worked—that the throughpores were large enough for the rate of convection to exceed the rate of diffusion. Rather, the Perseptive scientists discovered the very existence of the throughpores in the 4000–angstrom particles. Without this discovery and the understanding of the significance of the throughpores, the conception of the process was not complete. This discovery contributed to the operativeness of the completed invention by pinpointing the factor essential to "predictability of activity." *GAF Corp. v. Amchem Prod., Inc.*, 514 F.Supp. 943, 972, 211 U.S.P.Q. 172 (E.D.Pa.1981).

Prior to the throughpore discovery, Polymer Labs did not have a "definite and permanent idea of the complete and operative invention, as it is hereafter to be applied in practice." *Hybritech, Inc. v. Monoclonal Antibodies, Inc.*, 802 F.2d 1367, 1376 (Fed. Cir.1986) (quoting 1 *Robinson* on Patents 532 (1890)), *cert. denied*, 480 U.S. 947, 107 S.Ct. 1606, 94 L.Ed.2d 792 (1987). Perseptive reported to the Patent Office that only some of the experimental batches of PL–SAX widepore materials exhibited unusual behavior. The named inventors also testified there were inconsistent test results on the samples. Without understanding the significance of the throughpore and its dimensions, Polymer Labs did not have a basis for controlling for this feature. Once the named inventors understood the significance of the throughpore, the scientists at Polymer Laboratories continued to work with the named inventors to perfect the perfusive particles and method until a month before filing the patent application.

In short, each made "some original contribution, though partial, to the final solution of the problem." *Monsanto*, 269 F.Supp. at 824. It is not necessary that joint inventors contribute equally to each claim under 35 U.S.C. § 116(3). There is no evidence that the three patents or the various claims should be treated differently for co-inventorship purposes. The patents are therefore invalid for failure to name all inventors, unless they may be corrected.

### 2. *Intent to Deceive*

Patent applications must be filed by the inventor, 35 U.S.C. § 111, who "shall make oath that he believes himself to be the original and first inventor." 35 U.S.C. § 115.

When an improper inventor appears on a patent application or a rightful inventor is omitted therefrom, 35 U.S.C. § 256 gives this court authority to correct the mistake if it arose as a result of "error and without deceptive intention."[9] *See RCA Corp. v. Davidson*, 215 U.S.P.Q. 469, 471 (D.N.J.1981) (ordering correction of issued patent, after "notice and hearing of all parties concerned," to delete named co-inventor whose contribution of preparing compounds for evaluation and testing was not invention).

On the other hand, "[t]he willful naming of an incorrect inventive entity constitutes grounds for invalidation of the patent." *Ashlow Ltd. v. Morgan Constr. Co.*, 213 U.S.P.Q. 671, 697 (D.S.C.1982). Some courts also treat "gross negligence in avoidance of corrections on the part of responsible knowledgeable parties having full notice of the facts and their legal significance" as more than mere error and thus sufficient to constitute grounds for invalidation. *See Ashlow*, 213 U.S.P.Q. at 696 (citing *Rival Mfg. Co. v. Dazey Products Co.*, 358 F.Supp. 91, 177 U.S.P.Q. 432 (W.D.Mo.1973)). In addition, Section 116 requires an applicant to identify all known inventors of the claimed subject matter to the Patent and Trademark Office, and the Federal Circuit has indicated that willful failure to do so may trigger an "unclean hands" defense against a party who prosecuted a patent with "known defective inventorship." *MCV, Inc. v. King–Seeley Thermos Co.*, 870 F.2d 1568, 1573 n. 3 (Fed. Cir.1989) (rejecting an unclean hands defense for a lack of record support for the allegation that defendant believed another person was a co-inventor and knowingly left his name off the application).

On the present record, the court has insufficient evidence to determine whether the error in failure to name Lloyd and/or Warner was committed with a deceptive state of mind. There is evidence suggesting that Perspective may have affirmatively misled Polymer Labs about its intent to seek a patent. In light of the two-year history of documented collaboration, both informal and formal, between Polymer Labs and Regnier's laboratory, the record calls out for an explanation of why Polymer's Lloyd and Warner were not listed as joint inventors. There is also evidence of misstatements by the named inventors to the patent office and to Purdue Laboratory. For example, on April 29, 1991, Regnier wrote Purdue "Your memorandum notes that Frank Warner stated there was a collaboration between us. A collaboration involves an exchange of information and usually some agreement that there is collaboration. At no time did we ever obtain any information, ideas or concepts, from PL, even while our research was sponsored by them." In light of the documents in the record, that statement is quite remarkable.

Thus there remains a disputed issue of fact as to the named inventors' state of mind, preventing the court from ordering correction of the patent without hearing. The parties do agree on one procedural matter—that the revision of the application, if any, to correct an erroneous nonjoinder of a co-inventor should be resolved before the court after hearing, not before a jury.

If Polymer or Rounds intervenes in the hearing, there will be an issue as to whether they should be estopped from obtaining co-inventorship rights by their delay in asserting their rights. *See generally MCV. Inc. v. King–Seeley Thermos Co.*, 870 F.2d 1568 (Fed.Cir.1989); *Checkpoint Sys., Inc. v. U.S. Int'l Trade Comm'n*, 54 F.3d 756, 763 (Fed. Cir.1995). Regardless of whether the co-investors are estopped from claiming their rights, however, the court may correct the patent upon finding that the named inventors

---

**9.** Section 256 reads: "Whenever through error a person is named in an issued patent as the inventor, or through error an inventor is not named in an issued patent and such error arose without any deceptive intention on his part, the Commissioner may, on application of all the parties and assignees, with proof of the facts and such other requirements as may be imposed, issue a certificate correcting such error.

"The error of omitting inventors or naming persons who are not inventors shall not invalidate the patent in which such error occurred if it can be corrected as provided in this section. The court before which such matter is called in question may order correction of the patent on notice and hearing of all parties concerned and the Commissioner shall issue a certificate accordingly."

acted in good faith when they omitted the co-inventors. *See Advanced Cardiovascular Sys., Inc. v. Scimed Life Sys., Inc.*, 988 F.2d 1157, 1162 (Fed.Cir.1993) ("Since the defense of patent invalidity can be raised at any time, correction of inventorship should be similarly available at any time.").

## ORDER

Plaintiff's motion for partial summary judgment on issue of patent invalidity due to improper inventorship (Docket 307) is **DENIED**. Pharmacia's motion for summary judgment (Docket 327) and Sepracor's motion pursuant to Fed.R.Civ.P. 56(d) (Docket 424), are **ALLOWED**. Perseptive shall file any motion to correct inventorship by January 19, 1996 or the action will be dismissed.

If a hearing is scheduled, the clerk shall give timely notice to Polymer Laboratories and Mary Ann Rounds in the event they should seek to intervene pursuant to Fed. R.Civ.P. 24. All remaining motions for summary judgment are **DENIED** as moot, without prejudice to renewal, consistent with this opinion, after the Section 256 hearing.

## ATTACHMENT B

United States District Court
District of Massachusetts

PerSeptive Biosystems, Inc., Plaintiff,

v.

Pharmacia Biotech, Inc., Sepracor Inc., Pharmacia LKB Biotechnology AB, Pharmacia Bioprocess Technology AB and Procordia AB, Defendants.

Civil Action No. 93–12237–PBS

*MEMORANDUM AND ORDER*

March 31, 1997

SARIS, District Judge.

## INTRODUCTION

This is a dispute over the inventorship of three patents involving the use of liquid chromatography to separate biomolecules, like proteins, at high speed and efficiency.

On January 9, 1996, this Court allowed defendants' motion for partial summary judgment, and concluded as a matter of law that pursuant to 35 U.S.C. § 116, Frank Warner and/or Linda Lloyd were joint inventors of these three patents concerning "perfusive chromatography": U.S. Patent Nos. 5,019,-270; 5,228,989; and 5,384,042. The plaintiff moved to correct the inventorship pursuant to 35 U.S.C. § 256.

After a ten-day hearing, pursuant to 35 U.S.C. § 256, the Court concludes that PerSeptive Biosystems, Inc. ("PerSeptive") has not met its burden of proving by a preponderance of the evidence that the non-joinder was made without deceptive intent. Accordingly, the motion to correct inventorship is **DENIED**.

## PROCEDURAL HISTORY

### I. *Patents–in–Suit*

PerSeptive filed suit against defendants on October 14, 1993, alleging infringement of United States Patent Nos. 5,019,270 ("270 patent") and 5,228,989 ("989 patent"). The '270 patent claims chromatography methods of separating biomolecules at high speed and efficiency, that is, perfusive chromatography methods. Specifically, claim 1 of the 270 patent provides for:

A chromatography method comprising the steps of: (A) forming a chromatography matrix by packing a multiplicity of particles defining throughpores and solute interactive surface regions therewithin; and (B) passing a fluid mixture of solutes comprising biological molecules through said matrix at a velocity sufficient to induce a convective fluid flow rate through said throughpores greater than the rate of solute diffusion through said throughpores and to produce a Peclet number in said throughpores greater than 1.0.

270 patent, col. 25, lines 37–48. The '989 patent claims particles for practicing these methods, with certain specific combinations of geometric and physical features.

On January 25, 1995, PerSeptive filed another action alleging infringement of United State Patent No. 5,384,042 ("042 patent"), which claims a matrix for conducting high

efficiency and high speed adsorportion chromatography of biological molecules. All three patents list as inventors Drs. Noubar B. Afeyan, Robert C. Dean, and Fred E. Regnier.

## II. Cross–Motions for Summary Judgment on Inventorship

On January 9, 1996, this Court concluded, pursuant to 35 U.S.C. § 116[1], based on undisputed, clear and convincing evidence that Frank Warner and Linda Lloyd of Polymer Labs worked in collaboration with Mary Ann Rounds and Regnier at his laboratory at Purdue University and with the other named inventors, and are joint inventors of the perfusion patents. The Court also found that a disputed issue of fact existed as to whether Rounds was a joint inventor or just a "pair of hands." As a consequence of the Court's ruling, the perfusion patents are unenforceable until such time as the inventorship is actually corrected. The Court assumes familiarity with that opinion.[2]

In the January 9 Order and a subsequent March 12, 1996 order, the Court directed PerSeptive to move to correct inventorship of the Perfusion Patents pursuant to 35 U.S.C. § 256[3] or the patents would be ruled invalid. PerSeptive sought leave to petition for immediate appellate review of the January 9 Order, which the Court denied. The Court also

1. Section 116 reads: "When an invention is made by two or more persons jointly, they shall apply for patent jointly and each make the required oath .... Inventors may apply for a patent jointly even though (1) they did not physically work together or at the same time, (2) each did not make the same type or amount of contribution, or (3) each did not make a contribution to the subject matter of every claim of the patent.

"If a joint inventor refuses to join in an application for patent or cannot be found or reached after diligent effort, the application may be made by the other inventor on behalf of himself and the omitted inventor. The Commissioner, on proof of the pertinent facts and after such notice to the omitted inventor as he prescribes, may grant a patent to the inventor making the application, subject to the same rights which the omitted inventor would have had if he had been joined. The omitted inventor may subsequently join in the application.

"Whenever through error a person is joined in an application for patent as the inventor, or through error an inventor is not named in an application, and such error arose without any deceptive intention on his part, the Commissioner may permit the application to be amended accordingly, under such terms as he prescribes."

2. PerSeptive has suggested that a recent case decided by the Federal Circuit, *Hess v. Advanced Cardiovascular Systems, Inc.*, 106 F.3d 976 (Fed. Cir.1997), calls the Court's partial summary judgment decision on joint inventorship into question. The Court is not persuaded for two reasons.

First, the inventive contribution by the omitted "inventor" in *Hess* is very different than the collaboration between Polymer Labs and Rounds and Regnier at Purdue Labs. For example, the district court found that when the named inventors approached Mr. Hess he "did not more than a skilled salesman would do in explaining how his employer's product could be used to meet a customer's requirements," and his suggestions for the use of the product "were well known and found in textbooks." *Id.* In contrast, Polymer Labs approached Purdue with a conception for the use of its 4000°A particles that it had already demonstrated and recognized had unusually good results. It was this conception that became the subject of the patents sought by the named inventors.

Second, although the Court was persuaded on the limited record available for summary judgment that the named inventors had themselves made an inventive contribution, on the much more extensive record developed during the trial detailed in the pages that follow, it is questionable whether the named inventors—especially Dean and Afeyan—made *any* patentable inventive contribution at all to Polymer Labs' conception of the invention. Indeed, the embodiment of the invention described in the plaintiffs' patents describes precisely the column sent to Purdue for testing by Rounds. Moreover, there was no persuasive evidence that the invention was substantially improved by Synosys, for example, by eliminating the batch-to-batch variations.

3. Section 256 reads: "Whenever through error a person is named in an issued patent as the inventor, or through error an inventor is not named in an issued patent and such error arose without any deceptive intention on his part, the Commissioner may, on application of all the parties and assignees, with proof of the facts and such other requirements as may be imposed, issue a certificate correcting such error.

"The error of omitting inventors or naming persons who are not inventors shall not invalidate the patent in which such error occurred if it can be corrected as provided in this section. The court before which such matter is called in question may order correction of the patent on notice and hearing of all parties concerned and the Commissioner shall issue a certificate accordingly."

denied PerSeptive's motion to vacate the January 9 and March 12 orders on April 29, 1996. Over objection, PerSeptive filed a motion to correct inventorship before the deadline set by the Court, reserving its right to appeal the January 9 and March 12 orders and the Court's denial of its motion to vacate the orders.

On May 3, 1996, the Court provided notice of the January 9 order to Polymer Labs, Warner, Lloyd and Rounds and invited each to intervene. They did not do so.

The Court conducted an evidentiary hearing pursuant to Section 256 over 10 days between May 23 and June 19, 1996, to determine whether the nonjoinder of Warner, Lloyd and Rounds arose from error, or whether it was a result of an intent to deceive the Patent Office. Over PerSeptive's objection, the Court placed the burden of proving the absence of deceptive intent on PerSeptive. After extensive proposed findings of fact and conclusions of law were filed over the summer, closing arguments were heard on August 9, 1996.

## FINDINGS OF FACT

### I. *A Primer on Liquid Chromatography*

Liquid chromatography is a procedure in which a Liquid containing a mixture of compounds is passed through a material that separates the mixture into its components. The perfusion patents at issue in this case concern the use of liquid chromatography to separate mixtures of proteins or other biological molecules into components, in order to identify the components of a substance or to obtain a component in purified form. Liquid chromatography typically is performed using thin tubes ("columns") that are tightly packed with a matrix of microscopic base particles ("media" or "packing materials" or "beads"). To the naked eye, the base particles look like fine sand or talcum powder. The matrix of packed particles does not fill up the entire space inside the column; rather, an inter-particle network of channels exists.

The base particles may be solid or porous. Porous particles may have pores that are crater-like and do not transect the particles and/or pores that transect the particles called "throughpores." The size of the particles and the pores is also significant. Particle diameter is typically measured in microns. A micron is equal to .000001 meter. The diameter of the pores inside the particles is measured in angstroms. One angstrom ("A") is equal to .0000000001 meter.

In order to perform a method of chromatography, the chromatographer typically introduces into a column a liquid containing a solution of one or more proteins. When liquid containing a mixture to be separated is introduced at the top of the column, the liquid flows down, around and/or through the particles and out the bottom of the column. The fluid flow rate through a column is referred to as the linear velocity and is typically measured in centimeters per hour ("cm/hr"). A modern form of column liquid chromatography, high performance liquid chromatography ("HPLC"), uses a pump to push liquid through the column at increased linear velocities, thereby decreasing the time in which the separation is performed.

The base particles may be modified (or "derivatized") by applying a chemical to the particles that has the ability to selectively interact or bind with the components in the liquid mixture. In adsorptive chromatography, the type of chromatography that is the subject matter of the patents, the proteins generally adsorb to (meaning "bind" to or "associate" with) the interactive surface regions of the particles. If the particles are porous, the proteins can bind to the interactive surface regions in the interior of the particles as well. The separation of the components is achieved because the various components flow through the column and sometimes through the pores of the base particles themselves at different rates, depending on the conditions in the column and the degree to which each component adsorbs to the particles at the so-called "interactive" or binding sites.

During the HPLC separation process, the compounds to be separated are carried to the interactive sites by two specific types of fluid movement—convection and diffusion—which can take place at the same time. The rate of

convection through the pores is the rate at which pressure drives the liquid containing the compounds to be separated through the pores. The rate of diffusion within the pores is the rate at which the compounds migrate from areas where they are highly concentrated to areas of low concentration.

Following adsorption, the chromatographer can change a characteristic of the liquid in the column in a controlled manner, so that the proteins selectively "desorb" (or detach) from the interactive surface regions. Carried by the liquid flow, the proteins exit the column (or "elute") where they can be detected, measured, or collected.

The patents-in-suit involve "perfusive chromatography," a method which depends on particles which feature throughpores, permitting liquids to flow through a particle. The throughpores used are relatively large compared to the particle size, so that at achievable liquid flow rates, a significant portion of the liquid passing through the column flows through the particles. As defined by the patent claims, "perfusive chromatography" occurs when the rate of convective flow through the particles exceeds the rate of diffusion. This *intra* particle flow allows the chromatographer to separate proteins at high speed without losing resolution or capacity to the same extent as when non-perfusive particles are used. The benefits of perfusive chromatography is to permit separations in one or two minutes with a significant amount of material without losing capacity.

Prior to 1987, materials and methods for chromatography of proteins and other biological molecules had substantial limitations. The fastest protein separations using porous materials were performed in 30 to 60 minutes per run. The speed of the separations was limited because biological molecules moved in the pores of the chromatography packing materials by diffusion, a slow process of random molecular motion. Trial Transcript ("Tr. Tr.") 1:99–100. Standard 1.0 ml. columns typically were operated at superficial bed velocities of 300 to 350 cm/hr.

Tr. Tr. 1:101. Attempts to speed separations by increasing liquid flow rates resulted in deteriorating performance, in the ability of the column to separate molecules into pure components, both in protein adsorption capacity and the resolution of the resulting protein separation. Tr. Tr. 1:100–101. Researchers had attempted various means to solve the problem of reduced performance at increased flow rates, including using smaller porous particles or non-porous particles. Both approaches were unsatisfactory. Tr. Tr. 1:100.

II. *Formation of Synosys Corporation*

A. *The Founders*

Afeyan, Dean and Regnier first discussed the formation of a company to design production-scale bioprocessing equipment in the summer of 1987. At that time, Dean, who was already an experienced entrepreneur and founder of several technology start-ups, met Afeyan, then a graduate student enrolled at the Massachusetts Institute of Technology ("MIT") Bioprocess Engineering Program. Tr. Tr. 1:94; 6:27–28. Dean introduced Afeyan to Regnier, who had been on the scientific advisory board of one of Dean's companies. Tr. Tr. 6:27. Regnier was a world-famous chromatographer. Tr. Tr. 1:94. Afeyan, Dean and Regnier incorporated Synosys Corporation ("Synosys"),[4] the predecessor of PerSeptive, in November 1987.

Synosys was a company in search of a product.

The three founders of Synosys have quite impressive scientific backgrounds. At the time Synosys was formed, Afeyan was completing his Ph.D. in chemical and biochemical engineering at MIT. Tr. Tr. 1:82. Afeyan became the President and CEO of PerSeptive in 1992. Tr. Tr. 1:81. Dean is an engineer, manager, and entrepreneur, having received his doctorate in chemical engineering from MIT in 1954. Tr. Tr. 6:15; Tr. Ex. 37. Dean had been an engineering professor in fluid mechanics at Dartmouth College where he taught the physics of fluid behavior and the engineering aspects of how one designs devices such as turbines and compressors, pipes and dams. He had started several

4. I will sometimes refer to Synosys as PerSeptive, and use the names interchangeably.

successful technology start-up companies. Tr. Tr. 6:16–18. He was elected to the National Academy of Engineering in 1977 and was the recipient of an award on innovation. Tr. Tr. 6:20. He is a named inventor on 15 or 16 patents, Tr. Tr. 6:21, 13 of which were obtained jointly with other inventors. Tr. Tr. 6:23. He left PerSeptive in January, 1989.

At the time Synosys was formed, Regnier was a professor of chemistry at Purdue University ("Purdue"), where he had taught since 1968. Tr. Tr. 8:5; Tr. Ex. 47. At Purdue, he also conducted research in separation science, which includes chromatography, primarily in the analysis of large biological molecules, such as proteins and DNA. Tr. Tr. 8:5–7. He began to work in the field of rapid separations in 1972 and his first publications were in 1976. For the past twenty years, Regnier has not himself worked in a laboratory, but describes himself as an "executive scientist." In his words, "I direct research, I'm involved in the research activity, but professors do very little hands-on research." Tr. Tr. 8:7. He had approximately 20 people working in his Purdue laboratory. Tr. 9–27. He had approximately 10 patents before forming Synosys, all in the field of protein chromatography. Tr. Tr. 8:10.

Regnier's specialty is in the area of surface coatings on particles. Tr. Tr. 8:10. A surface coating is a thin film (like shrink wrap) with hydrophilic properties, that modifies the particles without closing the pores. This pore coating enables a chromatographer to use the particles for more rapidly separating biomolecules in chromatography. Tr. Tr. 8:12. Regnier's patented invention was a surface coating called polyethyleneimine, or PEI. The patent was held by Purdue. Tr. Tr. 8:12.

B. *The Focus*

During the first few months, Synosys was a start-up without a laboratory or funds to pay any employees. The first technical discussions among the founders concerned the development of laboratory equipment for separations, an outgrowth of Dr. Afeyan's doctorate work at MIT. Tr. Tr. 1:94; 6:28.

As Dean and Afeyan both had primarily hardware backgrounds, in the summer of 1987, while Dr. Afeyan was finishing up his doctorate, they were interested in developing machinery to accelerate the chromatography process. Tr. Tr. 1:94; 6:28. The founders knew that about 75 percent of the cost in manufacturing protein pharmaceuticals was in the separation and purification end of the process, which they called "downstream processing". The focus of Synosys was to be improving downstream processing. Tr. Tr. 6:25, 6:27. Synosys' initial business priority was on the development of hardware and accompanying software for automated separations processes to be used with currently available chromatography media. Tr. Tr. 2:84; Tr. Tr. 6:28; Tr. Ex. 453 at 329247; Tr. Ex. 411 at 330483.

Synosys' early overall plans had included as a *secondary* priority the development of "consummables", that is, media products, as an important part of the company's business. Tr. Tr. 2:86; Trial Ex. 453. On November 3, 1987, Afeyan of Synosys wrote an investor about its focus on manufacturing units: "Synosys will develop during the first 18 months, a new unit of operation ... that will enable the user to carry out chromatographic separations continuously and without the use of columns." Tr. Ex. 453. He concluded:

So far, I purposely omitted a description of our plans for developing advanced chromatography media and filters which constitute the consummables side of our business. Consummables will be an important element with SYNOSYS. However, we will initially focus on the development of hardware and accompanying software and sensors to be used with currently available consummables. The reason for this has been elaborated above. At an early stage, we plan to initiate a new media development program within SYNOSYS, to complement the strong activities in this area at Purdue in Prof. Regnier's laboratories. We intend to provide substantial funding to his group. The developments made there will then form the basis for consummables manufactured by Synosys (per-

haps in cooperation with a materials supplier).

*Id.*

### C. *Refocus*

However, in late 1987, in light of experiments at his laboratory in Purdue on chromatography particles manufactured by Polymer Laboratories, Regnier convinced Dean and Afeyan that there were better business opportunities in improving the chromatography column itself and the media. Tr. Tr. 6:29. They refocussed the priorities of Synosys into developing chromatography packing materials superior to materials that had previously been available. Tr. Tr. 1:94–95; 6:29; 8:43. Afeyan, Dean and Regnier discussed the concept of enhanced intraparticle mass transfer in chromatography packings. Tr. Tr. 6:32. At the time of these initial conceptual discussions, Afeyan, Dean and Regnier explored the idea that flow through chromatography particles was a potential area of research. Tr. Tr. 8:57.

On December 14, 1987, Afeyan, Dean and Regnier followed up their discussions with a grant proposal to the National Institutes of Health ("NIH") Small Business Innovation Research Program ("SBIR"), proposing to conduct research on the design of "a new chromatography media" with a special bimodal porosity that would enhance transport. Tr. Tr. 1:105–106; 6:32; Trial Ex. 5. It was based on preliminary research at Regnier's lab at Purdue which showed that processing could be cut to minutes or even seconds. Bimodal particles are ones with two families of pores—very large pores and very small ones. Tr. Tr. 1:106. The SBIR proposal was submitted in mid–December 1987. Tr. Tr. 1:105–06; Trial Ex. 5. Afeyan, Dean and Regnier proposed to perform research to develop particles (or "popcorn balls") that would have been a special bimodal pore structure which would become part of the new company's "product line." They hypothesized that this special bimodal pore structure would permit enhanced intraparticle mass transfer of solute molecules because of high surface area. Tr. 1:95, 1:106. The performance sites for the research were to be

Synosys Corporation in Cambridge, which did not yet have a laboratory, and Purdue University. Tr. Ex. 5. The proposal was not funded. Tr. Tr. 1:108.

In late 1987 or early 1988, Prof. Regnier informed William Baitinger, head of Purdue's Office of Patents and Copyrights and a chromatographer, about his association with Synosys. Tr. Tr. 8:44–45.

### III. *Polymer Laboratories*

Since 1977, Polymer Laboratories Ltd. ("Polymer Labs"), a British company, has manufactured and sold products in the area of chromatography and polymer analysis. Warner is the chairman of PL International, Ltd., a holding company for Polymer Labs and its subsidiary, Polymer Laboratories, Inc. of Amherst, Massachusetts. Polymer Labs sells these products and offers technical support for the company's products in the United States. Deposition Transcript ("D. Tr.") 14–16 (Warner, May 16, 1995). Warner co-founded Polymer Labs in England in 1976. D. Tr. 12–13 (Warner, May 16, 1995).

Warner also has an impressive set of scientific credentials. Warner obtained his undergraduate degree at Loughborough University in industrial chemistry. He then received a doctorate in polymer science from Loughborough University. After receiving his doctorate, Warner conducted post-doctoral research in the area of the structure of polymer systems, and taught polymer science and engineering at the University of Massachusetts. D. Tr. 7–8 (Warner, May 16, 1995). He has twenty publications generally in the area of chromatography or the structure of polymers. D. Tr. 10 (Warner, May 16, 1995). Linda Lloyd, about whose educational background little is known, was formerly employed by Polymer Labs. One of her duties was to develop chromatographic media. D. Tr. 42–43 (Warner, May 16, 1995).

One of Polymer Labs' early product lines was a series of uncoated chromatography particles sold as early as 1977 under the trade name PL–GEL. This product line offered particles averaging three to 100 microns in diameter and having pore sizes ranging from ten to fifty angstroms up to

4000 angstroms. D. Tr. 24–26, 28 (Warner, May 16, 1995). PL–GEL particles were porous and were made from a styrene and divinylbenzene copolymer system. The PL–GEL particles were made by mixing together liquid styrene and liquid divinylbenzene with solvents to create pores inside the particles.

Warner was involved in developing Polymer Labs' process for manufacturing PL–GEL products and in marketing PL–GEL products. Polymer Labs first sold PL–GEL in the second quarter of 1977. The PL–GEL 4000°A product, which had a trade name of "PL–GEL 10⁶," was first sold in 1977. D. Tr. 24–26, 28 (Warner, May 16, 1995).

According to Warner, the PL–GEL particles made by Polymer Labs have always had transecting interconnecting pores. Scanning electron micrographs ("SEMs") or transmission electron micrographs ("TEMS") showed that PL–GEL particles were made of agglomerated microparticles that formed a complete structure. D. Tr. 28, 30–32 (Warner, May 16, 1995). These styrene-divinylbenzene copolymer particles have approximately fifty (50) percent pore volume. D. Tr. 31 (Warner, May 16, 1995). *Id.* Warner analogized the structure of these particles to "a ball that you can throw into water and basically it's able to absorb water throughout the structure." D. Tr. 32 (Warner, May 16, 1995). Warner arrived at the understanding that the PL–GEL 10⁶ had transecting pores through the particle from examination of SEMs in 1976. D. Tr. 47 (Warner, May 17, 1995).

In the early 1980's, Polymer Labs developed another kind of base particle ("PLRP–S"), with 4000–angstrom pores for use in reverse phase chromatography. PLRP–S is also a styrene/divinylbenzene copolymer. A reverse phase material is a hydrophobic (water-hating) packing material that is used to separate molecules by means of the attractions that surfaces have for each other. A reverse phase material does not separate molecules on the basis of size, but on the basis of attraction. D. Tr. 33–34 (Warner, May 16, 1995).

The Polymer Labs' PLRP–S particles were made in the exact same way as the PL–GEL particles. Polymer Labs sold PLRP–S particles ranging in diameter from 5 to 100 microns. The average pore sizes for the PLRP–S particles were 100°A, 300°A, 1000°A and 4000°A. Polymer Labs first sold PLRP–S particles in the early 1980s, sold PLRP–s with a 1000°A average pore size in 1985, and first sold 4000°A PLRP–S particles before January 1, 1988. D. Tr. 36–37 (Warner, May 16, 1995).

### IV. *Collaboration Between Purdue and Polymer Labs*

#### A. *First Rounds*

From 1985 to July 1987, Prof. Regnier's laboratory at Purdue University conducted research on chemical coatings for Polymer Labs chromatography materials. The rights to all this research belonged to Purdue. Tr. Tr. 8:17–21. Tr. Ex. 430, 432. In late 1985, the informal collaboration commenced. The goal was to apply the surface coating technologies which Regnier had developed for use on silica particles, which are a different type of chromatographic media, onto Polymer Lab's polystyrene packings. D. Tr. 45 (Warner, May 16, 1995).

Mary Ann Rounds was employed first as a lab technician and then as a research assistant in Regnier's laboratory at Purdue University from June 1982 through December 1989. D. Tr. 18–19 (Rounds, Oct. 6, 1994). Rounds has a bachelor of science degree from Purdue. She also has a masters degree in textile chemistry from Cornell University and a masters degree in chemistry from Purdue. D. Tr. 15–17 (Rounds, Oct. 6, 1994); Tr. Tr. 9–27 (Regnier). Regnier was her ultimate supervisor, but he delegated a broad scope of authority to the students and technicians in his laboratory. Particularly in the later years of employment, her work was "fairly independent." D. Tr. 36 (Rounds, Oct. 6, 1994). She co-authored several publications with Regnier. *Id.*

After seeing an advertisement, Rounds made the initial contact with Polymer Labs to inquire as to the availability of packing material. D. Tr. 45 (Rounds, Oct. 6, 1994).

On December 17, 1985, Warner wrote to Rounds at Purdue University in Lafayette, Indiana, stating: "Polymer Laboratories would be pleased to *collaborate* with yourself and Professor F. Regnier by supplying, free of charge, loose polymeric HPLC packings for derivatizing at Lafayette." Tr. Ex. 430 (emphasis added). He then wrote: "Currently we have available a whole range of polystyrene/DVB macroporous packings at 8 or 10 micron particle sizes in 100, 300, 1000 and 4000–angstrom pore sizes. These may in the future be available in modified form and could possibly be useful to you as an intermediate in your work." *Id.* Warner indicated that he was researching "modification areas on these materials" and might be able to provide Rounds with some. *Id.* In return, he wanted to be informed of any "interesting or commercially useful results on the materials that we supply." *Id.; See also* D. Tr. 41–44 (Rounds, April 7, 1995); D. Tr. 50–54 (Warner, May 16, 1995); Tr. Ex. 430.

On January 3, 1986, Rounds and Regnier responded, stating that their "objective is to make ion-exchange chromatographic media for biomolecules" and promising that if the research is successful, they would make their findings available well in advance of publication and acknowledge that Polymer Labs provided the materials. The letter concluded:

In accordance with your wishes, we will simply exchange findings of interest to you for the packings received. Should you decide that you prefer monetary compensation for the media or *a more formal collaboration,* please do not hesitate to contact us.

Tr. Ex. 432 (emphasis added). The understanding was that Dr. Regnier's lab at Purdue and Polymer Labs would exchange information on the Polymer Labs packing material which Regnier's lab received free of charge. *Id.; See also* D. Tr. 41–45 (Rounds, April 7, 1995); D. Tr. 50–54 (Warner, May 16, 1995); Tr. Ex. 430.

Rounds hoped to evaluate the Polymer Labs materials for use in the chromatography of large molecules. The purpose of Rounds' initial work at Purdue was to modify Polymer Labs' PL–GEL product by applying an interactive surface chemistry known as SAX. This coating technology involves the application of an adsorbed polyethyleneimine ("PEI") coating to the base particle, and modification to create a strong anion exchange (SAX) particle. The SAX technology had been patented by Regnier, and had been licensed to Polymer Labs by the Purdue Research Foundation which owned the rights to the invention because the work had been done at Purdue. *See also* D. Tr. 41–44 (Rounds, April 7, 1995); Tr. Ex. 430.

Rounds evaluated the 300–angstrom and 1000–angstrom media from Polymer Labs in the first half of 1986, and discussed the results with Regnier. They concluded that the results were favorable. With Regnier's knowledge, Rounds sent the evaluation of the material to Polymer Labs. The collaboration with Polymer Labs continued to be informal. D. Tr. 44–47 (Rounds, April 7, 1995).

On April 21, 1986, Rounds sent additional data to Warner consisting of chromatograms using the 300°A and 1000°A PEI–coated styrene-divinylbenzene copolymer particles from Polymer Labs. The chromatograms using PL–SAX 1000°A material demonstrated that their performance was equivalent or better than the best silica-based strong anion-exchange column in certain aspects. During this period, Regnier was aware of, and excited about, Rounds' work on the Polymer Labs material because they had frequent discussions regarding her experiments and results. D. Tr. 53–55 (Rounds, April 7, 1995). Rounds' and Regnier's work on the 1000 angstrom Polymer Labs' particle was published in the *Journal of Chromatography* in June, 1987. Rounds was listed as the first author, signifying that she made the primary contribution to the work. D. Tr. 57 (Rounds, April 7, 1995).

After receiving the favorable results of the research from Regnier's laboratory, Polymer Labs decided to commercialize the SAX coated version of its 1000–angstrom particle. In Warner's words: "The PL–SAX product was developed through a *collaboration* with Professor Regnier of Purdue University and that collaboration started, I think, in 1985." D. Tr. 45–48 (Warner, May 16, 1995) (emphasis added). During this period of informal col-

laboration, Polymer Labs developed and supplied the macroporous packing materials and Purdue supplied the coating technology.[5] D. Tr. 45–50 (Warner, May 16, 1995).

On July 7, 1986, Rounds had written Warner:

I am pleased to hear that Polymer Labs is interested in marketing the strong anion-exchange packing material which I made from your 1000°A polystyrene DVB.

Although other larger companies are also quite interested in this technology, it has always been my hope that Polymer Labs would benefit most directly since none of this work would have been done without your generous gift of polystyrene last December.

Tr. Ex. 435; see also D. Tr. 64–65 (Rounds, April 7, 1995).

During the summer and fall of 1986, Warner and Dr. Ray Wetton of Polymer Labs visited Regnier's laboratory at Purdue with Rounds and certain graduate students. Regnier was not present. D. Tr. 69–70 (Rounds, April 17, 1995). The purpose of the visits was to discuss the results that had been obtained to date on Polymer Labs media and to discuss additional, more formal collaboration. At Purdue, Warner learned how Rounds coated Polymer Labs particles, packed them into a column, and evaluated them. D. Tr. 68–71 (Rounds, April 7, 1995).

### B. A Formal Collaboration

On December 1, 1986, Polymer Labs obtained a non-exclusive license to use the Purdue PEI coating technology developed by Regnier. Tr. Ex. 48. In lieu of paying a license fee to Purdue for the coating technology, Polymer Labs agreed to sponsor research in Regnier's lab, primarily by Rounds. Tr. Tr. 8:30. In December 1986, Polymer Labs entered into a formal six-month agreement with Purdue to provide $20,000 in funding for the development of packing materials for HPLC of proteins, and, in particular, to optimize "the macroporous strong anion-exchange (SAX) packing material for commercialization." Tr. Ex. 49; see also Tr. Ex. 50. The project title was "The Development of Polystyrene Divinylbenzene–Based Packing Materials for HPLC of Proteins." Tr. Ex. 50. The agreement provided that "[c]ommunication of research findings will generally be informal, i.e., by telephone or brief written descriptions, since this is felt to be most efficient." Tr. Ex. 49. In addition, the agreement, which covered the period from January 1, 1987 through July 31, 1987, specified that Rounds would devote 100% of her time to the research, while Regnier would spend only 2% of his time on the project. Tr. Ex. 49. Polymer Labs made its 1000°A PL–SAX particles available to the market at a February 1987 Pittsburgh Conference known as "Pit-Con 1987." D. Tr. 66–69 (Warner, May 16, 1995).

Rounds understood that it would be her responsibility to teach Polymer Labs how to make packing materials pursuant to the procedure she would devise. D. Tr. 61, 63 (Rounds, October 6, 1994). There were no limits on her authority to communicate with Warner or Lloyd, the chromatographer and product manager at Polymer Labs. There was a high level of interaction between Rounds and Lloyd under the agreement. D. Tr. 48, 64–65 (Warner, May 16, 1995); Tr. Ex. 50. On June 24, 1987, Lloyd sent Rounds two columns of 1000°A PL–SAX packing material from the first production batch, which Polymer Labs intended to commercialize. Rounds evaluated the columns using a standard protocol and protein mixture and they compared favorably to the runs she had performed previously. D. Tr. 67–68 (Rounds, April 7, 1995). Rounds spent July, 1987 analyzing the PL–SAX columns. On July 14, 1987, she wrote Dr. Warner expressing doubts about her authority to communicate information directly after July 31, when the formal agreement ended, if further funding was not forthcoming. Tr. Ex. 54. However, despite her concerns, communications continued throughout the summer.

5. The structure of the base particles of the PL–SAX media are extremely similar to the base particles of the PL–GEL, and PLRP–S particles, and manufactured in the same way. D. Tr. 37, 41 (Warner, May 16, 1995); D. Tr. 49–51 (Warner, May 17, 1995).

Regnier was aware of the work Rounds conducted on Polymer Labs materials during the summer of 1987. D. Tr. 79 (Rounds, April 7, 1995). On August 13, 1987, Regnier wrote and sent a "curt and angry" letter to Warner to request continued funding for Rounds' work on the Polymer Labs particles. Tr. Ex. 51. He pointed out that Purdue had produced proprietary columns with "reproduceable" results, which gave him a competitive "edge." He wrote: "The situation is critical! I am not sure that you ever really believed that, but it is true. It is impossible to get anyone else to fund the development of media for which you hold the exclusive license." *Id.* In making his request, Regnier stated "I can not ask a talented scientist, such as Mary Ann, to work in an environment where they do not know from one month to the next if they will be employed." *Id.*

On October 13, 1987, Warner responded, writing that Polymer Labs, "a small company," could not provide additional funding until sales results justified research expenditures. Tr. Ex. 53. Pointing out that "$20,000 coupled with our costs represented a major expenditure into this area for us," Warner wrote: "I am personally very concerned with your discontent with us as a collaborator since I believed there was a strong future between PL· and yourself." Tr. Ex. 53.

### V. *Polymer Labs Develops The 4000 Angstrom Particle*

In 1987, Polymer Labs, on its own initiative, began applying the SAX coating technology to 4000–angstrom particles. Polymer Labs developed the PL–SAX 4000°A particle so that the larger pores of the particles would allow larger proteins or oligonucleotides to enter the pores. D. Tr. 69–70 (Warner, May 16, 1995). Proteins which might be excluded by the 1000–angstrom pores might enter the 4000–angstrom pores. Polymer Labs made the base PL–SAX 4000°A particles using the same process that was used to make PL–GEL $10^6$ particles and coated the PL–SAX 4000°A particles with PEI. *Id.* After derivatizing the PL–SAX 4000°A particles,

Polymer Labs packed them into a column and conducted various quality control tests. *Id.* at 70. A series of standard samples were injected into the column to check the efficiency of the column. Polymer Labs quality control personnel then evaluated the separations. *Id.* The PL–SAX 4000°A packing material worked "extremely well with very sharp peaks and high efficiencies, possibly a little bit higher than we would have expected from our 1000°A background." *Id.* at 72. While at Purdue, Regnier had no role in the development of the 4000 angstrom particles. D. Tr. 852–853 (Regnier Aug. 17, 1994).

Lloyd publicly presented her work on PL–SAX 4000°A which studied the influence of pore size on chromatographic performance of PL–SAX particles, including the 100, 300, 1000 and 4000 angstrom particle at a flow rate of 1 ml/min (which amounts to 360 cm/hr). D. Tr. 73–76 (Warner, May 16, 1995). In a paper presented at a conference in England on September 15–18, 1987, Lloyd, Warner and others showed the results of separations of biological materials in a matrix composed of PL–SAX 1000 particles. They also presented "dynamic protein loading" and "capacity data" for columns of 100, 300, 1,000 and 4,000 angstrom columns.

Lloyd and Warner publicly proclaimed the improved speed and high resolution provided by Polymer Labs' macroporous particles:

Until recently, biochromatography was the restricted domain of those (patient) scientists suffering 12–36 hour run times. The "soft" microporous gels used for this type of liquid chromatography provide high resolution separations by discrimination of solutes based on molecular size, hydrophobicity, ionic charge and specific bioaffinities. Replacement by HLPC sililas and macroporous polymers with the same basic separation mechanisms allow separations *to be performed in minutes rather than hours.*

Tr. Ex. 449 (emphasis added). An electron micrograph of 4000 angstrom, 10 micron particle was included in the presentation. *Id.*

Polymer Labs again publicly presented the results at the conference in England and at the Seventh International Symposium on HPLC of Proteins, Peptides and Polynucleo-

tides in Washington D.C. on November 2–4, 1987. D. Tr. 73–74 (Warner, May 16, 1995). Regnier and Rounds attended. D. Tr. 81 (Rounds, April 17, 1995). A poster prepared for the symposium was entitled "Influence of Pore Size/Ionic Capacity on the Separation of Small and Large Biomolecules when using Polymeric Anion Exchange Media." D. Tr. at 80–81 (Warner, May 16, 1995). In the paper presented at the conference, Warner, Lloyd and another author concluded: "Therefore for the analysis of very large proteins, e.g., thyroglobulin and DNA the optimum material would be the PL–SAX 4000A but for the gradient elution of small solutes and the majority of proteins the smaller pore size PL–SAX 1000A would provide optimum resolution loading."

## VI. Collaboration Between Purdue and Polymer Labs Succeeds

As a result of the conference, the collaboration between Polymer Labs and Purdue Laboratory continued. At the conference, Regnier and Rounds met with John McConville, a representative of Polymer Labs who asked them to do some additional chromatographic evaluations of a column packed with the PL–SAX 4000°A polystyrene particles which had been derivatized and evaluated by Lloyd. Regnier agreed to convey Purdue's findings back to Polymer Labs after completion of the tests requested by McConville. D. Tr. 80 (Rounds, April 7, 1995).

On November 12, 1987, as McConville requested, Rounds wrote a research plan indicating she would compare PL–SAX 1000°A particles, PL–SAX 4000°A particles, and nonporous media. Tr. Ex. 456. She would use a standard protocol for the comparison and, in her research plan, she posed the specific question: "Can fast separations be achieved if the 4000°A is packed into small cartridges analogous to non-porous SAX?" Id.

On November 17, 1987 Rounds wrote Lloyd and informed her that she would be glad to evaluate the Polymer Labs 4000°A column. Rounds stated in her letter that Regnier wanted her to compare 1000A, 4000A and nonporous packings on large proteins. She wrote:

I am curious to see if it is possible to achieve equally fast separations on the 4000°A packing as on non-porous if both are packed into the same size columns. . . .

Tr. Ex. 487; D. Tr. 80–83 (Rounds, April 7, 1995).

On December 1, 1987, Lloyd sent Rounds a column packed with PL–SAX 4000°A media. Tr. Ex. 460. Lloyd wrote Rounds that she had made PL–SAX 4000A to "investigate the effect of pore size and pore infill on both ionic capacity and protein loading with a view to optimizing a material for preparative fractionation. As demonstrated in the poster, the 4000°A pore size is required for large proteins and DNA (fragments) for maximum resolution and loading." Tr. Ex. 460. Lloyd further wrote that "this larger pore material is the basis of a commercial product and [I] hope to be able to undertake further evaluation with a view to commercialization . . . . I would be most interested to hear what you think of this material and if you feel, as I do, that the material should be commercialized." Id.; see also D. Tr. 83–84 (Rounds, April 7, 1995). She enclosed her poster data.

Rounds received experimental batches of PL–SAX 4000A from Polymer Labs (from the same batch that Lloyd had used to produce the data in the poster) for testing on December 28, 1987. Rounds ran the columns at high flow rates of 360 cm/hr (1 ml/min) and 720 cm/hr (2 ml/min), according to the standard lab protocols and her experience. D. Tr. 202 (Regnier, July 21, 1994). The initial separation results were in Rounds' words "really good." Tr. Ex. 464; D. Tr. 90 (Rounds, April 7, 1995). Of particular significance was the "surprisingly high capacity of the 4000–angstrom pore diameter material compared to 1000 angstrom pore diameter material." D. Tr. 82–86 (Rounds, April 7, 1995). Based on her chromatograms, Rounds concluded that "very little resolution is lost by going to a five-minute gradient at 2 ml per minute flow rate." D. Tr. 86–91 (Rounds, April 7, 1995).

On December 30, 1987, Regnier and Rounds discussed the chromatograms produced by Rounds. Regnier was very excited and said "Hey Mary Ann, this is a great column." D. Tr. 84–86 (Rounds, April 7,

1995). Regnier was so excited about the results of the data that he suggested to Rounds that she call Lloyd and that they "should get together and plan a study and write a paper on these comparisons." D. Tr. 91 (Rounds, April 7, 1995). In addition, during their discussion, Rounds and Regnier discussed running the media at higher velocity, pursuant to a "standard testing protocol," to 4.0 ml/min, as had been used in testing non-porous materials. Tr. Tr. 8:55.

On December 30, 1987, Rounds called Lloyd to plan jointly the study and to exchange data. That same day Rounds forwarded the chromatograms and wrote Lloyd:

> Dr. Regnier is very excited over the 4000°A packing material (he thinks it will be great for preparative use). He suggested that you and I *collaborate* to do a thorough study of this material, which should be publishable.

Tr. Ex. 464 (emphasis added). (Tr. Ex. 464.) Rounds then asked for 10 micron, 4000°A packing particles for testing. *See also* Tr. Ex. 464; D. Tr. 86–91 (Rounds, April 7, 1995). Rounds had concluded that the porous 4000°A particles had excellent performance without the disadvantage of nonporous particles. Tr. Ex. 464.

Lloyd gave Rounds' December 30, 1987 letter to Warner and discussed Rounds' chromatograms with him. D. Tr. 101–107 (Warner, May 16, 1995). He agreed with Rounds' conclusion that the "chromatographic performance of the 4000°A approaches that of the non-porous with the advantage of higher capacity and *without* the disadvantages associated with the use of small non-porous particles!" Tr. Ex. 464 (emphasis in original); D. Tr. 101–106 (Warner, May 16, 1995). Warner was also excited about the evaluation of the 4000°A PL–SAX products because it was a Polymer Labs particle, Polymer Labs had licensed the coating for the particle, Polymer Labs was bringing the product to market, and Polymer Labs was making presentations to the scientific community about the use of the 4000°A product to effect chromatographic separations of proteins. D. Tr. 106–107 (Warner, May 16, 1995). As far as Warner knew, no other people were making presen-

tations to the scientific community in late 1987 or early 1988 about PL–SAX 4000°A particles. *Id.*

Rounds conducted additional experiments on the Polymer Labs 4000°A column on January 12, 1988. D. Tr. 92–98 (Rounds, April 7, 1995); Tr. Ex. 467. In these experiments, she increased the flow rate to 4 ml/min. *Id.* The January 12 chromatograms confirmed Rounds' earlier conclusions that the Polymer Labs 4000°A materials were unusual. *Id.* When Rounds showed the results of her January 1988 experiments to Regnier, he concluded that the Polymer Labs media were "spectacular." Tr. Tr. 8:56. He "had never seen a ... porous material ... that would retain its resolution almost unchanged at ... high velocities[.]" Tr. Tr. 8:56.

On January 22, 1988, Rounds forwarded her January 12 chromatograms to McConville at Polymer Labs. Tr. Ex. 472. In a letter to McConville, Rounds wrote, "Fred is quite excited about the 4000°A material, which he already envisions to be 'the *Universal* Packing Material,' i.e., for analytical *and* preparative!" Tr. Ex. 472 (emphasis in original). Rounds based this statement on "Regnier's excitement and enthusiasm and interest expressed during several conversations about the results [obtained] on this column of 4000 angstrom packing material." D. Tr. 97–98 (Rounds, April 7, 1995). Rounds further stated to McConville in her January 22, 1988 letter: "I'm glad you plan to introduce it [PL 4000] at Pit–Con as I think lots of companies might want to 'get on the bandwagon' if they hear about the advantages of the very large pore polystyrene." Tr. Ex. 472.

On January 19, 1988, Lloyd sent Rounds 8 micron PL–SAX 4000°A and 10 micron PL–SAX 4000°A for her evaluation. D. Tr. 99–100 (Rounds, April 7, 1995); *see also* Tr. Ex. 470. Lloyd agreed with Rounds that "the non-porous materials should not be regarded as a replacement for large pore packings." Tr. Ex. 470. Lloyd also indicated in an accompanying letter that she was working on a "product launch" for the PL–SAX 4000°A aimed to take place at the Pittsburgh Conference in February, 1988. Tr. Ex. 470.

Rounds packed the bulk PL–SAX 4000°A material sent by Lloyd into small cartridges

for evaluation and ran various experiments using the small cartridges. D. Tr. 100–103 (Rounds, April 7, 1995); Tr. Exs. 474 and 475. Based on these additional experiments, she again concluded that the PL–SAX 4000°A material was behaving "analogously" to non-porous polystyrene-based packing. Tr. Ex. 475. She spoke with Regnier about the chromatograms that resulted from the experiments with small cartridges. D. Tr. 99–103 (Rounds, April 7, 1995).

On February 5, 1988 Rounds wrote an animated letter to Lloyd proclaiming the virtues of 4000–angstrom PL–SAX media which "does indeed perform analogously to nonporous, without the problems of high back pressure and low loading capacity." Tr. Ex. 475. Rounds had separated a four protein mixture at a flow rate of 3 ml/min achieving a good resolution *in 45 seconds.* She wrote:

> Dr. Regnier is most excited about the preparative potential of this packing material and told me that he had talked to Frank (Warner) about the possibility of arranging some kind of agreement between PL and "Synosis", the new company which Fred is involved in starting along with two other men from the Boston area. Whether this takes place or not, there certainly will be a market for the 4000°A packing material, if Fred's interest and enthusiasm for it are a valid indication of the future.

*Id.* The chromatograms generated by Rounds on 4000–angstrom Polymer Labs material, at Polymer Lab's request, in January and February 1988, represented perfusion chromatography. In the early part of 1988, Rounds discussed with Warner and/or Lloyd that Regnier hypothesized that flow-through the particles was a possible explanation for the excellent performance of the PL–SAX 4000°A particles at high speed. D. Tr. 107–108 (Warner, May 16, 1995). All communications between Warner and Lloyd at Polymer Labs and Rounds in early 1988 were authorized.

The 4000A PL–SAX particle was first introduced as a commercial product at the Pittsburgh conference ("Pit–Con 1988") in February 1988 and first sold in the United States in June, 1988. D. Tr. 81 (Warner, May 16, 1995).

On March 4, 1988, Lloyd wrote to Rounds stating that Rounds' PL–SAX 4000°A evaluation looked "absolutely great," and added: "The more I use the [PL–SAX 4000°A] material the more convinced I become that high speed/high load separations could be achieved using standard HPLC systems." Tr. Ex. 29. Twice Lloyd forwarded to Rounds data Polymer Labs had developed on PL–SAX 4000°A. D. Tr. 108 (Rounds April 7, 1995). Lloyd forwarded information concerning separations she accomplished on PL–SAX 4000°A at a flow rate of 2 ml/min (720 cm/hr), and asked for Rounds' completed evaluation on the packing materials. Included with the letter was Lloyd's chromatogram depicting the separation of an oligonucleotide or polypeptide sample at 2 ml/min. Tr. Ex. 29.

On March 16, 1988, Rounds replied again to Lloyd, calling the oligonucleotide chromatogram "spectacular," continuing the data exchange, and proposing that they begin "putting together a paper." D. Tr. 108–110 (Rounds April 7, 1995).

The oligonucleotodide separation performed by Lloyd was presented in a publication entitled "Application of Polymeric Packing in Bio–HPLC" by Lloyd and Warner ("Lloyd III") at the International Symposium on Biomedical Applications of Liquid Chromatography, March 23–25, 1988, Bradford, Yorkshire, U.K. D. Tr. 108–111 (Rounds, April 7, 1995). This is the third presentation by Polymer Labs in a scientific forum. Polymer Labs concluded again: "For the analysis of large proteins (e.g., thyroglobulin) or DNA restriction fragments/oligonucleotides, a large pore PL–SAX 4000°A materials is recommended." Ex. 488. This paper also includes an SEM of a 4000°A, 10µ PL–SAX particle, before derivatization. Tr. Ex. 488 at 313527; D. Tr. 97–101 (Warner, May 16, 1995). It is the same base particle as used for the PL–GEL $10^6$ and PLRP–S particles. At the time Polymer Labs presented this paper, Warner knew that the chromatographic resolution for the 4000°A PL–SAX particles was very high and that the Polymer Labs 4000°A particles performed significant-

ly better than the 1000°A particle for the separation of oligonucletodides. D. Tr. 97–101 (Warner, May 16, 1995). The collaboration between Polymer Labs and Purdue had succeeded in achieving a separations process for proteins at high speeds without losing resolution.

## VII. *The Race Car*

By early 1988, Synosys intended to sell chromatography media. Regnier knew that the media manufactured by Polymer Labs presented the business opportunity Synosys had been seeking. Tr. Tr. 9:66–9:67. Following the receipt and analysis of Rounds' work on the PL–SAX 4000°A media in early 1988, Regnier called Afeyan and Dean to tell them about Rounds' results. Tr. Tr. 9:67. Prior to that time, neither Afeyan nor Dean even knew the experiments were being done. Tr. Tr. 2:104. Indeed, Dean recalled first hearing about Polymer Labs early in 1988 from Regnier. Tr. Tr. 6:39.

Within a day of Rounds' follow-up chromatograms on January 13, 1988, Dean and Regnier discussed for the first time the chromatographic performance, including resolution, of Polymer Labs 4000°A. Tr. Ex. 210 at 306748–749; Tr. Tr. 6:93–6:94. Dean's Synosys notebook states that Polymer Labs 4000°A "run almost as fast as non-porous" particles. Tr. Ex. 210 at 306749; Tr. Tr. 6–93 to 6–94 (Dean). The chromatograms demonstrated that the particles provided good kinetics, that is, they resolved proteins at high speeds up to 1440 cm/hr. However, the chromatograms alone did not reveal anything about the mass transfer taking place in the particles. Tr. 8:57.

His interest piqued, within a week, Dean began to gather and record information on the nature of the Polymer Labs macroporous particles. Tr. Ex. 210 at 306762. Dean, a prodigious note-taker, made a notebook entry dated January 20, 1988, which includes a rough drawing of the structure of the Polymer Labs particles that depicts the particles as having at least two discrete families of pores—"macropores" and "micropores." *Id.* He presumed the 1000°A particles had "channels". *Id.* Dean asked Regnier: "FER—Do

you have SEM's of this macroporous stuff?" *Id.* On this date January 20, 1988, Dean was also advised by McConville that the void fraction of the Polymer Labs particles was 0.50. Void fraction measures the percentage of empty space within the particle. Tr. Ex. 41.

By early February 1988, the Synosys triumvirate knew they had a "race car," and set about in earnest to determine how the "engine" worked. On February 5, 1988, Regnier reported to Dean the results of chromatographic experiments using Polymer Labs 4000°A particles in which "excellent" resolution was obtained in a short period of time (3 minutes). Tr. Ex. 210 at 306808; Tr. Tr. 6:96–6:97. Dean followed up with a call to Warner to learn as much as he could. Warner told Dean there was flow through the Polymer Labs particles and that Regnier believed that there was convective mass transfer inside the particles. Tr. Tr. 6:97–6:98. Warner also told Dean that it was easy for Warner to tailor the pore sizes of his particles and provided data on the surface area of PL–SAX 4000°A media. Tr. Tr. 6:100–6:101: Tr. Ex. 210 at 306811; D. Tr. 84–85 (Dean, November 18, 1994); Tr. Ex. 210 at 306810. Dean learned that Polymer Labs did not have patents but was protecting its technology as trade secrets. Tr. Tr. 6:100.

On February 25, 1988, Rounds, at Regnier's request, sent copies of chromatograms that she had run on 4000°A PL–SAX material at Purdue in January, 1988 to Dean. D. Tr. 105–108 (Rounds, April 7, 1995).

## VIII. *Pit–Con*

The Pittsburgh Conference meeting is an annual industry meeting. According to Warner, "It's the major meeting in the States, in fact, worldwide, where people produce new products for sale. And it's a meeting essentially of commercial companies, but there are also associated lectures there at the meeting." D. Tr. 66–67 (Warner, May 16, 1995). It occurs generally at the end of February or the beginning of March of each year. *Id.*

Pit–Con was held on February 22 to 26, 1988. Polymer Labs introduced the PL–SAX 4000°A particle as a commercial product at this conference. D. Tr. 81 (Warner, May

16, 1995). Before introducing PL–SAX 4000°A particles, Polymer Labs began advertising and sending out press releases for the new product to a number of journals. D. Tr. 83–86 (Warner, May 16, 1995). One February 1988 press release describes PL–SAX 4000°A as follows: "[t]he high capacity combined with exceptionally short equilibration times enables rapid anion exchange of biological macromolecules to be achieved in minutes with steep gradients."

Lloyd, Warner and other scientists presented another paper ["Lloyd II"] at the 39th Pittsburgh Conference and Exposition on Analytical Chemistry and applied Spectroscopy in New Orleans entitled "Polymeric Anion Exchange Columns for the HPLC Analysis of Large Biological Solutes (Proteins)." This paper discussed the use of PL–SAX 1000 and 4000–angstrom particles of 10–micron diameter, and included chromatograms. For analysis of DNA, restriction fragments and oligonucleotides, the paper concluded "the large pore size maximizes the loading capacity through maximum available surface area." D. Tr. 88:93 (Warner, May 16, 1995).

Synosis also had a presence at Pit–Con. Regnier brought samples of the PL 1000°A and 4000°A particles (given to him by Rounds) to obtain SEMs "to get some idea of what these particles looked like." Tr. Tr. 8:66; *see also* D. Tr. 46–47 (Rounds, April 6, 1995). Afeyan went with Regnier. Tr. Tr. 8:69–8:70.

Regnier, Afeyan and Dean each received copies of the SEMs of the Polymer Labs materials that were taken at the Pittsburgh Conference in February of 1988. Tr. Tr. 9:74. Although the SEMs did not reveal the internal pore structure of the particles. Tr. 1:113, 6:51, 8:67, they confirmed that the PL–4000°A media had "very large pores." Tr. Tr. 8:66–8:67.

IX. *Perfusion*

By the end of March, Dean and Regnier had concluded that the Polymer Lab particles had throughpores. After seeing the micrograms on February 25, 1988, Dean authored a memorandum "to commence the formal development of our mass-transfer technology base for adsorbents." Tr. Ex. 38; Tr. Tr. 6:35–6:36. The memorandum states, under the heading "Mass–Transfer": · ·

> There also is the issue of perfusion *through* the sorbent particle which may be a more significant phenomenon in packed beds than in stirred or fluidized beds, because of the higher pressure gradients of the former.
>
> *    *    *    *    *    *
>
> Likewise, if there be perfusion *through* the particle, then the mass-transfer coefficient can be affected by orders of magnitude.

Tr. Ex. 38 at 308343 44 (emphasis in original). The memorandum assumes transport "channels" through the particle, as well is transport in secondary pores. The Synosys objective is to "assess the state-of-the-art of scientific understanding of the mass transport processes in POROS media and specifically bi-modal poros media." *Id.* at 208347. It also states that "there is no theory, developed from first principles, to explain and quantify" the effect of perfusion through the matrix. Tr. Ex. 38 at 308348. Dean testified that the use of the term "perfusion" in his memorandum referred to "convective flow" through the particle—in one side and out the other. Tr. Tr. 6:36–6:37.

On March 9, 1988, McConville visited Synosys for a meeting with Dean that lasted for several hours. Tr. Tr. 6:111; Tr. Ex. 210 at 306858–863. At that time, McConville, who worked from the Polymer Labs facility in Amherst, Massachusetts, was the United States representative of Polymer Labs. Tr. Tr. 6:112. During their March 9, 1988 meeting at Synosys, McConville gave Dean information about Polymer Labs products, including data on the pore volume of the 4000°A particles, *i.e.*, the fraction of the particle that is empty. Tr. Tr. 6:111–6:113. McConville told Dean (what he had already heard two months earlier) that the pore volume of the PL–SAX 4000°A particles was 50%; in other words, that about 50% of the space inside the PL–SAX 4000°A particles was empty. Tr. Ex. 210 at 306860. Dean's notebook record of his March 9, 1988 meeting with McConville includes a drawing that depicts Polymer Labs particles as a "macroporous" agglomer-

ation of small microspheres, information that was provided by McConville to Dean at the March 9 meeting. Tr. Ex. 210 at 306860; Tr. Tr. 6:114.

By February–March 1988, Regnier's loyalties had shifted from Purdue to Synosys, and Rounds' loyalties shifted from Regnier to Warner. Tension developed between Rounds and him. On February 19, 1988, McConville had asked Rounds for the photomicrographs Regnier had taken of the polystyrene particles at Pit–Con if it didn't "compromise her." On March 16, 1988, pursuant to this request, Rounds forwarded reprints of the SEMS which Regnier took of 4000°A PL–SAX—pointing out that Afeyan had the original.

Her letter reflects a disaffection with Regnier's new role at Synosys, and her concern about its effect on Polymer Labs.

> Linda Lloyd has sent me a product information sheet, along with some of her data from 4000°A PL–SAX (including a spectacular separation of oligoribonucleotides). I know she and I are both finding that this packing material has tremendous potential for both analytical and preparative applications. I guess that's why I called you about the photomicrographs. I find it difficult to interpret Fred's "Synosis-related behavior" [sic] because he has a lot at stake in this company (not only is he a personal investor but he also wants to impress the other two men). Presumably the "cross-licensing agreement" would be favorable to both parties; I assume that important points will be put into writing for P.L.'s protection, since you were the first to make such a large-pore polymeric packing and *since P.L. has obviously done an excellent job of optimizing the PEI coating as it is presently being applied to PL–SAX (both 1000°A and 4000°A PL–SAX perform a lot better than my original version!)*

Tr. Ex. 113 (emphasis added).

Regnier and Dean discussed the phenomenon of perfusion on March 21, 1988. D. Tr. 106–107 (Dean, November 18, 1994). By March 29, 1988, Regnier had already written

in a memorandum that the Polymer Labs 4000°A particles "have pores that go completely through the particle." Tr. Ex. 491. Dean annotated the memorandum: "through porosity permits perfusion." *Id.; see also* Tr. Ex. 491 at 306124; Tr. Tr. 6:52 to 6:55. Dean meant that "particles that have pores going through them will have some convective flow through the pores." Tr. Tr. 6:55 and 6:115.

### X. *"With or Without Them"*

On March 17, 1988, Dean, on behalf of Synosys, wrote Warner and McConville to propose a contract between the two entities and to request an exclusive license to sell PL–SAX in the United States. The first paragraph of the term sheet proposed by Dean read:

> Polymer Laboratories (PL) wishes to market its macroporous, polymer-based chromatography media line in the life science market for preparative use in process development, pilot and production applications, via an exclusive arrangement with Synosys (SYS). SYS agrees to purchase polymer-based media exclusively from PL during the term of this Agreement. SYS intends to collaborate with PL in the future improvement of polymer media.

On the cover sheet, Dean wrote: "We are very enthusiastic about collaborating with you." Tr. Ex. 7 at 309289; *See also* D. Tr. 110–111 (Warner, May 16, 1995).

On March 24, 1988, Warner of Polymer Labs rejected the proposal for an exclusive relationship. *See* Tr. Ex. 8. Synosys decided that it would proceed with its plans. As Afeyan wrote: "[Polymer Labs] ha[s] got to realize we're going to do it. They have no choice. With or without them." Tr. Ex. 447 at 306648–49.

In March of 1988, Synosys was engaged in negotiations with the Purdue Research Foundation in an effort to acquire exclusive rights to inventions from Regnier's laboratory that were of interest to Synosys. Tr. Tr. 6:107–6:108; Tr. Ex. 480 at 330638. In its March 1988 Business Plan, Synosys acknowledged that until an agreement was reached:

> All of Regnier's inventions, and those of any other Purdue University employees

(which generally includes graduate students and post-doctoral fellows), which are made at Purdue or for which Purdue facilities and/or equipment are utilized, are the intellectual property of the Purdue Research Foundation.

Tr. Ex. 480 at 330638–39. With respect to Regnier's work at Purdue, by the middle of 1988, Synosys acknowledged that "plainly, some of the work of Regnier and his laboratory belonged to Purdue." D. Tr. 15 (Dean, July 18, 1995, Vol. II).

In this March, 1988 business plan, a chromatography media called "POROS" was prominently featured for the first time. Tr. Ex. 480 at 330595–600; Tr. Tr. 2:145–46. The plan described two lines of POROS chromatography particles to be offered by Synosys: "POROS–I", which was to be manufactured and supplied by Polymer Labs, and "POROS–II", which was to result from Synosys' own particle engineering work. Tr. Tr. 6:44 to 6:45; Tr. Ex. 480 at 330635.

The March 1988 business plan described the performance characteristics and properties of the POROS–I product PerSeptive hoped to obtain from Polymer Labs. Tr. Ex. 480. The first page of the executive summary states that "POROS media are based on a rigid polymeric support material which is macroporous. Matrices with unique porosities of 1000 and 4000 angstroms will be offered in the form of 10 micrometer diameter spheres, pre-packed in columns ranging from 50 ml to 1 liter in volume." Tr. Ex. 480 at 330550.

The March 1988 business plan also touted the performance of POROS media, stating that "[s]ixty and thirty-second purification runs have also been performed successfully using this new media, proving the rapid kinetics achieved through the macropores." Tr. Ex. 480 at 330596–98. According to Afeyan, the reference was to chromatographic runs performed at Purdue. Tr. Tr. 3:63–3:64; Tr. Ex. 480 at 330596. The business plan also included chromatograms generated by Rounds in January 1988, using PL–SAX 4000°A media. Compare Tr. Ex. 480 at 330598 with Tr. Ex. 461; Tr. Tr. 3–59 (Afeyan).

The March 1988 business plan also stated that POROS was "developed primarily at Professor Regnier's laboratories...." Tr. Ex. 480 at 330595. This representation was only partly true. D. Tr. 109–110 (Regnier, July 21, 1994). Regnier's lab provided no assistance in developing the base Polymer Labs particle, and it was Lloyd who took the initiative to apply Regnier's coating technology to the 4000°A particle. D. Tr. 619 (Regnier, July 25, 1994); see also Tr. Tr. 6:106; Tr. Ex. 113.

On March 28, 1988, Regnier told Afeyan and Dean that the work done by Rounds on the Polymer Labs media was funded by federal grants and that Synosys would be "taking federal grants' fruits without compensation." Tr. Tr. 9:68; Tr. Ex. 211 at 306892; Tr. Tr. 6:118–6:119.

By May, Synosys had hired patent counsel Edmund Pitcher to seek a patent on flow through technology. On May 11, 1988, Dean authored a Synosys memorandum entitled "Popcorn Balls Invention Disclosure." Tr. Ex. 224; Tr. Tr. 6:119, which states:

From studying the SEM's of the PL1000 and PL4000 material, I conclude that this is how they have made it. Their large pores are very random. The structure has been built from particles of about ... 200 nm diameter for the PL 4000.

Tr. Ex. 224 at 332839. Thus, by May 1988, Dean observed that the Polymer Labs 4000°A particles were composed of 200 nanometer microspheres that had been agglomerated together. Tr. Tr. 6:120; Tr. Ex. 224 at 332839. In the invention disclosure, Dean also asked Regnier about the proprietorship of the "agglomeration" invention: "[Fred] please clarify whether you consider this a Synosys invention or a Purdue invention or a mixture thereof." Tr. Ex. 224 at 332841. Dean had no qualms about elbowing Polymer Labs out of the market with a patent although it had a trade-secret protection.

In June 1988, PL–SAX 4000°A was first sold in the United States. D. Tr. 81 (Warner, May 16, 1995).

In early June 1988, Dean discussed a fluid engineering analysis of convective flow through the 4000°A particle with Regnier.

D. Tr. 59–60 (Dean, December 14, 1994). Regnier asked him whether it was possible to have convective flow through a particle with pores measured in thousands of angstroms. Regnier hypothesized that significant convective flow through the particles could explain the December 1987 and January 1988 chromatograms generated by Rounds in Regnier's Laboratory. Tr. Tr. 6:59–6:60. Specifically, Regnier asked Dean to determine whether there was significant flow relative to diffusion velocities for large proteins. Tr. Tr. 7:9. Eventually, Dean set about to determine the ratio of perfusion velocity to diffusion velocity through the throughpores in the particle. *Id.*

In response to this query, Dean prepared a written analysis dated June 6, 1988, and entitled "Perfusion of Macroporous Media," which showed that under typical operating conditions the convective flow velocity through a particle having 4000°A pores could exceed the diffusive flow velocity for proteins. Tr. Ex. 39 at 307850–858; Tr. Tr. 6:59. The June 6, 1988 perfusion analysis reflects the conclusion that "the convection velocity could be significantly higher than the diffusion velocity" for large proteins. Tr. Tr. 6:62; 7:10. Indeed, for the 4000°A particle evaluated, an effective Peclet number of 35 was calculated, *i.e.*, $Vp/V_{diff} = 35$. Tr. Ex. 39 at 307849; D. Tr. 98 (Dean, December 14, 1994).

In connection with his perfusion analysis, Dean drew a chromatography particle with a channel or path with "internal flow" transecting the particle. *See* Figure 1, *infra;* Tr. Ex. 39 at 307850; Tr. Tr. 6:60. Dean explained his drawing as follows:

> What is drawn here is a packed bed of particles and there is a line drawn through the left-hand upper one [particle], indicating that there might be internal flow that transected the particle.

Tr. Tr. 7:10. The drawing represented his best understanding of the likely morphology of the Polymer Labs chromatography particles. Dean concluded based on the model of the Polymer Labs particles that it was possible to get "significant convective flow through the particles." Tr. Tr. 7:10.

Figure 1

During the time that he was with Synosys, Dean used the term "throughpores" interchangeably with the following: "through-channel," "pores that transected," "channel," and "transecting pore". Tr. Tr. 7:8 to 7:9 (Dean). Dean concluded that the presence of through-channels in a particle always gives rise to flow—"[W]e know there's flow. There's always flow if they're [sic] through-channels." Tr. Tr. 7:9.

By June 20, 1997, Dean had a definite and permanent scientific explanation of the invention which was to be patented. Also in June, 1988, Synosys had revised its business plan to indicate that the company intended to bring Poros to the market in 1988 and 1989. Tr. Ex. 497. The plan included only Rounds' chromatography.

## XI. *The June, 1988 HPLC Meeting*

On June 23, 1988, Prof. Regnier presented slides of the chromatograms generated by Rounds in his lab at a scientific meeting held in Washington, D.C., (the "HPLC meeting"), including the chromatographs using the PL–Sax 4000A. D. Tr. 123–127 (Rounds, April 7, 1995). Tr. Ex. 469, 498 and 465. In editing the drawings of the Rounds chromatographs, Regnier made only one change: he crossed out "PL–SAX", and replaced it with "PO–ROS." Tr. Ex. 55; D. Tr. 127–128 (Rounds, April 7, 1995). A written abstract of Regnier's presentation was distributed at the conference. Tr. Ex. 502; Tr. Tr. 8:74 to 8:75.

The meeting was at the Twelfth International symposium on column liquid chromatography. During the presentation entitled "Macroporous Styrene–Divinyl Benzene–Based Media for Proteins", Regnier called his work "perfusion" and "claimed" results as due to "perfusive flow" through the particles and "flow through" the pores by convection. Tr. Tr. 9:149–150; D. Tr. 8, 32–33 (Herbertsson, April 18, 1995); Tr. Ex. 503; Tr. Ex. 558 at ST00125; Tr. Ex. 601.

During his presentation, Regnier said he was in the process of patenting technology he discussed at the conference. D. Tr. 114–118 (Warner, May 16, 1995). Warner was concerned when Regnier said that the technologies were in the process of being patented because he wasn't sure if Regnier was referring to coating technology or the Polymer Labs particles. Warner explained his concern:

> Because I wanted to make sure that there was nothing that was being patented without PL's input into that, because a lot of this work had a lot of *collaboration* between Mary Rounds and Polymer Laboratories, and I wanted to make sure that we were not left out in the cold. (emphasis added).

D. Tr. 118–121 (Warner, May 16, 1995) (emphasis added).

At that June 1988 meeting, Warner immediately confronted Afeyan, who stated that: "[T]he flow through chromatography he did not consider was patentable at that time and they had no intentions in that direction." D. Tr. 120 (Warner, May 16, 1995). This was an intentional misrepresentation as Synosys did have intentions to obtain a patent in the "direction" of flow-through chromatography although the plans were inchoate.

At the time of the HPLC meeting (and indeed, to date), Drs. Afeyan, Dean and Regnier had no data proving to a certainty that pores transected the particles or permitted liquid to flow through the particle, although they then (and now) believed that to be true. Tr. Tr. 3:66–67; 9:148.

Regnier and Afeyan had contacted their patent lawyer, Edmund Pitcher, *before* the June 1988 conference. Immediately prior to the HPLC Conference, both Regnier and Dean had drafted and forwarded to Pitcher their invention disclosures relating to perfusion chromatography. Tr. Ex. 689; Tr. Tr. 7:11–7:12. In fact, Regnier testified at his deposition that in June 1988 he was having discussions about "this patent." D. Tr. 111 (Regnier, July 21, 1994).

The June 20, 1988 invention disclosure drafted by Dean and sent to Afeyan, Regnier and Pitcher is an addendum to Regnier's "Disclosure for approximately the same date relative to Perfusion Through Macroporous Chromatography Adsorbent Matter." Tr. Ex. 689. PerSeptive has no copies of Regnier's invention disclosure. Tr. Tr. 7:12; Tr. Tr. 9:168–9:169; Tr. Tr. 5:130; Tr. Tr. 10:14–10:15.

Under the heading "Background" Dean's memorandum states:

> Dean in a handwritten memorandum dated 6/6/88 developed a simple theory for laminar flow through such particles. *Of course, the assumption is that the pores in the particles pass entirely through the particles, i.e. they are not blind passages. Regnier's data for PL100[0] and PL400[0] DVB support particles indicate that the pores do connect through the particles.* Dean's analysis show that under certain, practical conditions, perfusion velocities within the particle could exceed the diffusion velocities for large protein molecules by several times, depending upon pore size, pressure gradient on the column and protein molecule size.
>
> \*　　\*　　\*　　\*　　\*　　\*
>
> *There are flow paths associated with the particle: around the particle and through the particle.*

Tr. Ex. 689 at 368128 (emphasis added). In the memorandum, Dean was referring to Polymer Labs particles which all the named inventors had concluded permitted flow through the particles. Tr. Tr. 7:15. It was received by patent counsel Pitcher on June 21, 1988. Tr. Ex. 689 at 368127.

Regnier's proposed "invention" was a strategy for improving intraparticle convection in which the interstices between particles in a bed would be partially blocked with smaller "blocking" particles. Trial. Ex. 689 at 368129. Regnier believed that blocking particles were necessary in order to achieve sufficient intraparticle flow to improve mass transfer. Tr. Tr. 4:34–36; 5:70–72; 9:201–204.

The subject matter under the heading "Background" in the invention disclosure submitted by Dean on June 20, 1988 is the same subject matter covered by claims of the '270 patent. The proposed Regnier invention of blocking particles never came to fruition.

At some point prior to August 1988, Regnier learned that Warner was irritated because Regnier had not acknowledged the contributions of Lloyd to the work presented at the HPLC conference. Tr. Tr. 8:81. According to Dean's notes, Regnier informed Dean on July 26, 1988 that Warner was upset about what had transpired in Washington:

> Warner told Maryann "no more materials because you guys treated us badly in Washington."

Tr. Ex. 211 at 307028; Tr. Tr. 7:20–7:21. In addition, on August 3, 1988, Warner wrote Afeyan stating that "both myself and our HPLC product manager, Linda Lloyd, are still furious at the gross misrepresentation by Fred at the HPLC 88 meeting on work carried out by Linda at Polymer Laboratories Ltd. and Many Rounds on our commercial 4000°A PL–SAX product given to Purdue, FOC, in good faith." Tr. Ex. 511. On August 3, 1988, Dean recorded a conversation in his laboratory notebook: "Got to get Poros from Frank—Frank has FER real mad." He also pointed to the continuing problem in reaching agreement with Bill Bartinger at Purdue over "exclusivity." Tr. Ex. 211.

Regnier prepared and signed (but did not send) an irate response dated August 16, 1988. Tr. Ex. 512. In that response, Regnier acknowledged that he was "apparently" being accused of "intellectual theft." Tr. Ex. 512. Regnier "categorically" denied that he "ever knowingly used either the ideas or data of Linda Lloyd":

> There have apparently been frequent conversations between PL and Mary Ann Rounds that escaped my attention. . . .
>
> I never knew which column or materials you sent for testing, when they arrived, or what it was we were supposed to do with them.
>
> \*　　\*　　\*　　\*　　\*　　\*
>
> Furthermore, this meant that frequent unmonitored conversations were occurring between my laboratory and PL. *I have no idea what was discussed during these conversations and do not know whether some ideas might have come to my laboratory from PL or vice-versa.*

Tr. Ex. 512 (emphasis added). Regnier also wrote disingenuously that he was "shocked" to learn that Rounds and Lloyd had made arrangements to jointly publish on the

4000°A media. Tr. Ex. 512. At about the time Regnier wrote his August 16 letter to Warner, Rounds told that part of her correspondence with Lloyd concerned their plans for joint publication. Tr. Tr. 9:20–9:21.

Rounds' relationship with Regnier was deteriorating at the same rate as Regnier's with Warner. On August 8, 1988, she wrote to Warner to thank him for writing her a letter of reference to Eli Lilly as part of her job search. "I certainly hope that I can make a change this Fall [sic] because it is very obvious that the situation here is not going to get any better. (It is also obvious that Fred's conscience bothers him periodically. It would be easier for him if he could convince me to believe exactly as *he* wants to believe but he knows that this is not the case.)" Ex. 231 (emphasis in original). She pointed out that Regnier was telling the world that "non-porous packings are passe." *Id.*

In another letter to McConville in early August, Rounds wrote:

The sooner I can extricate myself from my present position, the better. Fred is still telling me things which I don't believe and he knows it. (I hope Frank is planning to attend the Eighth Int. Symposium in Copenhagen in October. I have the distinct feeling that the same set of slides may appear again in a talk by Fred or Noubar, although I'm not supposed to know anything about these abstracts.) Even others in the lab here, who don't know anything about P.L./Synosis [sic] dealings, sense that Fred's intense involvement with Synosis [sic] is going to destroy him. Although I never had real personal rapport with Fred, I was really proud to work for him and I wish my years in his lab didn't have to end this way.

Tr. Ex. 232.

In still another handwritten note to Lloyd regarding her flow rate dated August 10, 1988, Rounds wrote: "If you have not already conducted the "plates *vs.* flow rate" that I mentioned early this summer, *don't* feel you need to do it unless P.L. is interested in this data. It is obvious that Fred will not give Polymer Labs just credit for anything anymore, and I simply will not write a paper for 'Synosis.'[text material not displayable] [sic] Tr. Ex. 233)."

## XII. *Research at Synoys in the Fall/1988*

In the fall of 1988, Afeyan, Dean and Regnier used samples of polymer beads with 300°A, 1000°A and 4000°A nominal pore sizes provided by Polymer Labs on September 15, 1988, to conduct physical experiments, take physical measurements and perform microscopy at the Synosys lab at MIT. Most of these experiments took place in November. Later, they performed various chromatographic experiments, including newly devised methods to measure mass transfer in the packing particles. Tr. Tr. 1:109. The research program included investigating the flow properties inside these particles and their mass transfer characteristics. Tr. Tr. 1:120. Chromatographic experiments measured mass transfer within particles, including frontal loading (or dynamic capacity) experiments, and plate height (or van Deemter) experiments. Tr. Tr. 1:120–21; 3:134–35; Tr. Exs. 69–78. To assist the program of research and experimentation Polymer Labs provided not only quality control data but ideas to explain data inconsistencies.

### a. *Frontal Loading (or Dynamic Capacity) Experiments*

The named inventors conducted frontal loading (or dynamic capacity) the summer and all of 1988. Some of these experiments were done at Synosys and some at Purdue. Dynamic capacity refers to the amount of material that can be adsorbed onto a particle with increasing rates of flow; it measures how fast the performance deteriorates as the flow increases. The experiments involved loading a column with protein until all the sites are saturated, at various flow rates, before "breakthrough" occurs, and creating a chromatogram of the "breakthrough" of unbound protein at the outlet of the column. Tr. Tr. 1–121. Consistent with the earlier tests conducted by Lloyd and Rounds, Afeyan concluded that PL 4000°A materials exhibited dynamic capacity curves that did not deteriorate rapidly at increasing flow rates, as was typical with conventional packing materials. Tr. Tr. 1:121. Unlike conventional

columns, which exhibited premature breakthrough at increasing flow rates, the PL 4000°A particles retained capacity. The sharp breakthrough curves confirmed and isolated mass transport inside the particle, which differed from diffusive bound materials. Tr. Tr. 3:134–39.

Some of the Polymer Labs materials gave dynamic capacity test results that were not consistent. Tr. Tr. 2:9. On October 7, 1988, Warner sent Afeyan quality control capacity data for PL–SAX 1000A and 4000A particles stating: "As you can see the data is variable ... but reproducible." Tr. Ex. 517. On November 8, 1988, Dr. Afeyan requested dynamic capacity data for for PS–SAX 1000A and 4000A particles stating: "As you can see the data is variable ... but reproducible." Tr. Ex. 517. On November 8, 1988, Dr. Afeyan requested dynamic capacity data over variant flow rates from Polymer Labs in an effort to understand the reasons for this inconsistency. One theory was that the permeability of glass columns differed from stainless steel columns, which could result in "channeling." Tr. Tr. 2:10; Tr. Ex. 15. Polymer Labs provided the requested quality control ("Q/C") data. Tr. 2:9. The quality control and applications data which Polymer Labs supplied to PerSeptives were publicly available. Tr. 2:68; Tr. Ex. 19.

On November 9, 1988, Warner sent Afeyan information concerning packing conditions and dynamic capacities and requesting, in return, breakthrough curves and experimental details. Tr. Ex. 716.

On November 10 and 28, 1988, Afeyan again requested data relating to the issue of capacity of the materials and inconsistencies in the samples Synosys received, including pore size data and distributions and experimental results on binding kinetics. Tr. Tr. 2:12; Tr. Exs. 16, 17. He also forwarded to Warner data regarding Synosys' breakthrough experiments. Afeyan ended up agreeing with Warner that inconsistencies in data were not the result of channeling but possibly defects in coating in glass columns. Tr. Ex. 16. On November 28, 1988, Afeyan requested data from Polymer Labs on "pore size distributions, details on binding capacity

and rate data. . . ." Tr. Ex. 17 at 309264. In that letter, Afeyan also requested pore size data, stating:

> I am afraid we may be doing experimental and theoretical analyses for these materials in the absence of existing data that may influence our current work. Please urge Linda to send this information to us.

Tr. Ex. 17 at 309264 66, Tr. Tr. at 2:75–2:76.

1. On December 6, 1988, Lloyd sent additional data to Afeyon relating to 4000°A media. Tr. Ex. 19.

On December 8, 1988, Dean sent Warner a letter including a table containing columns of data containing variables relating to the mathematical modeling being done by Dean in late 1988. Tr. Ex. 540. In the table attached, Dean indicated that the data being used came from Polymer Labs. *Id.*

### b. *Plate Height Experiments*

Also, in November, 1988, Drs. Afeyan, Dean and Regnier conducted research on plate height curves, which measured the efficiency of resolution obtained in a separation. Tr. Tr. 1:122–23. The plate height experiments measured the rate of molecule transport inside the particles.

### c. *Electron Micrographs*

In the summer of 1988, Dean and Regnier obtained transmission electron micrographs ("TEMs") of fractured particles that showed a large porosity in PL 4000°A particles but did not show they went through the particles. Tr. Tr. 1:124–25; 6:66–67. Dean then performed a detailed analysis of the SEM's taken in Pittsburgh in February. Tr. Tr. 6:67–70; Tr. Ex. 42. He described the particle as a popcorn ball with individual pieces stuck together. Tr. Tr. 6:68. On November 3, 1988, Dean sent Warner the SEM's "we have been basing our ideas of Poros 4000 structure upon" and added: "The collaboration developing between us is most satisfying and has exciting potential."

By November 7, 1988, Dean had received SEMs of Polymer Labs 4000°A media from Polymer Labs; Dean forwarded the SEMs to Regnier. Tr. Ex. 528.

### d. *Mathematical Modeling*

In the late summer and fall of 1988, Drs. Afeyan and Dean conducted more mathematical modeling of mass transport in particles, that compared diffusion rates with convection rates inside the particles. Tr. Tr. 1:125; 3:132–33; 6:73–76; Tr. Ex. 41.

Based on this work, Dean authored a Synosys document entitled "Flow in Packed Beds and Macroporous Particles" dated October 28, 1988. Tr. Tr. 6:73–74 (Dean); Tr. Ex. 41. The second part of Dean's October 1988 flow analysis—flow in macroporous particles—is a refinement of his June 1988 analysis of chromatography particles having through-channels as well as an analysis of the quality of the bed-backing. Tr. Tr. 6:74. *See* Tr. Ex. 39 at 307850. This refined flow analysis confirmed that the convection velocity could be considerably higher than the diffusion velocity in the pores of Polymer Labs 4000°A particles. This is substantially the same conclusion Dean had reached in early June 1988 as a result of his initial flow analysis. Tr. Tr. 6:75–6:76 (Dean). *Compare* Tr. Tr. 6:59 and 6:62. Dean's October 28, 1988 mathematical analysis of flow through macroporous particles utilized the void fraction data for Polymer Labs 4000°A provided by McConville. Tr. Ex. 41 at 307820; D. Tr. 108–109 (Dean, December 14, 1994).

Dean authored another memorandum on the subject of Perfusion Chromatography dated November 4, 1988. Tr. Tr. 7:40; 6:83; Tr. Ex. 44. Once again, the particle he was studying came from Polymer Labs, and Dean drew a diagram of his conception of the internal structure of it. Some of the data included in Dean's report came from Polymer Labs as well. Tr. Tr. 7:43–7:49; Tr. Ex. 44. Dean's conclusion that, in addition to having 4000 angstrom pores, POROS 4000°A possessed a second set of pores, *i.e.*, subpores of about 700°A in diameter, was based on information he received from Polymer Labs that their size exclusion experiments indicated that Polymer Labs particles had 4000°A pores and 700°A subpores. D. Tr. 64–65 and 90–92 (Dean, December 15, 1994). Because the Polymer Labs 4000°A particles possessed

two predominant pore sizes [4000°A and 700°A], Dean concluded they were at least bimodal in its pore size distribution. D. Tr. 90 (Dean, March 9, 1995).

Afeyan and Dean testified they believed that conception of the subject matter claimed in the Perfusion Patents was completed by early November, 1988. Tr. Tr. 2:10; 6:90. Dean testified that the invention in the October 13 memo occurred as early as August, 1988. Tr. Ex. 237. At either time, the only source for POROS was Polymer Labs.

### XIII. *Synosys Business Activities—Late 1988 and 1989*

Pitcher's initial strategy during the spring of 1988 was to obtain the right from Purdue Research Foundation to obtain exclusive licenses to all intellectual property creations made in Regnier's lab in the field of chromatography. Tr. Tr. 5:123 5:124. To this end, Synosys sought a first right to negotiate an exclusive license for all proprietary creations developed in Regnier's laboratory, whether or not supported by a Synosys-sponsored research agreement. Tr. Tr. 5:125; Tr. Ex. 228 at 300340. In particular, Synosys sought a retroactive exclusive license on inventions developed in December 1987 and January or February of 1988. Tr. Tr. 5:126. This retroactive license would have covered the work done by Rounds with the Polymer Labs particles. In August 1988, William Baitinger, who was negotiating with Pitcher on behalf of the Purdue Research Foundation, would not agree to this proposal. Tr. Tr. 5:126 (Pitcher); Tr. Ex. 228.

In the summer of 1988, Regnier entered into a formal consulting agreement with Synosys. Tr. Tr. 9:24. The consulting agreement was the first formal agreement that Regnier had with Synosys. *Id.* Although the consulting agreement with Synosys was effective June 1, 1988, it was signed by Regnier on July 29, 1988, approximately one month after the HPLC conference. Tr. Ex. 225; Tr. Tr. 9:77.

Under the consulting agreement, Regnier received the right to obtain an equity interest in Synosys and reimbursement for his expenses. Tr. Tr. 9:24. The consulting agreement also gave Synosys the right to

inventions Regnier developed pursuant to the agreement after that date. Tr. Tr. 5:128; Tr. Ex. 225. With respect to Regnier's inventions developed prior to July 28, 1988, Synosys had only the right to negotiate with Purdue, and Purdue was free to sell whatever rights there were to anyone who wanted them. Tr. Tr. 5:129.

Synosys' supply agreement with Polymer Labs was signed in March 1989. Tr. Ex. 12; D. Tr. 114 (Warner, May 16, 1995). Pursuant to the agreement, Polymer Labs could sell its products into the research market in the United States, and PerSeptive was allowed to sell those products under its PO-ROS trade name to the U.S. preparative market. Tr. Ex. 12; Tr. Tr. 3:71.

In the business plan prepared before March 1989, which Afeyan participated in drafting, Synosys stated, "[t]he company is currently preparing three patents, including a key patent covering the fundamental description of perfusion chromatography. . . ." Tr. Ex. 538 at 306589.

Meanwhile, collaboration between Lloyd and Rounds at Purdue continued. On March 21, 1989, Rounds sent a letter to Lloyd at Polymer Labs including a draft paper she had written as well as van Deemter curves for Polymer Labs 4000°A material generated by Linda Lloyd. Tr. Ex. 114; D. Tr. 112–114 (Rounds, April 6, 1995).

On June 21, 1989, Afeyan wrote Warner again seeking 4000–and 1000–angstrom–pore particles, . . . :

> Polymer Laboratories is a recognized specialist in porous polymer manufacture, and has already made particles stronger and better than others, at least in our assessment. Encouraged by your past achievements, and based on our numerous discussions *about ways to jointly improve the particles,* I have a request for such an improvement.

Tr. Ex. 266. On August 8, 1989, Regnier wrote a memo to Purdue concerning his relationship with Synosys. He acknowledged:

> It should be understood that neither me nor my students own discoveries or "knowhow" from my laboratory. Our compensa-

tion for our work is a salary or stipend. . . . The research findings we produce are the exclusive property of PRF and the organization who paid for the research. Neither me nor my students can give any results from my laboratory to [PerSeptive] unless there is a written agreement giving them the rights to the data. . . . Giving away intellectual property is as much a theft as giving away equipment. Incidentally, I am also prohibited from giving laboratory data and "know-how" of the laboratory away in a consulting relationship for which I am compensated. As noted above, the data is not mine to give away. . . . One could imagine that a student could be cheated by not having his name put on a patent to which he or she contributed. This is illegal. *It is important in patent law that all individuals who made a creative contribution to a patent be listed on that patent or it can be challenged in court and will be declared invalid.* This is a very serious matter in which both Purdue and the U.S. patent office require that the inventors signify that they are the "true" inventors. This means that the people named on a patent verify that they have not excluded anyone and that they actually made the invention. All students in my laboratory who make an intellectual contribution to a discovery must be included on our patents.

Tr. Ex. 276 at 3000664–666 (emphasis added).

After promising to file a patent application, on or about March 31, 1989, Synosys obtained its first round of venture capital financing. It soon changed its name to PerSeptive Biosystems, Inc. Tr. Ex. 304, 305.

### XIV. *The Inventive Contribution of Polymer Labs*

Warner and/or Lloyd was a joint inventor of the high-speed aspect of perfusion chromatography through collaboration with Rounds and Regnier at Purdue. The inventive contribution consisted of Polymer Labs' development of the Polymer Labs 4000°A SAX packing material and its initial chromatographic evaluations of it. Before Polymer Labs sent the 4000°A material to Rounds, Polymer Labs had already observed that the coated 4000°A material was more efficient than the

1000°A material, and that the 4000°A material worked extremely well, had high resolution (sharp peaks and high efficiencies), and higher capacity than they expected based on earlier work with Polymer Labs 1000°A materials.  D. Tr. 68–72 (Warner, May 16, 1995). These conclusions were presented in three scientific papers at scientific meetings. These scientific observations prompted Polymer Labs to request further testing by Rounds at Purdue.  While neither Lloyd nor Warner understood the scientific explanation set forth in the patents, they were the first to apply the SAX coating to large pore particles and conclude that they substantially expedited the separations of proteins, DNA fragments and large oligonucleotides.

### XV.  *The Patent Application*

Obtaining patent protection was important to PerSeptive's business strategy because, in Dean's experience, patents are "extremely valuable in raising money despite their actual value."  D. Tr. 158–159 (Dean, March 9, 1995).  Tr. Ex. 304–307.

Patent counsel Edmund Pitcher was first retained by Synosys in 1988.  Tr. Tr. 2:15. He began as early as March 1988 to obtain an exclusive supply agreement between Synosys and Polymer Labs. Tr. Tr. 5:120–5:122; Tr. Ex. 317.  In addition, during the spring of 1988, Pitcher was also involved in negotiations concerning the consulting agreement between Synosys and Regnier.  Tr. Tr. 5:121–5:122;  Tr. Ex. 225 and 317.  He also discussed the patentability of the "continuous affinity extraction machinery" which Afeyan and Dean were working on. Tr. Tr. 2:15; Tr. Ex. 317; Tr. Tr. 4:116; 5:120–24.

Discussions about patenting POROS itself, as opposed to blocking particles or popcorn particles, intensified in the early fall, 1988. On September 1, 1988, Dean made a note to himself: "patent perfusion Poros—that is operating range."  Tr. Ex. 211 at 307083. Operating range referred to a velocity that would force liquid through the particles at a rate where convection would be significant relative to diffusion. Tr. Tr. 7:23–35. Perfusion referred to "flow through the particles." Tr. Tr. 7:25–26.  The Synosys Research plan

dated September 9, 1988 states: "The strong anion exchange packing of PL is already a very good material which needs no further development."  Tr. Ex. 235 at 303464.

In the same research plan, Regnier summarized the state of his thinking on the so-called POROS II media as follows:

The concepts for POROS II are generally from SYNOSYS.  Much of this has already been described in the SBIR proposal that we submitted last spring.  The concept for POROS IT is based on the observation that very large pore-diameter media have exceptional kinetic properties.  Very large porosity media probably allow the perfusion of liquid directly through the particle and therefore considerably enhance the rate at which proteins enter and leave the pores of a packing material.  Unfortunately, very high porosity media have relatively lower surface area and therefore diminished loading capacity.  Our solution to this problem would be to use 0.5 to 1 micron particles with 300 to 500 angstrom porosity and to aggregate them into larger particles.  Aggregates of such particles would have pores of several thousand angstrom diameter leading into the interior of the packing material.  The small pores in the fundamental particles used to generate this matrix would enormously increase the surface area of these aggregate packings. Such materials would have approximately the same surface area as 300 to 500 angstrom pore diameter packing materials and the kinetics of 4000 to 5000 angstrom pore diameter packing materials.  Most of the technology to accomplish the aggregation process has yet to be developed within SYNOSYS.... The problem in POROS II is to develop a technique to cement the small individual particles together.

Tr. Ex. 235 at 303470–471, 303475.

On October 5, 1988, Pitcher received a handwritten memorandum from Dean entitled "Patenting Poros."  There, Dean stated: "I should think *PL/Synosys* could get a patent on the structure of POROS re perfusion ... What do you think?  Ted?" Tr. Ex. 712 (emphasis added); Tr. Tr. 5:116–5:117.  As Pitcher understood, "PL" was referring to Polymer Labs. Tr. Tr. 5–117 (Pitcher).  The

joint invention between Polymer Labs and Synosys which Dean describes in his October 5, 1988 memorandum includes particles characterized by hav[ing] channels through them, pores, interconnected pores, it implies, that go through the particles and permit perfusion meaning convective velocity significantly greater than diffusive velocities when used at a given pressure drop. Tr. Tr. 7:29–7:30.

On October 13, Dean prepared another invention disclosure, identifying Dean and Regnier as inventors. The disclosure also listed the date of invention as August, 1988. Tr. Ex. 237. In it, Dean wrote:

Analysis of this situation by well-known fluid dynamic methods reveals that there is a combination of column pressure gradient, particle size, pore size, and fluid viscosity which define the bounds of a regime of perfusion rather than diffusion mass transport through the chromatography particles. That is, in this regime, the convective or perfusion velocity through the particles is significantly higher than the diffusion velocity so protein molecules are convected to and from the chemically-active surface by a flow *through* the particle driven by the column pressure gradient. We believe that this region of greatly enhanced kinetics has not been recognized before. Operating in this regime permits increases in throughput flux of 3–10 times, with no loss of resolution, compared to chromatography columns whose design lies outside this critical bound. We have analyses which identify the bound. It has an experimental factor in it which describes the tortuosity of the channels in the chromatography particle. Obviously, if the channels are very tortuous, their length can be significantly greater than the diameter of the particle. This factor also includes the influence of the cross-sectional shape of the pores because, if they are flattened, for example, there will be more friction surface area per unit cross-sectional area ... which means larger pressure drop per unit length for given velocity in the pore. This tortuosity/shape factor must be determined experimentally for a given chromatography medium. Other

than this geometrical effect, the flow behavior of the bed can be determined by our analysis.

Tr. Ex. 237 at 328590–591. The invention disclosure entitled "Perfusion Chromatography Media" incorrectly states they discovered the "invention" in "developing the Synosys POROS adsorptive chromatography medium with 4000 angstroms nominal size." *Id.* at 328590.

On October 14, 1988, Dean prepared yet another invention disclosure entitled "Chocking to Enhance Perfusion Chromatography," again listing himself and Regnier as the inventors and August as the date of invention. It stated: "The concept of perfusion chromatography media is extended to cover all porosity and to add the concept of "chocking" particles in order to enhance the effect." Tr. Ex. 92 at 332833. In fact, that disclosure restates substantially the same subject matter contained in the earlier disclosure of June 20, 1988. Nothing ever came of the "chocking" particles.

The first conference with Pitcher on the perfusion chromatography application occurred on October 20, 1988. Tr. Tr. at 2:15 and 2:89; Tr. Tr. 5:135–5:136; Tr. Ex. 238.

On November 28, 1988, Afeyan wrote to Warner stating that "we are currently taking the necessary steps to obtain patent protection for these new coatings." Tr. Ex. 534 at 309264. Afeyan did not disclose the efforts to patent perfusion chromatography as contrasted to "coatings." Tr. Tr. 2:91–2:92.

On December 1, 1988, Pitcher spent two hours reviewing disclosures from Dean and on December 14, 1988, he met with Terry Loucks (the new CEO of Synosys), Afeyan and Dean regarding a perfusion chromatography disclosure. Tr. Tr. 5:138–5:140 (Pitcher); Tr. Ex. 238 at 650093. After December 14, 1988, Pitcher did no further work on the perfusion chromatography application until June 1, 1989. Tr. Tr. 5:141–5:142.

On December 5, 1988, Dean wrote another memo concerning the "perfusion chromatography" patent. Tr. Ex. 245 at 316322. He pointed out a "refinement" by Afeyan with respect to the morphology of POROS—that it had heterogeneous porosity with channels

of 4000 angstrom diameter (the side pockets of 700 angstrom diameter). *Id.* He noted:

> The optimum specifications for perfusion chromatography have not been worked out. They are now the subject of a mass-transfer modeling campaign in order to specify the best ratios of internal to external flow, etc. for different chemistries and applications. Plainly, the size of the molecule being separated is an important input spec.

Tr. Ex. 245 at 316323.

Other than a cursory discussion with Regnier about whether Polymer Labs should be named as an inventor, Tr. Tr. 9:18–20, Pitcher did not investigate the role of Warner or Lloyd in the claimed invention. Tr. Tr. 5:139–41. Pitcher knew that Polymer Labs was the source of the perfusive media referenced in the patent application, but concluded its role was merely as a raw materials supplier. Tr. Tr. 10:95; Tr. Tr. 9:16; 9:18; 9:20. It is not clear whether Regnier disclosed to Afeyan, Dean or Pitcher the full scope of the collaboration between Rounds of Purdue and Lloyd or Warner Polymer Labs in late 1987, early 1988. Tr. Tr. 9:16; 9:18; 9:20.

Pitcher did recognize the possibility that Purdue University had rights and interest in the perfusion patents. Tr. Tr. 8:97. From the earliest time he was retained by Synosys, Pitcher understood that there were questions about what rights Synosys might have with respect to work that was being done in Regnier's laboratory at Purdue. Tr. Tr. 5:122. He had a lengthy discussion with Regnier on the subject. Tr. Tr. 8:97.

Regnier prepared a memorandum dated December 19, 1988, to form the basis for the patent application. Tr. Tr. 3:81; Tr. Ex. 656.

> As noted above, Giddings stated in his book that it should be possible to get liquid to flow through the pores of a chromatographic packing material if the pores were very large. Even though it has been discussed, no one has actually demonstrated flow through pores in a chromatographic column and documented what would be expected to happen. *We have already given a paper at an international meeting in which we claimed to have flow through the pores of a sorbent.* Again, our evidence was weak and most important, we did not show or discussed [sic] the conditions under which this flow should occur. The net effect of liquid flow or perfusion through sorbent pores would be that solutes are actually swept through the pores in a fraction of the time required for molecular diffusion into and out of the pores. * * * Although it has been suggested by others, such as Giddings, that intraparticle perfusion could occur and that it should minimize bandspreading. The *whole question that has never been previously described or even address [sic] is what are the physical laws that govern the intraparticle perfusion process.*

(Ex. 656 at 331285–86 (emphasis added)); *see also* Tr. 9:149; 9:174 (emphasis added). In fact, Regnier had shown slides at the conference which included the flow rates and column sizes of the experiments performed by Rounds. D. Tr. 518 (Regnier, July 25, 1994); Tr. Ex. 405. Thus, the necessary flow and conditions had been disclosed. Afeyan revised Regnier's draft by changing the word "claimed" to "speculated." Tr. Tr. 3:82–3:83. The revised draft was given to Pitcher. Tr. Ex. 262; Tr. Tr. 3:95–3:96. Pitcher's work on the original perfusion patent application occurred primarily between June 1, 1989 and July 6, 1989, when the application was filed. Tr. Tr. 4–117 to 4–118. On June 5, 1989, Pitcher called Afeyan. His notes of the conversation state: "What has been disclosed? May 1988. F. Regnier tried particles *4000A.* Reported 'may be flow though'—HPLC in [Washington] D.C. (1) oral (2) *not enabling."* Tr. Ex. 311. In the specification of the '270 patent, which is substantially unchanged from the text submitted by PerSeptive in its original patent application, a very much different statement was made: "Recently, it was suggested by F.E. Regnier that chromatography particles having relatively large pores may enhance performance by allowing faster *diffusion* of large molecules." Tr. Ex. 637 at 15 (emphasis added).

On June 9, 1989, Loucks, then the CEO of Synosys, wrote to Pitcher, stating: "I would

like to be able to announce at the Board of Directors Meeting (July 7, 1989) that the Perfusion patent has been filed. I know this puts pressure on us all but it's vital for the company and our relationship." Tr. Ex. 312; Tr. Tr. 5:145.

During the preparation of the patent application, Pitcher's primary contact was Afeyan. Tr. Tr. 3:16. Dean had no involvement with the preparation of the patent application from the time he left the company in January 1989 (due to personality conflicts) until he received the draft patent application for review just prior to filing. Tr. Tr. 7:60–61. On July 6, 1989, Dean faxed Pitcher his comments concerning the draft patent application Pitcher had sent for review. Tr. Tr. 5:150–151; Tr. Ex. 315. The draft application states: "Both types of [Polymer Labs] particles were produced in an ongoing effort directed by F.E. Regnier." Tr. Ex. 315 at 368167. Dean wrote back: "I was not aware that Fred 'directed' PL's particle fabrication effort." *Id.* As a result, Pitcher changed the word "directed" to read "initiated" in the application filed with the PTO. Tr. Ex. 637 at 49; Tr. Tr. 5:153 (Pitcher). It now read "Both types of particles were produced in an ongoing effort initiated by F.E. Regnier to increase intraparticle diffusion of large solutes such as proteins by increasing pore sizes." Tr. Ex. 637 at 49.

On July 6, 1989, PerSeptive filed the patent application that ultimately led to the '270, '989, and '042 patents. Tr. Ex. 637 at 5. Only Afeyan, Regnier and Dean were named inventors. *Id.* at 84–85. The prosecution before the PTO for the 270 patent lasted approximately two years. PerSeptive was in a rush to file the application before a scheduled board meeting on July 7.

### XVI. *Patent Counsel*

Synosys' patent counsel Edmund Pitcher has been prosecuting patents before the Patent Office since 1975 and in 1991 became the head of the Patent Department at Testa, Horwitz & Thibeault in Boston, Massachusetts, which has approximately twenty-seven lawyers, and six technology agents. Before that, he was a founding partner at Lahive

and Cockfield, another "boutique firm" that practiced patent and trademark law. He is a *magna cum laude* graduate of Suffolk University Evening Division Law School. He has been involved in the prosecution of hundreds of applications in the United States. Tr. Tr. 4:108–112.

He dealt initially with Afeyan, age 25, and a neophyte in the patent arena, and Dean, who had extensive patent experience. He recalls that the drafting exercise was

> very difficult because I thought that the technology was, first of all, very important and very subtle, and it was a struggle to draft claims that differentiated from the prior art that was definite and at the same time didn't omit something and leave a shortcut or leave a place where competitors could expropriate the advantages of the invention without infringing the claims.

Tr. Tr. 1:121. Despite this focus on differentiation from the prior art, he did not do his own prior art search, but relied on the three named inventors who were far more knowledgeable than he was. Pitcher "presumed from day one that whatever Polymer Laboratories had done was prior art to what we were doing, that we were going beyond where Polymer Labs was." Tr. Tr. 4:127. Pitcher testified that the named inventors "didn't have any communications with any other set [of inventors] on the subject of making of the invention," Tr. Tr. 4123, and that he did not know about the ongoing communications between Lloyd (of Polymer Labs) and Rounds of Purdue. Tr. Tr. 4:128. The only knowledge he had of Lloyd was from the prior art references. Tr. Tr. 4:128.

The named inventors provided patent counsel with the documents they considered to be the most pertinent prior art to the claimed inventions. However, Regnier, whom Pitcher worked with the least, never disclosed the extent to which Warner and/or Lloyd had worked with Purdue. Among the materials provided, counsel received and reviewed information concerning 1000°A and 4000°A pore size particles manufactured by Polymer Labs. Tr. Tr. 4:124. For purposes of working on the case, Pitcher assumed that the PL 1000°A and 4000°A materials and Lloyd references were prior art. Tr. Tr.

4:125. He knew that Rounds had generated the chromatograms used in the patent in early 1988 at Purdue, Tr. Tr. 4:143, and understood that was significant in determining whether Purdue had rights in the "invention."

Based on the information made available to him by applicants, Pitcher believed that no one other than the named inventors made an inventive contribution to the claimed subject matter of the Perfusion Patents. Tr. Tr. 4:141.

At the time the application was filed, in July 1989, counsel believed that Afeyan, Dean and Regnier were inventors, but performed no independent investigation to determine whether anyone at Polymer Labs should be named as a joint inventor.

### XVII. *The 1990 Lloyd Publication*

In 1990, Afeyan became aware of a paper describing PL–SAX 4000A materials written by Warner and Lloyd and published in the *Journal of Chromatography.* Tr. Tr. 2:20; Tr. Ex. 31. The publication was first presented by Warner and Lloyd in November 1989, at the same scientific meeting that Afeyan made an oral presentation describing his work on perfusion chromatography. Tr. Tr. 2:20. The 1990 Polymer Labs paper reported some data concerning the use of PL–SAX 4000 that were similar to the results reported in PerSeptive's patent Tr. Tr. 2:21. Lloyd and Warner again explained that they had developed a rigid macroporous polymer with a 4000A pore size that provides a "high performance matrix for macromolecule HPLC separations." Tr. Ex. 31. He disagreed with their understanding of the reason for the improved separation as "an apparent increase in the diffusion coefficiency." The Lloyd paper also reported plate height data for AMP, a small molecule, which was inconsistent with Afeyan's experiments. Tr. Tr. 2:21–22; Tr. Ex. 31 at 372. Afeyan was therefore convinced that Warner and Lloyd did not understand the mechanism which made the high speed separations of proteins so successful. Tr. Tr. 2:23–24; Tr. Ex. 31 at 371.

### XVIII. *The Prosecution History*

#### a. The Application

In its application for the '270 patent, PerSeptive disclosed that perfusion chromatography could be performed using both the Polymer Labs 1000°A and 4000°A media. Tr. Ex. 1 at col. 22; Tr. Ex. 637 at 49.

The applications submitted to the PTO included prior art references authored by Lloyd, Warner and other Polymer scientists concerning PL–SAX 1000A and 4000A. Tr. Ex. 32 at 115–18; Tr. Tr. 1:84–85. These included the following publications: Lloyd, et al., "Affinity and Ion Exchange Chromatographic Supports for High Performance Biological Separations." (Sept. 15–18, 1987) Tr. Ex. 23; Lloyd, *et al.*, "Polymeric Anion Exchange Columns for the HPLC Analysis of Large Biological Solutes (Proteins)" (Feb. 22–26, 1988) Tr. Ex. 267; McConville, "Influence of Pore Size/Ionic Capacity on the Separation of Small and Large Biomolecules When Using Polymeric Anion Exchange Media" (undated) Tr. Ex. 24; and "High Performance Columns and Media for Today's Life Scientist" (1989) *Id.;* Tr. Tr. 4:125–26. The Polymer Labs publications are listed as references on the patents themselves. Tr. Ex. 1, 2 and 3. The publications dated prior to 1989 disclosed the use of PL–SAX 4000A at linear velocities of 360 cm/hr. (1 ml/min.) and 720 cm/hr. (2 ml/min.).[6] Tr. Ex. 23–26, 713.

The Polymer Labs particles are shown in the SEMs depicted in Figures 4A through C of the perfusion patents, and Polymer Labs particles were used to produce the chromatograms in Figures 10 through 20 and 22. Tr. Ex. 1.

The application (and ultimately the specification of the perfusion patents) states that "[o]ne source of particles suitable for the practice for perfusion chromatography is

---

**6.** The claims of the Perfusion Patents describe the fluid flow rates used to perform separations in terms of a superficial bed velocity, expressed in cm/hr. Operating conditions expressed in a volumetric rate, usually ml/min. can be convert-

ed to linear velocity by dividing by the cross-sectional area of the column bed and correcting the time units. Therefore, 1.0 ml/min. in a 4.6 mm. ID column is equal to 360 cm/hr. linear velocity.

POLYMER LABORATORIES (PL) of Shropshire, England," although it adds that Polymer Labs particles "are by no means optimal for perfusion chromatography." Tr. Ex. 637 at 48–49; Tr. Ex. 1. PerSeptive also stated in the application that Polymer Labs 4000°A particles perfuse at flow rates above 300 cm/hr and have throughpores. Tr. Ex. 1, col. 12, lines 48–54; col. 18, lines 4–12.

At the time PerSeptive filed its initial application, the *only* perfusive particles known of or tested by PerSeptive came from Polymer Labs. Tr. Tr. 2:37–38. Similarly, the only perfusive media that Regnier knew of or had tested at Purdue were the Polymer Labs materials. D. Tr. 283 (Regnier, July 22, 1994); D. Tr. 898–900 (Regnier, August 18, 1994).

PerSeptive inaccurately told the PTO that Polymer Labs 4000 particles "were produced in an ongoing effort initiated by Regnier to increase intraparticle diffusion of large solubles such as proteins by increasing pore size." Tr. Ex. 637 at 49. In fact, Polymer Labs had been producing the 4000°A material (PLRP–S) since 1987 (and the 4000°A PL–Gel ten years earlier) and *Linda Lloyd* had made the decision to experiment with the PEI coating on the 4000°A particles, using the methods she had been taught by Roungs with respect to the 1000°A materials in 1987. D. Tr. 65–74 (Warner, May 16, 1995). The "making of the invention" section is misleading because it fails to disclose the close relationship between Regnier's lab and Polymer Labs. In the section "Making of the Invention", Pitcher inaccurately stated: "[Regnier's] interest in protein separations led him to suggest to PL that they should manufacture a material with larger pore size."

Claim 20 of the application as filed covers Polymer Labs 4000°A particles, which none of the named inventors invented. Claim 20 in the original patent application was worded broadly enough to literally cover the Polymer Labs 4000°A particles. Tr. Tr. 5:161–162; Tr. Ex. 637 at 74. Thus, PerSeptive claimed in the patent application to be entitled to a patent on the particles made by Polymer Labs, which particles were the only perfusive particles known to the named inventors and

which the named inventors had not invented. Tr. Tr. at 2:37–38 and 2:40–41.

When Pitcher filed the original application with claim 20, he was aware that the named inventors had never actually made particles embodying their invention and that Polymer Labs was the only manufacturer of such particles. Tr. Tr. 5:197–198 (Pitcher).

Nevertheless, Pitcher drafted, the named inventors signed, and PerSeptive submitted to the PTO the Declarations of Afeyan, Regnier, and Dean, which all stated: "I do not know and do not believe that the subject matter of this application was ever known or used in the United States before my invention . . . ." Tr. Ex. 637 at 81–85. As a basis for its patent application and as "data demonstrating the properties of perfusion chromatography systems," Tr. Ex. 1, col. 8, l. 67–68, PerSeptive included the chromatograms Rounds generated in January 1988 using PL–SAX 4000°A particles run at 1 ml/min (360 cm/hr), 2 ml/min (720 cm/hr), and 4 ml/min (1440 cm/hr). *Compare* Tr. Ex. 1, Fig. 10 and col. 23, l. 3–24 *with* Rounds' chromatograms, Tr. Ex. 55; D. Tr. 75 (Regnier, July 21, 1994).

Figures 10, 11, 12, 13, 16 and 17 of the perfusion patents, all of which figures are represented to be embodiments of the perfusion invention, were done by Rounds at Purdue in January 1988. Tr. Tr. 3:30–31; Tr. Ex. 637 at 225. At the time the figures were included in the patent application, Afeyan wrote: "I have reviewed the figures we included in the perfusion patent"; "Figures 10, 11, 12, 13, 14, 16, and 17 were provided by Fred Regnier from Purdue University." Tr. Tr. at 3:31. The other figures (15, 18, 19, 20, 21 and 22) were performed at PerSeptive based on experiments during November 1988. Tr. Ex. 711. PerSeptive did not disclose to the PTO that these chromatograms had been generated by Rounds at Purdue in early 1988. Tr. Tr. 3:37. In addition, although it did cite other Polymer Labs publications, PerSeptive did not cite as prior art to the PTO a Polymer Labs publication (Lloyd III) showing an oligoribonucleotide separation using PL–SAX 4000 at a flow rate of 2 ml/min. (*i.e.,* 720 cm/hr) that had been presented by Lloyd and Warner on March

23–25, 1988. Tr. Ex. 488 at 313525 and 313532. This publication is referenced in Dean's October 28, 1988 analysis on flow through macroporous particles ("From Lloyd & Warner PP412 3/88 4000°A, 10 cm"). Tr. Ex. 41 at 307821.

### b. First Office Action

On July 26, 1990, in the first office action on the application which led to the '270 patent, the Patent Examiner rejected all of the claims based on various prior art references. Tr. Ex. 637 at 147–151. Among the prior art references relied on by the Examiner was a published article by M.A. Rounds et al., *Journal of Chromatography*, Vol. 397, pgs. 25–38 (1987) ("*Rounds*"); Tr. Ex. 637 at 148. According to the Examiner, PerSeptive's proposed claims were obvious from *Rounds* because "at best the claims differ from Rounds, Lloyd (1987); Lloyd (1988); and "High Performance Columns . . . A Polymer Laboratories Publication" in reciting use of [a flow velocity of] 400 cm/hr." Tr. Ex. 637 at 149. He also rejected the claims as being obvious based on two Lloyd publications. Lloyd et al.: *International Conference on Separations For Biotechnology*, September 15–18, 1987 ("Lloyd I"), and *39th Pittsburgh Conference And Exposition On Analytical Chemistry And Applied Spectroscopy*, Feb. 22–26, 1988 ("Lloyd II"). Tr. Ex. 637 at 148–150; Tr. Ex. 449 and 478. Lloyd I and II disclose various chromatographic separations of biological molecules using chromatographic materials manufactured by Polymer Labs, including PL–SAX 4000°A particles. Tr. Ex. 449 and 478.

In the first office action, the Examiner also rejected the claims in view of an article in *Biochromatography*, Jan./Feb.1989. Tr. Ex. 637 at 148; Tr. Ex. 548, 549. This publication described the June 19–24, 1988 oral presentation of Regnier at the HPLC meeting in Washington, D.C. Tr. Ex. 549 at S–006419. The article reported that, at the presentation, Regnier "demonstrated very fast protein separations . . . on 10μlm 4000°A polymeric materials under high flow conditions" and "postulated that the wide-open structure of these materials allows mobile phase flow within pores and eliminates stagnant pools." Tr. Ex. 549 at S–006419. The article does not mention any other explanation offered by Regnier at the conference.

Afeyan had learned about the *Biochromatography* article in early 1989, before the filing of the initial application. Tr. Tr. 4:74–75. After reading the portion of the article referring to Regnier's talk, Afeyan wrote a note to PerSeptive's president which stated, "TLL! We need to face up to Fred's ego! I think our patent is still okay, but not for long." Tr. Ex. 548; Tr. Tr. at 3:21. "TLL!" refers to Terry Loucks, then the president of PerSeptive. Tr. Tr. 3:149.

### c. PerSeptive's Response to First Office Action

In response to the first office action, Pitcher amended the claims "to clarify that the structure of the matrix material must comprise throughpores." Tr. Ex. 637 at 153–156 and 160. The inventors argued:

"More specifically, not one of the cited references (fn. omitted) either directly or inherently disclose that any of the chromatography media they disclose have, or for any reason should be modified to have, structural features of the type recited in the claims. Not one of the cited references suggest that a chromatography particle should have throughpores, or that throughpores are desirable."

Tr. Ex. 637 at 160.

In response to the Examiner's rejection, PerSeptive urged the patentability of the method claims over *Rounds* by arguing that the chromatography materials disclosed in *Rounds* could not be made to perfuse at the flow rate disclosed (360 cm/hr) in the article. Tr. Ex. 637 at 163–164. This statement is incorrect. The flow rate disclosed by *Rounds* is not 360 cm/hr, but 454 cm/hr, a velocity that, is within the perfusive range described in the '270 patent. Tr. Ex. 1 at col. 9, ll. 40–42.

In response to the Examiner's rejection of the claims over Lloyd I and II, PerSeptive similarly argued that "[t]he only chromatographic separations disclosed by [Lloyd I were] conducted at 180 cm/hr, a velocity far

below the perfusive range for any particle currently known." Tr. Ex. 637 at 164. PerSeptive further stated that Lloyd II was "essentially duplicative" of Lloyd I. Tr. Ex. 637 at 165. These statements were false because Lloyd II discloses flow rates of up to 4 ml/min (or 1444 cm/hr) using Polymer Labs particles and further states that "[m]inimal loss of resolution is experienced at high flow rates 4.0 ml/min with the optimum flow rate being 1.5 ml/min.". Tr. Ex. 478 at PL003993.

In response to the Examiner's rejection of PerSeptive's patent application in light of the 1988 presentation at the HPLC conference and the description of it in the January 1989 *Biochromatography* article, PerSeptive submitted an unsigned Rule 131 Declaration of Afeyan, Regnier and Dean. Tr. Ex. 637 at 202–205. This Declaration was submitted to demonstrate that the invention was made *prior* to the date of the January 1989 *Biochromatography* publication (to eliminate the publication as prior art under 35 U.S.C. § 102(a)) but *after* the date of the June 1988 presentation (so that the presentation could not, therefore, have been prior art because it could not have disclosed the invention). Essentially, the inventors claimed that the date of invention was before January 1, 1989, but after Regnier's presentation on June 22, 1988. Pitcher understood June 22, 1988 was significant because the examiner believed that an oral presentation at a scientific meeting was prior art which would preclude patentability. Pitcher disagreed with this legal conclusion. *See also* Tr. Tr. 5:39; 5:199–200; 5:205–206; and 5:214–215; Tr. Tr. 3:34–35. Specifically, PerSeptive represented to the PTO that: (1) "[a]t the time the [HPLC conference] oral presentation was made, the invention had not been made" because the named inventors were not aware that "any experimental PL particles had throughpores" and (2) "applicants made their invention prior to the earliest possible time this [the *Biochromatography*] reference could have been made available to the public." Tr. Ex. 637 at 166.

d. The September 27, 1990 Office Action

2. In the second office action, the Examiner again rejected PerSeptive's claims based on *Rounds,* Lloyd I, Lloyd II, the *Biochromatography* article and Regnier's June, 1988 HPLC presentation. Tr. Ex. 637 at 209–215. With respect to PerSeptive's comments about *Rounds,* the Examiner, noting the significance of *Rounds,* stated:

> The remarks urge that *Rounds* (Journal of Chromatography) lacks the proper flow rate based upon one example of *Rounds* ... being 360 cm/hr. However, this is substantially the 400 cm/hr of page 22, line 9 of the specification required for perfusion.

*Id.* at 212–213.

The Examiner stated his view that the June, 1988 oral presentation of Regnier was prior art. "Since the presentation was made to an HPLC meeting, it became ... known to those people skilled in the chromatography art. As such, the Regnier oral presentation is prior art." Tr. Ex. 637 at 214.

As to the Rule 131 Declaration, the Examiner stated it was insufficient to support the date of the invention. ("The Declaration is not considered to be effective because it lacks data and is not signed"). *Id.* at 213–214.

e. PerSeptive's December 1990 Response

After the September 27, 1990 office action, Pitcher and Afeyan personally interviewed the Examiner and discussed the claims, the unsigned Rule 131 Declaration, and the prior art. Tr. Ex. 637 at 216. According to the Examiner's Interview Summary Record, adding a limitation requiring that the Peclet number be greater than 1 was discussed. *Id.* With respect to the (unsigned) Rule 131 Declaration, the Summary Record also states that PerSeptive will be submitting "more data." *Id.*

Subsequently, in an Amendment filed in December 1990, PerSeptive amended all of the method claims to specify that the method for performing perfusion chromatography produced "a Peclet number in a said throughpore greater than 1.0." Tr. Ex. 637 at 240–248. In the remarks accompanying the Amendment, PerSeptive claimed that the amendments were in response to the suggestion that such limitations would render the

claims patentable over the prior art. *Id.* at 249.

As to the oral presentation of Regnier in June 1988, and in response to the Examiner's inquiry, PerSeptive stated that it had confirmed with Regnier that the presentation "was *not* accompanied by a poster, abstract, or writing of any kind," and, thus, was not prior art. Tr. Ex. 637 at 250.

This statement was false because an abstract had been distributed at the presentation, Tr. Ex. 502 at 1; D. Tr. 515–516 (Regnier, July 25, 1994), and because slides with the chromatographies performed by Rounds at Purdue and submitted with the Rule 131 declaration in the '270 prosecution had been presented. D. Tr. 888–889 (Regnier, August 18, 1994).[7]

f. The Signed Rule 131 Declaration

In December, 1990, a revised, signed Rule 131 Declaration was also submitted to support the assertion that the date of invention was after June, 1988 and before January, 1989. Tr. Tr. 3:22–23; Tr. Ex. 637 at 225–230. Pitcher and all the named co-inventors knew that the June 22, 1988 date of Regnier's Washington, D.C. presentation was important to the Examiner. Tr. Tr. 5:39. The Rule 131 Declaration was intended to address both the June 22, 1988 and January 1, 1989 dates. Tr. Tr. 5:205–206; *see also* D. Tr. 138 (Afeyan, October 12, 1994).

The revised Declaration attached as Exhibits B and C original chromatograms, including five chromatograms performed by Rounds at Purdue in January and February 1988 on Polymer Labs 4000°A particles. Tr. Tr. 2:103–104; Tr. Ex. 637 at 233–236. In the Rule 131 Declaration, the named inventors represented to the PTO that the five chromatograms were evidence of reduction to practice and embodiments of the claimed

perfusion chromatography method. Tr. Tr. 2:103–106; Tr. Ex. 637 at 225–227.

The dates on the chromatograms submitted to the PTO were redacted by Pitcher. Tr. Tr. 5:37; 2:110. As a result, the Examiner had no way to know that, although the named inventors were representing that the invention was made between June 22, 1988 and January 1, 1989, the embodiments and evidence of actual reduction to practice of the invention were dated in January and February 1988.

The submission of the five chromatograms as evidence of reduction to practice was misleading. PerSeptive redacted the dates which would have disclosed that the experiments were performed well before June, 1988. Tr. Tr. 3:36–37. Furthermore, PerSeptive did not tell the Examiner that these very chromatograms had been publicly presented by Regnier at the June, 1988 HPLC conference. D. Tr. 886–887 (Regnier, August 18, 1994); Tr. Tr. 3:37.

Pitcher explained that the redaction of the dates on Rounds' chromatograms was in accordance with PTO practice, specifically, the Manual of Patent Examining Procedure ("MPEP"). Tr. Tr. 5:38–43; Tr. Ex. 120. Section 715.07 of the MPEP discusses the removal of dates on an exhibit when a patent applicant is "alleging that conception or a reduction to practice occurred *prior* to the effective date of the reference." Tr. Ex. 120, MPEP § 715.07 at 700–136. The MPEP does not address the unusual situation when a patent applicant is representing to the PTO that an invention was made *between* two dates. Tr. Tr. 5:207–208.

In the Rule 131 Declaration, PerSeptive also represented that "[n]one of us was aware as of the date of Dr. Regnier's 1988 Washington, D.C. presentation that any PL chromatography material had throughpores." Tr. Ex. 637 at 228. This representation was

7. During the prosecution of the '989 patent, PerSeptive submitted an Information Disclosure Statement ("IDS"). One reference provided with this IDS was the abstract submitted in advance of the June, 1988 presentation by Regnier. Tr. Ex. 60 at 113. In the IDS, PerSeptive disclosed for the first time that Regnier presented slides at the HPLC conference showing chromatograms obtained using "a 4000°A packing mate-

rial" at flow rates as high as 4.0 ml/min. Tr. Ex. 60 at 113. PerSeptive, however, did not disclose that the chromatograms shown on the slides were the same chromatograms by Rounds which had been submitted to the PTO with the Rule 131 Declaration as "embodiments" and "evidence of actual reduction to practice" of perfusion chromatography. *Compare* Tr. Ex. 55 *with* Tr. Ex. 33 at 233–235; 226–227.

false. Regnier had already concluded that Polymer Labs 4000°A particles had through-pores. Specifically, Regnier had written a memorandum, dated before April 1, 1988, in which he stated that the Polymer Labs 4000°A media "have pores that go completely through the particle." Tr. Ex. 491 at 306124. Dean noted on his copy that "through porosity permits perfusion." *Id. See also* Tr. Tr. 9:177. Similarly, a document dated February 25, 1988 authored by Dean includes a section entitled "MASS TRANSFER," which states: "There also is the issue of perfusion *through* the sorbent particle . . . ." Tr. Ex. 479. Afeyan saw this document before June 1988. Tr. Tr. 3:56. In a March business plan, PerSeptive stated it already had performed purification runs "proving the rapid kinetics *through* the macropores." Tr. Ex. 480 at 330596 (emphasis added). On June 6, 1988, Dean authored a document graphically depicting "internal flow" through the 4000°A particles and computing velocity of liquids flowing through pores. Tr. Ex. 519 at 30849–307850. Regnier himself had reported that in June 1988, he had "claimed to have flow through the pores . . ." Tr. Ex. 656 at 331285.

On June 20, 1988 Dean drafted an invention disclosure addressed to Afeyan, Regnier and Pitcher stating that "of course, the assumption is that the pores in the particles pass entirely through the particles, *i.e.* they are not blind passages. Regnier's data for PL100[0] and PL400[0]DVB support particles indicate that the pores do connect through the particles." Tr. Ex. 689 at 368128; Tr. Tr. 3:46–47. It also states that "Dean's analysis show that under certain, practical conditions, perfusion velocities within the particle could exceed the diffusion velocities for large protein molecules by several times, depending upon pore size, pressure gradient on the column and protein molecule size." Tr. Ex. 689 at 368128. It further states "that [t]here are flow paths associated with the particle: around the particle and through the particle." *Id.* The disclosure was "read and understood" by Pitcher on June 21, 1988. Tr. Ex. 689 at 368130.

In the Rule 131 Declaration, Afeyan, Dean and Regnier represented to the PTO that, in making the claimed invention, they "*observed directly* that the [Polymer Labs] particles . . . had throughpores." Tr. Ex. 637 at 225–226 (emphasis added). This representation was also false. Dean admitted at trial that: "I have never and I never heard of anybody else devising direct indication that there are channels through the [Polymer Labs] particles." Tr. Tr. 6:64.

PerSeptive further alleged that nothing Regnier stated at the HPLC conference would enable a person skilled in the art to understand the claimed invention. Trial. Exhibit 637 at 251. This statement was also false because according to Regnier, "[a]nyone could obtain one of these commercial columns from [Polymer Labs] and duplicate our results in a few hours after this presentation." Tr. Ex. 611 at 333385. Tr. Ex. 611 was never provided to the PTO. At the HPLC conference, Regnier had identified the supplier of the media (Polymer Labs), Tr. Tr. 9:147, and had shown slides which revealed the flow rate, column within, and solutes separated in the Rounds chromatograms. D. Tr. 518 (Regnier, July 25, 1995); Tr. Ex. 55.

After this amendment, the application was allowed and the '270 patent issued on May 28, 1991. Tr. Ex. 1.

## XIX. *Conflict with Polymer Labs*

On January 31, 1990, Warner visited PerSeptive's offices in Boston. D. Tr. 129, 132 (Warner, May 16, 1995). He met with Afeyan, Loucks and Fulton and was told for the first time that PerSeptive was attempting to patent "perfusion" chromatography. D. Tr. 132–133 (Warner, May 16, 1995); Tr. Tr. 3:72. PerSeptive advised Warner that it would no longer purchase particles from Polymer Labs and would seek to enforce the perfusion patent(s) against Polymer Labs if it sold the particles to anyone other than PerSeptive. D. Tr. 134 (Warner, May 16, 1995). Warner testified that "that was a little bit of a bombshell for me, having been told that the patent had not been applied for by Noubar earlier." *Id.*

After being presented with these facts, PerSeptive delivered to Warner a proposed

termsheet with two options. Tr. Ex. 582 at PL002524. "Option A" was for PerSeptive "to add PL to the competitor list" in which case PerSeptive would sue Polymer Labs for infringement and prevent Polymer Labs from selling its PL–SAX products. *Id.;* D. Tr. 133–137 (Warner, May 16, 1995). "Option B" was that Polymer Labs accept royalty payments from PerSeptive at an amount determined by PerSeptive. Tr. Ex. 582 at PL002524. At the meeting, Warner "turned to Scott Fulton and said, 'how can you work with these liars.'" D. Tr. 133 (Warner, May 16, 1995).

Warner subsequently wrote PerSeptive a letter rejecting both options and refusing to continue a business relationship with PerSeptive. Tr. Ex. 585. In the letter, Warner wrote that neither he nor Polymer Labs were prepared "to further develop [a] business relationship" given "the threat of the perfusion patent and your 'Option A' being thrown at us." Tr. Ex. 585; D. Tr. 138–140 (Warner, May 16, 1995).

As a follow-up to their meeting, on February 23, 1990, Warner wrote to Loucks, asking for 5% of warrants in PerSeptive "which will . . . compensate PL for its *right* to 50% of the perfusion technology." Tr. Ex. 283.

On September 13, 1990, Afeyan wrote to Warner giving formal notice of termination of the supply agreement between Polymer Labs and PerSeptive. Tr. Ex. 593.

## XX. *Purdue Investigates Its Ownership in the Perfusion Patents*

Bill Baitinger of the Office of Patents and Copyrights at Purdue University contacted Regnier at some point prior to April 1991, in an effort to determine whether the work leading to the perfusion patent(s) had been done at Purdue and whether Purdue had any ownership interest in the perfusion patents. Tr. Tr. 8:97–98; 8:99–100; D. Tr. 89–92 (Regnier, July 21, 1994). Regnier reviewed Rounds' research notebooks and discovered improprieties in the way she maintained them. Tr. Tr. 8:106. Regnier knew that, if the invention had been made at Purdue, Purdue would have an ownership interest in it.

Tr. Tr. 9:86. Because Rounds and Regnier were employed by Purdue and neither had day formal relationship with Synosys up until June 1988, at the earliest, any invention that was made before June 1988 by Regnier, in Regnier's lab or by Rounds, would belong to Purdue. Tr. Tr. 9:78–79.

On April 29, 1991, Regnier wrote Purdue "Your memorandum notes that Frank Warner stated there was a collaboration between us. A collaboration involves an exchange of information and usually some agreement that there is collaboration. At no time did we ever obtain any information, ideas or concepts, from PL, even while our research was sponsored by them." In that memorandum, Regnier represented that the perfusion patents were "in a different field than my laboratory had ever worked" and that the invention had been developed at PerSeptive and "not Purdue." Tr. Ex. 604 at 301305 and 301308; D. Tr. 92, 97 (Regnier, July 21, 1994). Regnier also wrote that "perfusion chromatography was conceived and developed at PerSeptive Biosystems, not Purdue. There is nothing in the research records that would indicate otherwise." Tr. Ex. 604 at 301308. Regnier also told Purdue that at the time of the June 1988 HPLC conference, "no one at that time had any notion of perfusion chromatography, or that it was possible." Tr. Ex. 604 at 301307.

Regnier's statements to Purdue in Trial Exhibit 604 were intentionally false because PerSeptive's patent application contained chromatograms produced in Regnier's lab at Purdue. D. Tr. 98 (Regnier, July 21, 1994). And, at the June 1988 HPLC conference, Regnier had used the term "perfusion." Tr. Tr. 9:149. Pitcher never told Baitinger that Rounds' chromatograms, performed at Purdue, had been represented to the PTO as evidence of an actual reduction to practice of an embodiment of the claimed invention. Tr. Tr. 10:117–18.

In August 1991, Regnier drafted a memorandum to Baitinger regarding the origins of the perfusion patent(s). Tr. Ex. 611. It was sent on August 13, 1991 to PerSeptive's lawyers, Leslie Davis and Pitcher. *Id.;* Tr. Tr. 2:121–123; Tr. Tr. 10:64–66. The draft letter to Baitinger states:

*Anyone could obtain one of these commercial columns from PL and duplicate our results in a few hours after this presentation.* It was not a secret that the very high porosity "4000°A" material from PL and probably similar materials from E. Merck, Rohm and Haas, Corning and a myriad of other companies had the potential to be operated at high speed.

The question was why these materials had this remarkable property. What made some materials equilibrate rapidly while others did not? Why would the PL 4000 material work at high speed and the PL 1000 not. What would you have to do in a manufacturing process to make a high speed material? Why was every lot of PL and Merck packing materials not equally efficacious in high speed separations? How could you make high speed chromatographic materials reproducibly? Until the mechanism for this high speed separation process was known none of these questions could be answered.

Approximately one year later, in June of 1989, PerSeptive Biosystems could answer these questions and solved the problem. They filed a patent in which they described and claimed the fundamental principles of "perfusion chromatography" and elaborated on the pore geometry and fluid mechanics necessary to achieve perfusion.

(Emphasis added). Tr. Ex. all at 333385–333386. The final version sent to Baitinger omits this statement and substitutes the opposite instead:

This phenomenon was not reproducible at will with all macroporous PL materials either before or as a result of our reports.

Tr. Ex. 296 at P000005. This statement was false and misleading.

Furthermore, Regnier's draft letter does not deny that some of the work to develop the invention took place at Purdue. Tr. Ex. 611. The final version, on the other hand, sent to Baitinger affirmatively states that: "My contributions to the invention were not made at Purdue" and "[t]he conception of the invention and its reduction to practice occurred in Cambridge, Massachusetts." Tr. Ex. 296 at P000007. This is intentionally false because the reduction to practice occurred at Purdue—the chromatograms.

Purdue relied upon Regnier's memorandum to conclude that the invention was not done at Purdue and therefore Purdue had no interest in the claimed invention(s). Tr. Ex. 620.

### XXI. *Polymer Labs Litigation*

On August 7, 1991, Polymer Labs, through its counsel, wrote to Pitcher. Tr. Ex. 609. In that letter, Polymer Labs asserted that the '270 patent was invalid in light of its prior written publications describing perfusion of biological macromolecules using PL–SAX 4000°A media. Tr. Ex. 609 at 301365. Thus, Polymer Labs asserted that its work anticipated the invention claimed in the '270 patent under 35 U.S.C. § 102. Polymer Labs also asserted that much of the work described in the '270 patent was carried out in Dr. Regnier's Laboratory by others at Purdue University. *Id.* Finally, Polymer Labs asserted that the patent was unenforceable as a result of material false statements to the PTO by PerSeptive. *Id.*

On September 5, 1991, Polymer Labs commenced a declaratory judgment action seeking a determination that the '270 patent was invalid and unenforceable. Polymer Labs did not contend that its employees were joint inventors. Tr. Ex. 613. PerSeptive, through Pitcher, responded by stating that PerSeptive had "found no acts of Polymer Labs in the United States which constitute infringement." Tr. Ex. 614. As a result of PerSeptive's representation that there was no case or controversy between the parties, Polymer Labs voluntarily withdrew its declaratory judgment action. Tr. Ex. 617.

Polymer Labs also withdrew from the conflict because it felt it could not bear the cost, in expense and time, of litigation. D. Tr. 150–151 (Warner, May 16, 1995). Polymer Labs withdrew PL–SAX 4000°A particles from the United States market because it did not want to enter into an expensive controversy with respect to PerSeptive's '270 patent. D. Tr. 149–150 (Warner, May 16, 1995).

Polymer Labs and Rounds have not sought to commence an interference proceeding in

the Patent Office relating to the inventions. Polymer Labs and Rounds have not brought an inventorship challenge under 35 U.S.C. § 256. Although Polymer Labs, Warner, Lloyd and Rounds have been provided notice of the Court's January 9, 1996 Memorandum and Order, and all have had an opportunity to intervene to assert any rights, they have chosen not to do so. Moreover, they did not provide live testimony at the evidentiary hearing.

## DISCUSSION

### I. *The Standard*

The issue currently before the Court is whether PerSeptive should be permitted to correct its patents under 35 U.S.C. § 256. It is well-established under both the express terms of section 256 and the relevant case law that to correct erroneous non-joinder of inventors on a patent, the error resulting in the non-joinder must be made without deceptive intent. *See, e.g., Paradigm Sales, Inc. v. Weber Marking Systems, Inc.,* 880 F.Supp. 1242, 1244 (N.D.Ind.1994); *Eldon Indus., Inc. v. Rubbermaid, Inc.,* 735 F.Supp. 786, 817 n. 16 (N.D.Ill.1990); *Manildra Mill. Corp. v. Ogilvie Mills, Inc.,* 1990 WL 136169 (D.Kan.1990). A good faith or inadvertent error in the naming of the inventor does not render a patent invalid. *Checkpoint Systems v. U.S. Int'l Trade Comm'n,* 54 F.3d 756, 763 (Fed.Cir.1995). Absent deceptive intent in the misdesignation of inventors, an error may be corrected before or after issuance of a patent. *Id.*

Under either § 116 or § 256,[8] the challenging party must initially prove by clear and convincing evidence that the patents contain improper inventorship, as the defendants have already done here. *See Garrett Corp. v. United States,* 190 Ct.Cl. 858, 422 F.2d 874, 880 (1970) *(per curiam ), cert. denied,* 400 U.S. 951, 91 S.Ct. 242, 27 L.Ed.2d 257 (1970); *Paradigm Sales,* 880 F.Supp. at 1244; *Indecor, Inc. v. Fox–Wells & Co., Inc.,* 642

F.Supp. 1473, 1490 (S.D.N.Y.1986). However, once this initial burden is met, the named inventors may decide to correct their patent by moving the Court to include the missing inventors because the omission was without deceptive intent on their part. *See Paradigm Sales,* 880 F.Supp. at 1244 ("Deceptive intent relates to improper inventorship only if and when the patent's owner attempts to remedy the mistake."). If the patent is not corrected, it is invalid due to improper joinder. *See* 35 U.S.C. § 256.

While the law is well-settled to this point in the process, the courts are split on the proper burden of proof for the element of deceptive intent in a correction motion pursuant to § 256. The Federal Circuit, which has appellate jurisdiction over cases involving patent infringement, 28 U.S.C. §§ 1292(c), 1295, has not decided this issue, and the Court finds little guidance in determining an appropriate standard from the patent law treatises. Defendants urge the Court to put the burden of proof on the named inventors to prove the absence of deceptive intent by clear and convincing evidence. The named inventors argue either that the plaintiffs are required to prove deceptive intent by clear and convincing evidence or, if they bear the burden, it is proof by a preponderance of the evidence.

One court has held, without discussion, that the party moving for correction must prove that the omission was without deceptive intent by "clear and convincing evidence." *Manildra Milling Corp. v. Ogilvie Mills, Inc.,* 783 F.Supp. 1288, 1290 (D.Kan. 1990) (citing *Hamilton Cosco, Inc. v. Century Prods., Inc.,* 305 F.Supp. 1271, 1272 (N.D.Ohio 1969)), *aff'd in part, vacated in part,* 1 F.3d 1253 (Fed.Cir.1993) (unpublished) (remanding for further consideration of inventorship without addressing clear and convincing standard of proof by trial court).

Other courts hold that the burden of proof on the issue of deceptive intent under 35 U.S.C. § 256 is a negative burden on the party moving for correction for proof by a

---

8. 35 U.S.C. § 116 concerns correcting inventorship of a patent application, and 35 U.S.C. § 256 concerns correcting inventorship of an issued patent. *Stark v. Advanced Magnetics, Inc.,* 29 F.3d 1570, 1573 (Fed.Cir.1994); *see also* 37 C.F.R. § 1.48 (providing procedure in patent office for correction of inventorship in patent application); 37 C.F.R. § 1.324 (providing procedure in patent office for correction of inventorship in issued patent).

preponderance of the evidence. *United States v. Telectronics, Inc.*, 658 F.Supp. 579, 592 (D.Colo.1987); *accord In re Searles*, 57 C.C.P.A. 912, 422 F.2d 431, 437 (Cust. & Pat.App.1970) ("Even absent a specific allegation of joint invention, it would be enough if the preponderance of the evidence submitted pointed in the direction of joint inventorship, so long as the existence of error without deceptive intention is satisfactorily demonstrated."); *Eldon Indus.*, 735 F.Supp. at 817 n. 16 (N.D.Ill.1990) ("When § 256 is invoked to correct errors in an existing patent, the burden of proving 'without deceptive intention' is on the named inventor."); *Paradigm Sales, Inc.*, 880 F.Supp. at 1244 ("[Defendant's] burden in asserting the affirmative defense [of improper joinder] would *only* be to prove by clear and convincing evidence that the patent contains improper inventorship.") (emphasis added); *id.* ("[T]he issue of deceptive intent becomes material if, after [alleged infringer] proves that the patent is defective for improper inventorship, [the named inventor] attempts to have the inventorship changed. At that point, the burden would shift to [the named inventor] to prove that the inventors were improperly named without deceptive intent."); *Consolidated Aluminum Corp. v. Foseco Int'l Ltd.*, 10 U.S.P.Q.2d 1143, 1171, 1988 WL 391250 (N.D.Ill.1988) ("The party seeking to change inventorship bears the burden of showing that the Court should order the change. The burden of proof necessary to convert ownership is a preponderance of the evidence, as long as there is true existence of error without deceptive invention.").

The Court is persuaded that a requiring the named inventors to prove a lack of deceptive intent by a preponderance of the evidence is the correct burden of proof under § 256 for a number of reasons.

First and most importantly, the weight of the authority appears to favor a preponderance of the evidence standard on the party moving for correction. *See e.g., Telectronics*, 658 F.Supp. at 592; *In re Searles*, 422 F.2d at 437; *Eldon Indus.*, 735 F.Supp. at 817 n. 16; *Paradigm Sales*, 880 F.Supp. at 1244;

*Consolidated Aluminum Corp.*, 10 U.S.P.Q.2d at 1171, 1988 WL 391250.

Second, a preponderance of the evidence standard comports with Congress' intent in enacting the statute imposing a requirement of clear and convincing evidence better than the named inventors. The Federal Circuit has determined that Congress intended that § 116 and § 256 should be given a liberal construction in favor of applicants. *See Coleman v. Dines*, 754 F.2d 353, 359 (Fed.Cir. 1985); *see also In re Schmidt*, 48 C.C.P.A. 1140, 293 F.2d 274, 278–79 (Cust.&Pat.App. 1961). However, the Federal Circuit also construed the legislative history as indicating that the PTO "must be assured of the presence of innocent error ... before permitting a substitution of a true inventor's name." *Coleman*, 754 F.2d at 359 (citing H. Rep. No. 542, 97th Cong., 2d Sess. 9, reprinted in 1982 U.S. Code Cong. & Ad. News 773 (comments to Pub.L. No. 97–247 amending 35 U.S.C. § 116)). A requirement that the alleged infringers must prove misjoinder by clear and convincing evidence and then shifting the burden to the named inventors to prove by a preponderance that the omission was not deceptive serves both of these goals.

Finally, by proving misjoinder by clear and convincing evidence, the defendants have met the requirement of 35 U.S.C. § 282 that invalidity must be proved by the challenging party by clear and convincing evidence. *See Innovative Scuba Concepts v. Feder Indus.*, 26 F.3d 1112, 1115 (Fed.Cir.1994) (citing *Hybritech, Inc. v. Monoclonal Antibodies, Inc.*, 802 F.2d 1367, 1376 (Fed.Cir.1986), *cert. denied*, 480 U.S. 947, 107 S.Ct. 1606, 94 L.Ed.2d 792 (1987)); *cf. LaBounty Mfg., Inc. v. U.S. Int'l Trade Comm'n*, 958 F.2d 1066, 1070 (Fed.Cir.1992) (holding that claims for "inequitable conduct," which arise when applicants or their attorneys breach their duty of candor to the patent office, must be proved by challenging party by clear and convincing evidence); *see also* Gregory E. Upchurch, *Intellectual Property Litigation Guide: Patents and Trade Secrets* § 15.08[1] n. 20 (1995) (collecting cases). Once this burden is met, the patent is invalid unless and until the named inventors successfully correct the omission; the defen-

dants need do no more to defeat the plaintiffs' infringement claims.

For these reasons, the Court will require the plaintiffs to prove the absence of deceptive intent by a preponderance of the evidence standard before correction will be allowed under Section 256.

An intent to deceive may be inferred from the patentee's overall conduct and from circumstantial evidence. *Gambro Lundia AB v. Baxter Healthcare Corp.*, 896 F.Supp. 1522, 1546 (D.Colo.1995). One factor a court may consider is the named inventors' conduct toward the omitted inventors, including a lack of candor. *Checkpoint*, 54 F.3d at 763 (pointing to the fact that "[the unnamed] inventor's inquiries regarding the filing of a patent application in his name were dodged by Checkpoint, for some purpose unknown to us, possibly because [the unnamed inventor] was under no obligation to assign his invention to Checkpoint.")

The failure of others to claim inventorship at the time of the original inventors' publication is evidence permitting an inference that the others' positions as inventors are not sustainable. *Consolidated Aluminum Corp.*, 10 U.S.P.Q.2d at 1172. On the other hand, an inventor has no duty to file a patent application. *Checkpoint*, 54 F.3d at 763.

With this framework in mind, I turn to the evidence.

## II. *Evidence Supporting Deceptive Intent*

Although they do not bear the burden of proof on the ultimate issue in a Section 256 proceeding, defendants have provided clear and convincing evidence of several intentional misrepresentations by the named inventors, in particular, the following significant, material ones:

### A. *Misrepresentations to the Patent Office Regarding The Role of Polymer Labs*

The named inventors intentionally misrepresented their role in developing the perfusive particle, and intentionally underplayed the role of Polymer Laboratories. In the Patent Application for Perfusive Chromatog-

raphy, the named inventors stated: *"One* source of particles suitable for practice for perfusion chromatography is POLYMER LABORATORIES (PL) of Shropshire, England" (emphasis added). This is only partly true because as of July 6, 1989, the *only* perfusive particles known to or tested by PerSeptive were the Polymer Labs chromatographic media. (Tr. Tr. 2:37–38). However, the more serious misrepresentation followed.

After pointing out that Polymer Labs produced and marketed media particles with a particle-mean pore diameter of 1000 and 4000 angstroms, the named inventors went to say:

> One type of PL particle, said to be useful for reverse phase chromatography is an untreated polystyrene divinylbenzene (PSDVB). Its interactive surfaces are hydrophobic polymer surfaces which interact with the hydrophobic patches on proteins. A second type of particle has interactive surface elements derivatized with polyethyleneimine and act as a cationic surface useful for anionic exchange. *Both types of particles were produced in an ongoing effort initiated by F.E. Regnier to increase intraparticle diffusion of large solutes such as proteins by increasing pore size.* These particles were used by the inventors named herein in the initial discoveries of the perfusive chromatography domain.

Tr. Ex. 637 at 49 (emphasis added). The underlined statement is untrue. The applicants later stated: "[Dr. Regnier's] interest in protein separations led him to suggest to PL that they should manufacture with large pore size." Tr. Ex. 627 at 160. This is also untrue.

The evidence demonstrates that Polymer Labs had produced the 1000 and 4000 angstrom particle without any input from Regnier. Dep. Tr. 618–19 (Regnier, July 25, 1994). As Dean said himself in his comments on the application: "I was not aware that Fred 'directed' PL's *particle* fabrication effort." Tr. Ex. 315 at 368167 (emphasis in original). The change from "directed" to "initiated" is a cosmetic response to Dean's comment, and does not change the thrust of the misrepresentation. While Mary Ann Rounds in Regnier's laboratory assisted Polymer Labs in

preparing the coating for the base material, it was Polymer Labs which took the initiative to derivatize the larger pore 4000 angstrom material with the coating to investigate and improve the separation of large biomolecules, like protein—an area in which she presented three papers. There is no credible evidence in the record that Regnier initiated any ongoing effort at Purdue to increase intraparticle diffusion by increasing pore size or encouraged Polymer Labs to do so. Similarly, the applicants misstate that *they* discovered that "certain of the PL supplied materials produced outstanding separations at extraordinarily high flow rates." *Id.* at 460. This was discovered by Lloyd and Rounds, working under Regnier's supervision at Purdue Labs in December 1987 and January 1988.

The named inventors had a motive to exaggerate their role in the development of the perfusive particle because claim 20 of the original application literally covered the PL–SAX 4000 angstrom particle. Tr. Ex. 637 at 73.[9] Essentially, the named inventors were trying to purloin the property rights in the Polymer Labs perfusive particle.

Further, while it is not clear what Pitcher, Dean and Afeyan knew—and when they knew it—about the early days of the relationship between Polymer Labs and Purdue Labs, at the very least, named inventor Regnier intentionally did not disclose the extensive collaboration between Rounds and Lloyd to the PTO. I specifically do not credit his testimony that he was unaware of, and did not authorize, the ongoing collaboration between the two women. The contemporaneous documentation militates otherwise. Not only did he encourage their joint work— before Synosys was interested in the particle as a priority focus—but he suggested that

they co-author a paper on the 4000 angstrom packing material. D. Tr. 91–92 (Rounds, April 7, 1995); Tr. Ex. 464. His interest in a collaboration evaporated after his loyalties shifted from Purdue to Synosys. By August, 1988, although "categorically" denying to Warner that he ever knowingly used either the ideas or data of Linda Lloyd, he was fully aware that the collaboration between Rounds and Lloyd had continued well into 1988, and that Warner was accusing him of "intellectual theft" because of Regnier's presentation at the Washington conference in June, 1988. Tr. Ex. 512.

Also, the named inventors did not disclose to the PTO the ongoing exchange of data concerning pore volume and structure between Warner and McConville of Polymer Labs and Synosys which were useful to Dean in his fluid dynamics modelling work, Tr. Tr. 6:112–13, and of the dynamic capacity data which were demanded by to Afeyan who was trying (unsuccessfully [10]) to explain certain batch-to-batch variations in the Polymer Labs particles. The named inventors minimize the usefulness of the data received from Polymer Labs in explaining why the macroporous particle revolutionized the separations of biomolecules, and claim Polymer Labs provided them only with technical "quality control data" which was readily available to Polymer Labs customers. (Tr. Tr. 2:68).

Nonetheless, the continuing documented interchange of significant "quality control" information between Polymer Labs and Synosys was directly used in the experimental and theoretical analyses of the materials as well as the improvement of those materials, for example in packing them. (Tr. Ex. 534). The description of Polymer Labs in the application to the PTO as simply "a source" of the perfusive particles—just as one would dis-

9. Pitcher explained his justification for claiming the Polymer Labs particle as follows: "They were not prior art because they were unwittingly produced, unknowingly produced, and is far as I was aware, Polymer Laboratories knew neither the nature the internal geometry nor the properties which flowed from that geometry and they made them quite by accident from time to time." Tr. 5:162. This statement shows a profound misunderstanding of the factual basis for the development of the particle as well as the law.

10. During the Summary Judgment motions, the submissions raised the possibility that certain Polymer Labs particles perfused, while others didn't. The record supports a finding that there was some batch-to-batch variation. However, there was no evidence that the cause for it was the morphology of the parties opposed to the column, the coating, or something else. In any event, there is no evidence that any of the batches of Polymer Labs 4000 angstrom particles did not perfuse because of failure to meet the specifications of the patent.

miss the sandman as the source of sand for a child's sandbox—omits material facts concerning Polymer Labs true role in developing the particle in tandem with Synosys.

The named inventors' deliberate minimization of the contribution of Polymer Labs is evidenced by a "smoking gun" document. Once again, it was Dean, cantankerous but candid, who recognized the contribution of Polymer Labs when he wrote to Afeyan and Pitcher on October 5, 1988: "I should think PL/Synosys could get a patent on the *structure of POROS re perfusion.*" (Tr. Ex. 712)(emphasis in original).

The named inventors insist that they did not disclose the ongoing relationship between Polymer Labs and Synosys because the named inventors were the ones to contribute a scientific explanation for a phenomenon. Invoking as his mantra, the long-established definition of invention as "the formation in the mind of the inventor of a definite and permanent idea of the complete and operative invention," *see Burroughs Wellcome Co. v. Barr Lab. Inc.*,[11] 40 F.3d 1223, 1228 (Fed. Cir.1994), *cert. denied,* 516 U.S. 1070, 116 S.Ct 771, 133 L.Ed.2d 724 (1996) (citation omitted), patent counsel Pitcher gave the legal justification for discounting Polymer Lab's inventive contribution by saying that Warner's and Lloyd's discovery of the efficiency of the 4000 angstrom particle in separating large biomolecules at unprecedented speeds was "unwitting" and "unknowing." (Tr. 4–4–141). However, it is black letter law that merely providing a scientific explanation for a phenomenon is not an invention, no matter how brilliant the explanation is. For example Herbert F. Schwartz, *Patent Law & Practice* (2d ed., Federal Judicial Center 1995) writes:

A *process* is a way to produce a result. For example, mixing A with B under conditions C to get D is a process. The inventor need not know why the process works. A patent is granted for discover-

ing and disclosing the process, not for the scientific theory behind it. No patent can be obtained for simply explaining the process, because ideas and theories are not patentable subject matter.

*Id.* at 49 (citing *Parker v. Flook,* 437 U.S. 584, 98 S.Ct. 2522, 57 L.Ed.2d 451 (1978)).

The information concerning Polymer Labs' contribution should have been disclosed to the Patent Examiner so that he could make an independent legal determination on the issue of joint inventorship. Instead, the information, which suggested that Polymer Labs was just "a source" of "raw materials," was misleading because it provided the patent examiner with only a red flag for the possible issue of prior art and obviousness—and obfuscated the threshold issue of inventorship. 37 C.F.R. § 1.56 (requiring submission of information which "refutes, or is inconsistent with, a position the applicant takes in ... opposing an argument of unpatentability relied on by the" PTO).

B. *Timing of the invention.*
   i. *Throughpores*

The named inventors knew that the timing of the invention had legal significance to ownership rights in the patent. Regnier told the PTO that the named inventors had not made the invention at the time of the June 1988 HPLC conference. Tr. Tr. 9:84. If the invention had been made before June 22, 1988, Purdue might have had an ownership interest in the patents. Tr. 9:86. Also, the patent examiner had focused on Regnier's presentation as creating potential prior art problems. *See* 35 U.S.C. § 102(b).

Further, the invention had to be made before January 1, 1989. The PTO rejected certain claims as unpatentable pursuant, to 35 U.S.C. § 103 (obviousness): "Regnier would appear to be available both because of its Jan/Feb 1989 publication date and because of a notation on the copy submitted by applicant that it was the subject of an oral

---

11. *Burroughs Wellcome* establishes: "Thus, the test for conception is whether the inventor had an idea that was definite and permanent enough that one skilled in the art could understand the invention; the inventor must prove his conception by corroborating evidence, preferably by showing a contemporaneous disclosure. An idea is definite and permanent when the inventor has a specific, settled idea, a particular solution to the problem at hand, not just a general goal or research plan he hopes to pursue." 40 F.3d at 1228.

presentation in a 1988 HPLC meeting in Washington, D.C." Tr. Ex. 637 at 148. The named inventors understood that the Patent Examiner believed that the invention postdated the oral presentation at the HPLC. Tr. Tr. 5–206.

The named inventors stated to the PTO:

The January/February 1989 report of an oral presentation of coinventor Regnier comprises an anecdotal observation of the properties of a particular batch of experimental PL material. *At the time the oral presentation was made, the invention had not been made. At that time neither Dr. Regnier nor the other inventors were aware, for example, that any experimental PL particles had throughpores* . . .

Tr. Ex. 637 at 166.

The underlined statement is an intentional misrepresentation. The documentary record provides overwhelming evidence that the inventors were "aware" that the particles had throughpores before June 22, 1988. Tr. Ex. 210; 479; 480; 491; 519; 558; 656; 689. The named inventors attempt to explain the inconsistency by claiming that the term "throughpore" in the Rule 131 Declaration and the patent itself has a narrow definition limited to a pore that transects the particle and permits convection to dominate diffusion. Tr. Tr. 2:34–35; 9:156.

I do not find this *post hoc* explanation credible for several reasons. First, while the claims in the patent have certain limitations, the term throughpore is not specifically defined in the patent or application. Second, the depositions of the named inventors do not contain such a limiting definition, but rather suggests that the term "throughpores" was loosely used to mean "through channels" or "pores that transected". Tr. Tr. 7:8. Pitcher similarly believed that the term "throughpore" was expansive and included a "transecting pore that would permit some flow but that would not permit enough to have convection dominate over diffusion". Pitcher

did not believe that the named inventors discovered that the particles had throughpores "no matter how you define them" until after June, 1988. Tr. Tr. 10–82. That broad usage is consistent with PerSeptive's own trade literature, describing POROS: "Transecting *throughpores* are large enough to have some convective flow through the packing itself". Tr. Ex. 637 at 175 (italics in original).

Third, even if the limited definition of throughpore were applicable, Dean's fluid dynamics formulas, developed in June, are premised on a throughpore where convection dominates diffusion. Tr. Ex. 519, 689. While Afeyan's plate height and dynamic capacity experiments in the late fall may provide additional corroboration for Regnier's and Dean's scientific explanation of the success of the Polymer Labs PL–SAX 4000A material, they were not legally necessary to the conception that the Polymer Labs particles had throughpores with certain characteristics.[12] *See Burroughs Wellcome*, 40 F.3d at 1228 (rejecting argument that without experimental confirmation, the conception of the invention is not sufficiently definite and permanent).

Also, although Afeyan had some concern about batch-to-batch variability in the performance of Polymer Labs Particles, PerSeptives had no scientific basis for the statement to the PTO that "some but not all" Polymer Labs particles had throughpores. Tr. Ex. 637 at 162, 225. There was minimal, if any, evidence that any lots of PL–4000 packing materials could not be used at high speeds to obtain high resolution. Tr. Tr. 9:182. Indeed the Synosys business plan dated June 1988 states that POROS media "is ready for market introduction in pilot-scale process development applications during the summer 1988." Tr. Ex. 497 at 300077. This undercuts any argument that concerns about batch-to-batch variability were significant.

12. All the named inventors concede that even today there is no certainty that the particles have throughpores. Without a "magic school bus" to ride the interior, it is unlikely that certainty can be achieved as the photographs (like SEM s and

TEM's) do not reveal the interior geography of the pores. However, the named inventors were fully aware that throughpores were the likely explanation for the successful separations before June 1988.

ii. · *The Rounds Chromatograms.*

A closer question arises from the redaction of the dates on the chromatograms generated by Rounds at Purdue Labs in January and February 1988 on Polymer Labs particles. They were submitted as Exhibits B and C of the Rule 131 Declaration as embodiments of the invention and actual reduction to practice. Patent counsel redacted the dates on the chromatograms, explaining that this is authorized by the MPEP which authorizes redaction of dates in situations where the Declaration is designed to get prior to date. Tr. Tr. 207–208. Defendants argue that this was designed to conceal the fact that the invention pre-dated June 22, 1988, and that the duty of candor in the Manual of Patent Examining Procedure ("MPEP") § 2001 requires disclosure of the date when a representation is made that an invention occurred between two dates.

While the MPEP may actually authorize the redaction of dates in certain situations, the stronger argument is that the duty of candor imposed on the named inventors the obligation to disclose to the patent examiner that the very chromatograms which constitute actual reduction of practice were generated prior to the date on which the named inventors claim the invention was made. While reduction to practice can follow conception, *Mahurkar v. C.R. Bard, Inc.,* 79 F.3d 1572, 1578 (Fed.Cir.1996), or be simultaneous with it, *Amgen, Inc. v. Chugai Pharmaceutical Co.,* 927 F.2d 1200, 1206 (Fed.Cir. 1991), there is no case support for patent counsel's somewhat novel argument that a reduction to practice of an invention can pre-exist the conception of the invention.

iii. *June 1988 HPLC Conference*

Regnier intentionally or recklessly misrepresented to the PTO that the June 1988 HPLC Conference was not accompanied by "a poster, abstract, or writing of any kind."

The chronology is important here. On June 5, 1990, the PTO rejected all of the method claims in the original patent application, partly because of the oral presentation at the 1988 HPLC meeting in Washington D.C. Tr. Ex. 637 at 148–149. In response, the named inventors claimed that "at the time the oral presentation was made, the invention had not been made", and alternatively that:

> An oral disclosure of an invention by a coinventor, even if enabling, never has been held to constitute prior art under any section of 35 USC 102. 35 USC 102(b) requires that the invention be patented or described in a *printed publication* more than one year prior to the filing date.

Tr. Ex. 637 at 166–167 (emphasis in original). When the examiner rejected the method claims again, the named inventors submitted a signed Rule 131 Declaration which stated: "As the Examiner requested, the undersigned attorney has confirmed with coinventor Fred Regnier that his brief talk at the 1988 Washington D.C. Chromatography Meeting was *not* accompanied by a poster, abstract, or writing of any kind." Tr. Ex. 637 at 250. In fact, Regnier showed slides at the meeting and prepared an abstract which was distributed at the conference. The slides included the chromatograms that Rounds ran in December of 1987 and early 1988. Tr. Tr. 8:74–77; Tr. Ex. 502, 55. I do not credit Regnier's explanation that he forgot about the abstract and slides. He either intentionally failed to disclose the written materials or recklessly failed to use due diligence to ascertain the truth about information which was so clearly a focus of the Patent Examiner as a key factor in patentability.

C. *Misrepresentation to Purdue*

In the April 29, 1991, memorandum to Bill Baitinger of the Purdue Research Foundation, Regnier wrote that the patent application concerning perfusion chromatography was in a "different field than my laboratory has ever worked." This is patently incorrect in light of the fact that the application and patent included chromatograms produced in Regnier's laboratory in January–February 1988. It is also inconsistent with the Synosys business plan which states that the PO-ROS media had "been developed primarily at Professor Regnier's laboratories." Tr. Ex. 497 at 300077. This misrepresentation was also included in Regnier's October 1991 memorandum to Purdue where he stated

that "the conception of the invention and the reduction to practice occurred in Cambridge, Massachusetts". Tr. Ex. 619. The chromatograms run by Rounds at Purdue were submitted to the PTO as reduction to practice. The purpose of these misrepresentations was to thwart inquiries from Purdue regarding any ownership interests in the patent, prompted by a visit by Warner to Purdue. Regnier also misrepresented in the April 29, 1991, memorandum to Purdue that there was no collaboration between Purdue and Polymer Labs. He knew that there was collaboration between Rounds and Lloyd in exchanging information and ideas concerning the separations breakthrough at least through early 1988.

### D. *Misrepresentation to Polymer Labs.*

At the June 1988 HPLC conference, Regnier mentioned that certain chromatography technologies were "in the process of being patented." D. Tr. 118 (Warner, May 16, 1995). Warner specifically asked Afeyan whether there was anything patentable about "flow through chromatography". Warner explained: "Because I wanted to make sure that there was nothing that was being patented without PL's input into that, because a lot of this work had a lot of collaboration between Mary Rounds and Polymer Laboratories, and I wanted to make sure that we were not left out in the cold." D. Tr. 119 (Warner, May 16, 1995). Afeyan replied "that we didn't think" there was anything patentable about flow through chromatography, as opposed to coating technology. Although the focus at that point was still on "chocking particles," this was not candid in light of the intensity of the communications concerning developing and patenting an invention involving packing media—not just coatings—just that month.

### III. *The Other Side of the Story*

On the other side of the ledger, three factors weigh in favor of a finding of lack of deceptive intent: the named inventors' outstanding professional backgrounds; reliance on the opinion of experienced counsel; and the silence of Polymer Labs.

First, both Regnier and Dean have impeccable scientific credentials and are leaders in their areas of scientific expertise, separations chromatography and fluid mechanics respectively. They both have numerous other patents. Therefore the obvious question must be why they would risk their reputation by seeking a patent on someone else's method or product.

The answer, I believe, lies in the financial pressure of starting a new company. The founders of Synosys had hoped to develop an improved hardware system for more efficient downstream processing (the company's initial focus) and then shifted their intellectual abilities to developing a better packing media by understanding the internal dynamic (i.e. the domination of convection over diffusion in throughpores) of the Polymer Labs particles. However, development of "popcorn" particles became unnecessary once Afeyan realized in November 1988 that the Polymer Labs particles were already bimodal. The "blocking" or "chocking" particle concept also was a dead end. As a result, the named inventors had a motive to claim exclusive rights in a separations method which they knew was developed in substantial part at Purdue during a collaboration with Polymer Labs.

The second factor that cuts in favor of PerSeptive is that the named inventors sought out the legal advice of Mr. Edmund Pitcher who had over twenty years of experience in the patent bar, and is the head of a patent department in a major law firm. While this court, in ruling on the motion for summary judgment, arrived at a conclusion different from Mr. Pitcher's concerning the law of joint inventorship, that, without more, does not suggest that Mr. Pitcher had a deceptive intent when he prepared the patent application. However, in preparing the patent application, Pitcher was exceedingly deferential to the named inventors, given their impressive credentials (Tr. Tr. 4:121) did not do his own prior art search; relied almost exclusively on Afeyan and had minimal interaction with Regnier and Dean; and was in a big rush to complete the application on extremely complex and technical materials in one month, by July 6, 1989 because of an upcoming board of directors meeting. Tr.

Tr. 4:117–8. In light of this deference and hasty timetable, I find that Mr. Pitcher did not reasonably investigate the chronology of the development of perfusion chromatography, or the role of Polymer Labs. Tr. Tr. 4:126–30. This failure to investigate the inventive contributions of Polymer Labs, as a potential joint inventor, is particularly significant in light of Dean's October 5, 1988 memorandum to him entitled "Patenting Poros" and suggesting a patent jointly owned by Polymer Labs and Synosys. Tr. Ex. 712.

Pitcher had certain fundamental factual misunderstandings. For example, he testified: "It's possible there could be more than one set of inventors. The ones that I represent didn't have any communication with any other set on the subject of the making of the invention." Tr. Tr. 4:127. Similarly, he had "no knowledge that Linda Lloyd knew Mary Ann Rounds" or any knowledge about the relationship between the Purdue Lab and Polymer Labs, Tr. Tr. 4:128, and believed Polymer Labs "was essentially not in the chromatography business." Tr. Tr. 4:144. He described Polymer Labs as "the manufacturers of a raw material that was used by the inventors to make an invention." Tr. Tr. 5:11. He also concedes he "arbitrarily" chose the date January 1, 1989 as the date Polymer Labs made its 4000°A material publicly available by issuing a commercial brochure. Tr. 5:32. That turned out not to be true in light of Warner's undisputed testimony it was commercially available by June, 1988, more than one year before the application was filed. See 35 U.S.C. § 102.

And, regardless of the ultimate legal conclusion on joint inventorship, I find problematic under the duty of candor Pitcher's failure to disclose to the PTO that the chromatograms which are the embodiment and reduction to practice were run four to five months prior to the period during which the named inventors were representing to the PTO the invention was made. I also find extremely problematic under the duty of candor Pitcher's initial claim 20 in the application which adumbrates the exact particle manufactured by Polymer Labs.

Thus counsel's factual and legal conclusion that Polymer Labs was only "a source" for the particles, and not a joint inventor with ownership rights, has less weight on the scales.

Finally, I must give great weight to the fact that despite receiving notice, Polymer Labs, through Warner or Lloyd, has not asserted any ownership rights to the patent either in the PTO or this proceeding. The poignant silence of Polymer Labs is not conclusive however (except perhaps on the issue of estoppel). It did file a declaratory judgment action challenging the '270 patent as invalid and unenforceable, which was resolved when Pitcher responded by stating that PerSeptive found no acts of Polymer Labs in the United States which constitute infringement. Tr. Ex. 613, 614. Polymer Labs was a small company with little economic incentive to fight a pyrrhic battle over ownership in a patent once PerSeptive declared a truce. Also, while Polymer Labs maintained litigation silence, Warner was personally vocal in his criticism of Regnier and Synosys.

Warner verbally accused Regnier of intellectual theft and Synosys as unethical in presenting him with Option A, and even went to Purdue to complain about Regnier's patenting of a method developed at a Purdue laboratory.

IV. *The Scales*

In weighing the clear and convincing documentary evidence presented by defendants demonstrating a pattern of misrepresentations to the PTO, Purdue and Polymer Labs, and the credibility of the witnesses, I conclude that PerSeptive has not made the scales tip albeit slightly in its favor in demonstrating absence of deceptive intent pursuant to 35 U.S.C. § 256. It has also not demonstrated that nonjoinder was through error.

**ORDER**

The court orders that PerSeptive's motion to correct inventorship is *DENIED.*